No. 25-4673

_____

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*

*v.*

LETITIA JAMES,

*Defendant-Appellee.*

_____

On Appeal from the United States District Court
for the Eastern District of Virginia, Case No. 2:25-cr-00122
The Honorable Cameron McGown Currie (sitting by designation)

_____

## RESPONSE BRIEF OF DEFENDANT-APPELLEE LETITIA JAMES

_____

Abbe David Lowell
LOWELL & ASSOCIATES, PLLC
1250 H Street NW, Suite 250
Washington, DC 20005
Tel: 202-964-6110
Fax: 202-964-6116
ALowellpublicoutreach@lowellandassociates.com

*Counsel for Defendant-Appellee Letitia James*

_____

# TABLE OF CONTENTS

Page

INTRODUCTION ....................................................................................1

STATEMENT OF THE ISSUES.............................................................3

STATEMENT OF THE CASE.................................................................4

    A.    Legal Background ................................................................4

    B.    Factual Background.............................................................7

    C.    Proceedings Below .............................................................8

SUMMARY OF THE ARGUMENT .....................................................10

ARGUMENT ........................................................................................16

I.     MS. HALLIGAN'S APPOINTMENT AS INTERIM U.S.
      ATTORNEY VIOLATED SECTION 546 ...............................16

    A.    The text and structure of Section 546 impose a clear limit on
          the duration of the Attorney General's interim appointment
          authority....................................................................................16

    B.    Statutory history confirms that the Attorney General's interim
          appointment authority expires after 120 days ...................27

    C.    The government's reliance on "historical practice" is unavailing.....30

II.    MS. HALLIGAN'S IMPROPER APPOINTMENT ALSO
      VIOLATED THE APPOINTMENTS CLAUSE .........................36

III.   DISMISAL OF THE INDICTMENT WAS THE APPROPRIATE
      REMEDY ................................................................................38

    A.    Ms. Bondi could not retroactively appoint Ms. Halligan to
          positions she never held ...................................................38

    B.    The de facto officer doctrine is inapplicable.....................42

    C.    Ms. Bondi's attempt to "ratify" the void indictment had no
          effect ................................................................................43

    D.    The unlawful appointment of Ms. Halligan was not harmless
          error ................................................................................45

CONCLUSION......................................................................................47

REQUEST FOR ORAL ARGUMENT .................................................47

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank of Nova Scotia v. United States*,
    487 U.S. 250 (1988)................................................................ 15, 16, 45, 46

*Bates v. United States*,
    522 U.S. 23 (1997)....................................................................................23

*Boumediene v. Bush*,
    553 U.S. 723 (2008)..................................................................................36

*CFPB v. All Am. Check Cashing, Inc.*,
    33 F.4th 218 (5th Cir. 2022) .....................................................................42

*CFPB v. Seila L. LLC*,
    997 F.3d 837 (9th Cir. 2021) ....................................................................44

*Collins v. Yellen*,
    594 U.S. 220 (2021)..................................................................................42

*Dames & Moore v. Regan*,
    453 U.S. 654 (1981)..................................................................................31

*Dean v. United States*,
    556 U.S. 568 (2009)..................................................................................23

*Edmond v. United States*,
    520 U.S. 651 (1997)....................................................................................4

*EPA v. Calumet Shreveport Ref., L.L.C.*,
    605 U.S. 627 (2025)........................................................................... 11, 22

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
    545 U.S. 546 (2005)..................................................................................29

*Gun Owners of Am., Inc. v. Garland*,
    19 F.4th 890 (6th Cir. 2021) .....................................................................44

*In re Grand Jury Proceedings December 4, 2025*,
    No. 2:25-ms-17 (E.D. Va. Dec. 5, 2025) .................................................10

*Loper Bright Enterprises v. Raimondo*,
    603 U.S. 369 (2024)..................................................................................32

*Lucia v. SEC*,
    585 U.S. 237 (2018)......................................................................... 4, 14, 42

ii

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Medellín v. Texas*,
　552 U.S. 491 (2008) ................................................................31

*Muldrow v. City of St. Louis*,
　601 U.S. 346 (2024) ...............................................................22

*Myers v. United States*,
　272 U.S. 52 (1926) ...................................................................4

*Neaderland v. Comm'r*,
　424 F.2d 639 (2d Cir. 1970) ............................................. 14, 44

*Newman v. Schiff*,
　778 F.2d 460 (8th Cir. 1985) ................................................45

*Nguyen v. United States*,
　539 U.S. 69 (2003) ........................................................ 14, 15, 43

*NLRB v. SW Gen., Inc.*,
　580 U.S. 288 (2017) ........................................................ 29, 31

*Ross v. Blake*,
　578 U.S. 632 (2016) ........................................................ 12, 28

*Ryder v. United States*,
　515 U.S. 177 (1995) ........................................................ 14, 42

*Salomon-Guillen v. Garland*,
　123 F.4th 709 (4th Cir. 2024) .......................................... 25, 26, 27

*Trump v. United States*,
　603 U.S. 593 (2024) ...............................................................37

*TRW Inc. v. Andrews*,
　534 U.S. 19 (2001) ......................................................... 21, 22

*United States v. Bennett*,
　464 F. App'x 183 (4th Cir. 2012) ........................................13

*United States v. Bolton*,
　893 F.2d 894 (7th Cir. 1990). .............................................45

*United States v. Comey*,
　No. 1:25-cr-272 (E.D. Va. Oct 21, 2025) ..............................9

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Davila*,
569 U.S. 597 (2013) .................................................................. 15, 45

*United States v. Durham*,
941 F.2d 886 (9th Cir. 1991) ...............................................13

*United States v. Garcia-Andrade*,
2013 WL 4027859 (S.D. Cal. Aug. 6, 2013) ......................... 13, 42

*United States v. Germaine*,
99 U.S. 508 (1879) ....................................................................4

*United States v. Giordano*,
416 U.S. 505 (1974) ...............................................................18

*United Sates v. Giraud*,
2025 WL 2416737 (D.N.J. Aug. 21, 2025) ......................... 24, 27, 28

*United States v. Haidley*,
400 F.3d 642 (8th Cir. 2005) ................................................ 15, 46

*United States v. James*,
No. 1:25-dm-13 (E.D. Va. Dec. 15, 2025) ..........................10

*United States v. Kelley*,
404 F. Supp. 3d 447 (D. Mass. 2019) ................................. 41, 42

*United States v. Morton*,
467 U.S. 822 (1984) ...............................................................19

*United States v. Oakland Cannabis Buyers' Cooperative*,
532 U.S. 483 (2001) ...............................................................35

*United States v. Sotomayor Vazquez*,
69 F. Supp. 2d 286 (D.P.R. 1999) ................................. 2, 22, 34, 43

*United States v. Thompson*,
287 F.3d 1244 (10th Cir. 2002) ........................................ 15, 45

*United States v. Trump*,
740 F. Supp. 3d 1245 (S.D. Fla. 2024) ............................. 14, 37

*Wille v. Lutnick*,
158 F.4th 539 (4th Cir. 2025) ........................................ 43, 44

iv

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Wille v. Raimondo*,
   2024 WL 2832599 (D. Md. June 3, 2024)...........................................................44

**Constitutional Provisions, Statutes, and Regulations**

5 U.S.C. § 3345(a) ...............................................................................5

5 U.S.C. § 3346..............................................................................5, 25

8 C.F.R. § 1003.1(a)(1) ......................................................................26

8 C.F.R. § 1003.1(a)(4) (2022) ...................................................... 26, 27

28 U.S.C. § 292(a) ..............................................................................43

28 U.S.C. § 541 .......................................................................... *passim*

28 U.S.C. § 545 ...................................................................................20

28 U.S.C. § 546 .......................................................................... *passim*

Act of Mar. 3, 1863, ch. 93, § 2, 12 Stat. 768.......................................6

Federal Vacancies Reform Act. ................................................... 5, 6, 25

Judiciary Act of 1789, 1 Stat. 73 § 35 ................................................5

Pub. L. No. 109–77, Title V, § 502, 120 Stat. 192, 246 (2006) ........................ 6, 28

Pub. L. No. 110–34, § 2, 121 Stat. 224 (2007)...................................6, 28

Pub. L. No. 89–554, § 4(c), 80 Stat. 618 (1966)...............................6, 35

Pub. L. No. 99–646, § 69, 100 Stat. 3616-17 (1986)................................6

U.S. Const. Amend. 14, § 3 ................................................................20

U.S. Const. Art. II, § 2, cl. 2 .......................................................... *passim*

**Other Authorities**

153 Cong. Rec. S3250 (March 19, 2007) ............................................29

153 Cong. Rec. S3298 (March 20, 2007) ............................................30

A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts*
   (2012) ............................................................................... *passim*

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Definition of Vacancy for the Purpose of Interim Appointment of United States Attorneys pursuant to 28 U.S.C. 546, as amended*, Office of Legal Counsel (Nov. 13, 1986) ................................................................................32

Fed. R. Crim. P. 1(b) ................................................................. 2, 39

Fed. R. Crim. P. 52(a) ...................................................................15

Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527 (1947) .................................................28

Henry B. Hogue, Cong. Rsch. Serv., RS21412, *Temporarily Filling Presidentially Appointed, Senate-Confirmed Positions* (Jan. 25, 2008) ....................................31

James A. Heilpern, *Interim United States Attorneys*, 28 Geo. Mason L. Rev. 187 (2020) ......................................5

Samuel L. Bray, *The Mischief Rule*, 109 Geo. L.J. 967 (2021) ..............................................28

The Federalist No. 76 (A. Hamilton) (C. Rossiter ed. 1961) ............................................................1

## JURISDICTIONAL STATEMENT

The government appeals the district court's dismissal of the indictment against New York Attorney General Letitia James. The district court had jurisdiction under 18 U.S.C. § 3231 and dismissed the indictment on November 24, 2025. J.A. 307-308. The government appealed on December 19, 2025. J.A. 309. This Court has jurisdiction under 18 U.S.C. § 3731.

**INTRODUCTION**

Since George Washington's first term, Congress has required the Executive Branch to obtain the advice and consent of the Senate to appoint U.S. Attorneys. This confirmation process has served as more than a procedural formality. Consistent with the Framers' vision, it has imposed "an excellent check upon a spirit of favoritism in the President" and a guard against "the appointment of unfit characters . . . from family connection, from personal attachment, or from a view to popularity.'" The Federalist No. 76, p. 457 (C. Rossiter ed. 1961) (A. Hamilton).

In attempting to justify the defective appointment of Lindsey Halligan, however, the government advances a radical theory that would upend this centuries-old framework. The government argues that the Attorney General can erase the Senate's role in the appointments process by naming "interim" U.S. Attorneys to an unlimited succession of 120-day terms. But this boundless interpretation of the Attorney General's power is contrary to the Appointments Clause and at odds with the text, structure, and history of the statutes that govern U.S. Attorney appointments.

Though the government accuses the district court's ruling of "aggrandiz[ing] the district court's appointment authority at the expense of the Executive Branch's," Gov't. Br. 2, the government's real issue is with the textual limitations imposed by Congress. As the district court recognized, 28 U.S.C. § 546 "is unambiguous."

1

J.A. 291.    The statute provides that when a U.S. Attorney's office is vacant, the Attorney General may select an interim U.S. Attorney for a total of 120 days.  After that window expires, the district court—and only the district court—may "appoint a United States attorney to serve until the vacancy is filled."  *Id.* § 546(d).

By shifting appointment authority to the district court after 120 days, Congress "provid[ed] an incentive for the President to exercise his statutory power under 28 U.S.C. § 541" to appoint U.S. Attorneys with the advice and consent of the Senate.  *United States v. Sotomayor Vazquez*, 69 F. Supp. 2d 286, 295 (D.P.R. 1999), *aff'd*, 249 F.3d 1 (1st Cir. 2001).  The purported appointment of Ms. Halligan, which occurred 244 days after the Attorney General first invoked Section 546, was an unlawful attempt to circumvent this carefully crafted scheme.

The district court correctly concluded that dismissal of the indictment was the only appropriate remedy for Ms. Halligan's invalid appointment.  Though the government seeks to obscure the relevant inquiry, all parties agree that any "attorney authorized by law" to act "as a prosecutor" can present a case to a grand jury or sign an indictment.  Fed. R. Crim. P. 1(b)(1)(D); *see* Gov't Br. 14.  The problem is that when Ms. Halligan presented this case to the grand jury and signed the indictment—*entirely on her own*—she was not a government prosecutor.  Her only purported appointment, which was unauthorized and unconstitutional, conferred no authority to litigate on behalf of the United States.

2

The government attempts to whitewash the indictment's fatal defect by pointing to alternative, lawful paths that U.S. Attorney General Pamela Bondi "could have" taken to install Ms. Halligan as a Special Attorney or Assistant U.S. Attorney. Gov't Br. 54. But the Executive Branch cannot bend space and time to retroactively appoint Ms. Halligan to positions she never held. Nor can it ratify this illegitimate indictment or claim that Ms. Halligan, whose purported appointment plainly violated the Appointments Clause, was a "de facto" officer. Further, given that the government has tried and failed to reindict Ms. James on two separate occasions following the district court's disqualification of Ms. Halligan, there is no colorable argument that the invalid appointment of Ms. Halligan was harmless error. Absent Ms. Halligan's unlawful appointment, the indictment never would have issued. This Court should affirm the district court's dismissal.

## STATEMENT OF THE ISSUES

1. Whether Ms. Halligan's appointment as interim U.S. Attorney violated 28 U.S.C. § 546 and the Appointments Clause.

2. Whether the district court correctly dismissed the indictment based on Ms. Halligan's unlawful appointment.

3

## STATEMENT OF THE CASE

### A.    Legal Background

The Appointments Clause provides the exclusive process by which the President may appoint "Officers of the United States."  U.S. Const. Art. II, § 2, cl. 2.  "[F]or purposes of appointment," the Clause divides officers into two classes: principal officers and "inferior officers."  *United States v. Germaine*, 99 U.S. 508, 509 (1879).  Principal officers must be appointed by the President by and with the advice and consent of the Senate.  *See Edmond v. United States*, 520 U.S. 651, 660 (1997).  That process "is also the default manner of appointment for inferior officers," subject to a limited exception: Congress may "by Law" authorize the President, the head of an executive department, or a court of law to appoint inferior officers without the advice and consent of the Senate.  *Id.*

U.S. Attorneys are inferior officers.  *See Myers v. United States*, 272 U.S. 52, 159 (1926).  Accordingly, U.S. Attorneys must be appointed either (1) by the President with the advice and consent of the Senate, or (2) through a process that Congress has properly authorized "by Law."  An appointment that comports with neither pathway violates the Appointments Clause.  *See Lucia v. SEC*, 585 U.S. 237, 251 (2018).

U.S. Attorneys have always been appointed through the "default manner of appointment," *Edmond*, 520 U.S. at 660—by the President with the advice and

4

consent of the Senate. *See* Judiciary Act of 1789, 1 Stat. 73 § 35; James A. Heilpern, *Interim United States Attorneys*, 28 Geo. Mason L. Rev. 187, 190 (2020). This requirement is now codified in 28 U.S.C. § 541(a).

To minimize the disruption posed by a prolonged vacancy at a U.S. Attorney's office, however, Congress has provided the Executive Branch with two pathways to temporarily install U.S. Attorneys without Senate confirmation. First, under the Federal Vacancies Reform Act (FVRA), 5 U.S.C. § 3345 *et seq.*, the First Assistant U.S. Attorney at the time a vacancy arises automatically assumes the role of "acting" U.S. Attorney, *see id.* § 3345(a)(1). The FVRA allows the President to override that default by naming as acting U.S. Attorney a different senior-level DOJ employee or Senate-confirmed officer. *Id.* § 3345(a)(2), (3). Subject to a few exceptions, acting U.S. Attorneys under the FVRA may serve "for no longer than 210 days beginning on the date the vacancy occurs." *Id.* § 3346(a)(1).

Title 28 U.S.C. § 546 provides the Executive Branch a second option for temporarily installing U.S. Attorneys. Under Section 546, "the Attorney General may appoint a United States attorney for the district in which the office of United States attorney is vacant," *id.* § 546(a), and that "interim" U.S. Attorney may serve until either "(1) the qualification of a United States attorney for such district appointed by the President" and confirmed by the Senate, "or (2) the expiration of 120 days after appointment by the Attorney General under this section,"

5

*id.* § 546(c)(1), (2).  When an interim U.S. Attorney appointment expires after 120 days, "the district court for such district may appoint a United States attorney to serve until the vacancy is filled."  *Id.* § 546(d).  From 1863 to 1986, Congress vested the authority to appoint interim U.S. Attorneys in courts alone.  *See* Act of Mar. 3, 1863, ch. 93, § 2, 12 Stat. 768; Pub. L. No. 89–554, § 4(c), 80 Stat. 618 (1966).  It was not until 1986 that Congress gave the Attorney General a complementary role in appointing interim U.S. Attorneys, albeit for a limited period of 120 days.  Pub. L. No. 99–646, § 69, 100 Stat. 3616-17.

The 120-day restriction on the Attorney General's interim appointment authority under 28 U.S.C. § 546(c)(2), along with the 210-day limit on acting appointments under the FVRA, guarantees the role of Senate confirmation as the exclusive means for the Executive Branch to appoint full-term U.S. Attorneys.  In 2006, Congress lifted the 120-day limitation on interim U.S. Attorney appointments as part of the PATRIOT Act.  *See* Pub. L. No. 109–77, Title V, § 502, 120 Stat. 192, 246 (2006).  A little more than a year later, however, Congress amended the statute to reinstate the 120-day limitation.  *See* Pub. L. No. 110–34, § 2, 121 Stat. 224 (2007).  The express catalyst for the reversion was Congress's concern about "several instances where the Attorney General made successive interim appointments pursuant to section 546 of either the same or different individuals."  H.R. Rep. No. 110–58 at 6 (2007).  Section 546 has not changed since the 2007

6

amendment.

###### B.     Factual Background

On January 21, 2025, U.S. Attorney General Pamela Bondi appointed Erik Siebert as interim U.S. Attorney for the Eastern District of Virginia under 28 U.S.C. § 546.[1]   When Mr. Siebert's interim appointment expired after 120 days, *see* 28 U.S.C. § 546(c)(2), the district court judges of the Eastern District of Virginia exercised their appointment authority under Subsection 546(d) and unanimously decided to retain Mr. Siebert as interim U.S. Attorney.[2]

Approximately eight months into Mr. Siebert's tenure, he reportedly informed senior Justice Department officials that there was insufficient evidence to bring fraud charges against New York Attorney General Letitia James, a political opponent of President Trump's whose prosecution the President had long sought.[3]   Instead of accepting Mr. Siebert's determination and dropping the prosecution against Ms.

---

[1] Press Release: Erik Siebert appointed Interim U.S. Attorney for the Eastern District of Virginia, United States Attorney's Office for the Eastern District of Virginia (Jan. 21, 2025), https://perma.cc/SZ2Z-KQ6P.

[2] *In re Appointment of Erik S. Siebert as United States Attorney*, Order of Appointment, United States District Court for the Eastern District of Virginia (May 9, 2025), https://perma.cc/2UM3-LX2X.

[3] Salvador Rizzo et al., *Top Virginia prosecutor resigns amid criticism over Letitia James investigation*, Wash. Post (Sept. 20, 2025), https://www.washingtonpost.com/national-security/2025/09/19/trump-letitia-james-erik-siebert-virginia.

James, President Trump responded by pressuring Mr. Siebert to resign.[4]  Mr. Siebert

resigned on September 19, 2025.

One day later, President Trump posted a statement on social media urging Ms.

Bondi to prosecute Ms. James, and to appoint Lindsey Halligan as interim U.S.

Attorney for the Eastern District of Virginia, seemingly to carry out that order.[5]  Less

than 48 hours after President Trump's post, Ms. Bondi purported to appoint Ms.

Halligan as interim U.S. Attorney pursuant to 28 U.S.C. § 546.  J.A. 34.

Two weeks after her purported appointment as interim U.S. Attorney, Ms.

Halligan—acting alone—appeared before a federal grand jury in the Eastern District

of Virginia and secured a two-count indictment charging Ms. James with bank fraud

and making false statements to a financial institution.

## C.    Proceedings Below

Ms. James moved to dismiss the indictment on the ground that Ms. Halligan,

the sole prosecutor who presented the case to the grand jury and signed the

indictment, was unlawfully appointed in violation of 28 U.S.C. § 546 and the

Constitution's Appointments Clause.  J.A. 147–168.

---

[4] *Id.*

[5] Betsey Klein, *Trump calls on Attorney General Bondi to use power of the Justice Department more aggressively*, CNN (Sept. 20, 2025), https://www.cnn.com/2025/09/20/politics/trump-justice-department-pam-bondi.

Chief Judge Diaz designated the Honorable Cameron McGowan Currie, Senior United States District Judge for the District of South Carolina, to decide all motions concerning the eligibility of Ms. Halligan to serve as interim U.S. Attorney for the Eastern District of Virginia. *United States v. Comey*, No. 1:25-cr-272 (E.D. Va. Oct 21, 2025), ECF No. 62.

Shortly after Ms. James moved to dismiss the indictment based on Ms. Halligan's defective appointment as interim U.S. Attorney, Ms. Bondi entered an order that attempted to retroactively (1) appoint Ms. Halligan as a "Special Attorney," and (2) ratify the indictment. J.A. 38-39. Though Ms. Bondi's order was issued on October 31, 2025, it purported to appoint Ms. Halligan as Special Attorney as of September 22, 2025. J.A. 38.

On November 24, 2025, the district court ruled that Ms. Halligan's appointment violated both 28 U.S.C. § 546 and Appointments Clause of the U.S. Constitution. J.A. 283-309. Further, the district court held that Ms. Bondi's attempt "to retroactively bestow Special Attorney status" on Ms. Halligan was "ineffective," J.A. 305, and that Ms. Bondi lacked the power to ratify the unlawful indictment, J.A. 305–306. The district court thus dismissed the indictment against Attorney General James without prejudice. J.A. 306.

Rather than immediately appealing the district court's ruling, the government spent several weeks trying to find an alternative route to resuscitate its case against

9

Ms. James. The government twice attempted to re-indict Ms. James—first in Norfolk, and later in Alexandria.[6] Both grand juries returned no true bills. The government attorney who presented those failed indictments to the grand jury was not Ms. Halligan; it was Roger Keller, Jr., an Assistant United States Attorney from the Eastern District of Missouri.[7] Only after striking out in its attempts to re-indict Attorney General James did the government file a notice of appeal in this case on December 19, 2025.

## SUMMARY OF THE ARGUMENT

The Attorney General's authority to name an interim U.S. Attorney expires 120 days after she makes an appointment. Section 546 affords the Attorney General a single 120-day period between the departure of one Senate-confirmed U.S. Attorney and the appointment of another. Once the Attorney General's interim appointment authority expires after 120 days, Subsection 546(d) provides that the exclusive authority to appoint an interim U.S. Attorney belongs to the district court.

---

[6] *In re Grand Jury Proceedings December 4, 2025*, No. 2:25-ms-17 (E.D. Va. Dec. 5, 2025), ECF No. 1; *United States v. James*, No. 1:25-dm-13 (E.D. Va. Dec. 15, 2025), ECF No. 1.

[7] *Id.* On at least one of the failed indictments, however, Ms. Halligan was listed as the United States Attorney for the Eastern District of Virginia, despite Judge Currie's ruling to the contrary. *See United States v. James*, No. 1:25-dm-13 (E.D. Va. Dec. 15, 2025), ECF No. 1 at 11. Because the other draft indictment (Norfolk) was ordered to remain sealed and impounded, Ms. Halligan's role in that failed attempt to indict Ms. James is unclear. *In re Grand Jury Proceedings December 4, 2025*, No. 2:25-ms-17 (E.D. Va. Dec. 5, 2025), ECF No. 1.

Because Ms. Bondi invoked Section 546 on January 21, 2025, to name Mr. Siebert as interim U.S. Attorney for the Eastern District of Virginia, her authority under Section 546 expired on May 21, 2025. Consequently, Ms. Bondi's attempt to appoint Ms. Halligan as interim U.S. Attorney for the Eastern District of Virginia on September 22, 2025, violated Subsection 546(c)(1).

The government resists this straightforward application of Section 546, arguing that the Attorney General has the power to appoint an unlimited number of interim U.S. Attorneys to an unlimited number of 120-day terms. But reading Section 546 to enable the Attorney General to string together an infinite number of "interim" U.S. Attorney appointments, including consecutive appointments of the same individual, would fully eliminate the Senate's advice-and-consent role in the appointment of U.S. Attorneys. This interpretation would impermissibly allow Section 546, the statutory exception allowing for the appointment of interim U.S. Attorneys, to supplant Section 541 as the default mechanism for appointing U.S. Attorneys for a full Presidential term. That is the wrong way to read these statutes. "Congress, after all, is unlikely to intend for an exception to swallow the rule." *EPA v. Calumet Shreveport Ref., L.L.C.*, 605 U.S. 627, 644 (2025).

The text and structure of Section 546 provide no support for the government's boundless conception of the Executive Branch's authority over interim appointments. As the district court recognized, the text of 28 U.S.C. § 546 "is

11

unambiguous." J.A. 291.  The government advances its preferred reading of Section 546 only by ignoring fundamental canons of construction, adding words to the statute, invoking "constitutional avoidance" to avert a problem that does not exist, and attempting to rely on "executive-branch practice" that consists of nothing more than a handful of appointments from more than 20 years ago.

Further, the government's interpretation of Section 546 entirely ignores the 2007 amendment that affirmatively reinstated the 120-day limitation on interim appointments.  That amendment was motivated by "several instances where the Attorney General made successive interim appointments pursuant to section 546 of either the same or different individuals." H.R. Rep. No. 110–58 at 6 (2007).  Yet the Attorney General now seeks to exploit the very loophole that the 2007 amendment was enacted to close, in contravention of Supreme Court's directive that "[w]hen Congress amends legislation, courts must presume it intends [the change] to have real and substantial effect." *Ross v. Blake*, 578 U.S. 632, 641-42 (2016) (internal quotation marks omitted).  Section 546 has not changed since the 2007 amendment, and, outside of this Administration, the government does not point to any example of successive interim appointments following the amendment's enactment.  The government argues for a profound redistribution of power that Congress expressly rejected.

12

Where the only purported government official presenting an indictment to a grand jury lacks a lawful appointment, the indictment is void. *See United States v. Garcia-Andrade*, No. 13-CR-993-IEG, 2013 WL 4027859, at *6, *9 (S.D. Cal. Aug. 6, 2013); *cf. United States v. Durham*, 941 F.2d 886, 891-92 (9th Cir. 1991); *United States v. Bennett*, 464 F. App'x 183, 184-85 (4th Cir. 2012) (per curiam) ("A federal district court is without jurisdiction in a criminal prosecution where the Government lacks an authorized representative.") (citation omitted). Here, there is no dispute that Ms. Halligan was the sole attorney who presented the indictment to the grand jury. Though Ms. Bondi undertook a novel series of ex post maneuvers to attempt to clean up the mess of Ms. Halligan's unlawful interim appointment, *see* J.A. 38-39, Ms. Bondi does not have a time machine. None of Ms. Bondi's actions change the fact that when Ms. Halligan brought the indictment before the grand jury, entirely on her own, she was not a government prosecutor. She was not an interim U.S. Attorney, Assistant U.S. Attorney, Special Attorney, or any other attorney with the power to secure an indictment.

Moreover, Ms. Bondi lacked the ability to "ratify" the unlawful indictment. As the district court noted, "the Government cites no authority holding" that the "agency-law doctrine of ratification can be used to cure a defective indictment." J.A. 113. On appeal, the government fares no better in attempting to explain why this Court should be the first to extend ratification to criminal cases, which involve

13

unique considerations of individual liberty. The "safeguards which surround an accused in a criminal prosecution . . . create wide differences between the bundle of legal principles which govern a criminal trial and those which apply to a civil suit." *Neaderland v. Comm'r*, 424 F.2d 639, 643 (2d Cir. 1970). And as the district court recognized, "[t]he implications" of the government's ratification argument would be "extraordinary" because "[it] would mean the Government could send any private citizen off the street—attorney or not—into the grand jury room to secure an indictment so long as the Attorney General gives her approval after the fact." J.A. 113-14. That cannot be the law.

Because Ms. Halligan's appointment is unconstitutional, her work "cannot be salvaged by the *de facto* officer doctrine." *United States v. Trump*, 740 F. Supp. 3d 1245, 1303 (S.D. Fla. 2024). "'[O]ne who makes a timely challenge to the constitutional validity of the appointment of an officer . . . ' is entitled to relief." *Lucia*, 585 U.S. at 251 (quoting *Ryder v. United States*, 515 U.S. 177, 182-83 (1995)). The Appointments Clause dictates that inferior officers like U.S. Attorneys can be appointed only (1) by the President "with the Advice and Consent of the Senate," or (2) through a process that Congress has properly authorized "by Law." An appointment like Ms. Halligan's that comports with neither pathway violates the Appointments Clause. And even if Ms. Halligan's unlawful appointment were solely a statutory violation, the Supreme Court in *Nguyen v. United States*, 539 U.S.

14

69, 79 (2003), held that the de facto officer doctrine does not apply to a statutory defect in an appointment where the violation is "fundamental" and contravenes a statute that "embodies weighty congressional policy."

Finally, because Ms. Halligan's unlawful appointment fundamentally tainted the structural integrity of the grand jury process, this is a case where the harmless-error inquiry does not apply. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 257 (1988). But if the Court did evaluate the prejudicial impact of Ms. Halligan's improper involvement in this prosecution, it would readily conclude that the government cannot sustain its "burden of showing harmlessness" under Federal Rule of Criminal Procedure 52(a). *See United States v. Davila*, 569 U.S. 597, 607 (2013). "The Supreme Court has articulated different harmless-error standards, depending on whether the error is of constitutional dimension." *United States v. Thompson*, 287 F.3d 1244, 1253 (10th Cir. 2002) (citation omitted). "If the error is of constitutional magnitude, then the government is required to prove the error was harmless beyond a reasonable doubt." *United States v. Haidley*, 400 F.3d 642, 645 (8th Cir. 2005) (citations omitted). "As to errors not of constitutional magnitude, . . . the government is required to establish that" there is not "'grave doubt' as to whether the error substantially influenced the outcome of the proceedings." *Id.* (citation omitted). And in the specific context of a nonconstitutional violation involving an indictment, the government must show that the violation did not

"substantially influence[] the grand jury's decision to indict." *Bank of Nova Scotia*, 487 U.S. at 256 (citation omitted).

Under either standard, the government does not come close to sustaining its burden of demonstrating harmlessness. The circumstances surrounding the indictment make clear that (1) *but for* Ms. Halligan's improper appointment as interim U.S. Attorney, the indictment never would have been presented to a grand jury, and (2) if a proper prosecutor had presented such an indictment, it would have failed. In the weeks after the district court dismissed the indictment and disqualified Ms. Halligan from serving as interim U.S. Attorney, the government twice attempted to reindict Ms. James. Both grand juries returned no true bills. In light of that conclusive evidence, it is inconceivable that Ms. Halligan's unlawful appointment was harmless error. Lawfully-appointed prosecutors have proven unwilling or unable to indict Ms. James.

## **ARGUMENT**

## I.    **MS. HALLIGAN'S APPOINTMENT AS INTERIM U.S. ATTORNEY VIOLATED SECTION 546**

### A.    **The text and structure of Section 546 impose a clear limit on the duration of the Attorney General's interim appointment authority**

The government's preferred reading of Section 546 is fundamentally incompatible with the text of Subsection 546(d). By its plain terms, Subsection (d) provides a single option following the expiration of a Subsection (a) appointment:

16

"[I]f an appointment expires . . . *the district court* for such district may appoint a United States attorney to serve until the vacancy is filled." 28 U.S.C. § 546(d) (emphasis added). Under the interpretive canon of *expressio unius*, Subsection (d)'s express mention of the district court—and only the district court—should be read to imply that no other authority may appoint an interim U.S. Attorney upon the expiration of 120 days. *See* A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 111 (2012). The government accuses the district court of reading Subsection (d) to implicitly state that after an interim appointment expires under Subsection (c)(2), "*only* the district court . . . may appoint" an interim United States Attorney. Gov't Br. 23, 25. But under the *expressio unius* canon, that is exactly how Subsection (d) is supposed to be read.

It is the government that reads into Subsection (d) words that do not belong. Brushing past the *expressio unius* canon, the government insists that the Attorney General—who Subsection (d) does not mention—has "parallel authority" to name an interim U.S. Attorney following the expiration of the 120-day window. Gov't Br. 23-26. The government thus reads Subsection (d) to provide that if an appointment expires, "the district court . . . [*or the Attorney General*] may appoint a United States Attorney." But that is not the statute that Congress wrote. If Subsection (d) intended to recognize the Attorney General's appointment power as a "parallel track," Gov't Br. 23, it would have said so.

17

The Supreme Court's analysis in *United States v. Giordano*, 416 U.S. 505, 513-14 (1974), is instructive. That opinion, which is cited as a textbook example of how to apply the *expressio unius* canon, *see* Scalia & Garner, *supra*, at 111, concerned a statutory provision closely resembling Subsection (d). The *Giordano* Court analyzed a provision providing that "(t)he Attorney General, or any Assistant Attorney General specially designated by the Attorney General, may authorize" a wiretap application. *Giordano*, 416 U.S. at 513 (quoting 18 U.S.C. § 2516(1) (1971)). Though the statute identified only two types of officials—the Attorney General and a specially designated Assistant Attorney General—the government in *Giordano* asserted that an additional official, the Attorney General's executive assistant, implicitly possessed parallel authority to authorize a wiretap. *Id.* at 512. The Court rejected that argument. *Id.* at 512-14. It held that because the provision expressly named certain officials, all others were excluded by negative implication. *Id.* Here, the fact that Subsection (d) expressly identifies only the district court carries the same implication. "If an appointment expires [after 120 days] under [S]ubsection (c)(2)," there is no other authority that can appoint an interim U.S. Attorney. 28 U.S.C. § 546(d).

To support its preferred interpretation of Section 546, the government principally relies on a textual argument grounded in meaningless formalism. The government asserts that because Subsection (b) is the only provision described as an

18

"exception" to the Attorney General's appointment authority under Subsection (a), Gov't Br. 4, no other provision can be read to limit the Attorney General's interim appointment power. *See* Gov't Br. 12 ("[S]ubsection (b) serves as the only limit on the Attorney General's authority to fill a U.S. Attorney vacancy with an interim appointment.").

To be sure, Subsection (a) states that "[e]xcept as provided in [S]ubsection (b)," the Attorney General may appoint an interim U.S. Attorney while the position is vacant. 28 U.S.C. § 546(a). And Subsection (b), in turn, prohibits the Attorney General from appointing someone whose nomination the Senate rejected. But to accept the government's premise that Subsection (b) is the "the sole restriction" on the Attorney General's appointment authority, Gov't Br. 11, one would need to stop reading the statute halfway through. "We do not, however, construe statutory phrases in isolation; we read statutes as a whole." *United States v. Morton*, 467 U.S. 822, 828 (1984).

The remaining provisions of Section 546 expressly delineate an additional constraint on the Attorney General's appointment authority. Subsection (c)(2) establishes that 120 days after the Attorney General invokes Subsection (a), an interim U.S. Attorney appointment expires. And Subsection (d) provides that when such an appointment expires, the district court inherits the power to appoint a U.S. Attorney until the position is filled through Senate confirmation. This is an express

19

temporal limitation on the Attorney General's appointment authority, regardless of whether the statute labels it an "exception."

In arguing that Subsection (b) is the "sole restriction" on the Attorney General's interim appointment authority, Gov't Br. 11, the government asks this Court to wear blinders as it evaluates the remaining statutory provisions and surrounding provisions of the United States Code. The government cannot seriously dispute that the Attorney General's appointment authority is subject to other *constraints*. As the government tacitly acknowledges, a single interim appointment may not exceed 120 days under Subsection (c)(2). Gov't Br. 29. The government refers to this as an "implied[]" limitation, Gov't Br. 18, but that label does not fit. If the Attorney General announced that she had appointed an interim U.S. Attorney to a term of 130 days, such an appointment would be invalid on its face. Subsection (c)(2) thus provides an express constraint on the Attorney General's appointment authority—"exception" or not.

Subsection (c)(2) is not the only additional constraint. Under 28 U.S.C. § 545, the Attorney General cannot appoint as interim U.S. Attorney a person who does not live in the district in which she would serve. And under Section Three of the Fourteenth Amendment, the Attorney General cannot appoint as interim U.S. Attorney a person who previously violated her constitutional oath by engaging in an insurrection or rebellion against the United States. U.S. Const. Amend. 14, § 3.

These provisions impose additional, express constraints on the Attorney General's Subsection 546(a) authority. By characterizing Subsection (b) as the "one exception," Gov't Br. 19, the government identifies what is, at most, a distinction without a difference. By no means is Subsection (b) the only constraint on the Attorney General's appointment power. Subsection (c)(2)—which provides that the Attorney General's appointment authority expires after 120 days—is among the additional constraints.

The government's analysis of the text also fails to contend with the fact that its preferred interpretation would render Subsection (d) "insignificant," leaving it to "lie dormant in all but the most unlikely situations." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001). Under the Government's reading of Section 546, the Attorney General's interim appointees can serve indefinitely so long as the Attorney General "revisit[s] and renew[s] her interim appointments every 120 days." Gov't Br. at 29. But if that were correct, the Attorney General could prevent interim appointments from ever "expir[ing] under subsection (c)(2)" by rubberstamping new "appointments" of the same individuals every 119 days, which in turn would prevent the district court from ever exercising its appointment power under Subsection (d). 28 U.S.C. § 546(d). Such a result would contravene to the principle that courts must avoid interpreting statutes in a way that has the "practical effect" of rendering a provision "entirely superfluous in all but the most unusual circumstances." *TRW*

21

*Inc.*, 534 U.S. at 29. Given that Subsection (d) is an "incentive for the President to exercise his statutory power under 28 U.S.C. § 541" to appoint U.S. Attorneys with the advice and consent of the Senate, *Sotomayor Vazquez*, 69 F. Supp. 2d at 295, the government's reading would fundamentally alter the structural scheme that Congress has crafted.

More broadly, reading Section 546 to enable the Attorney General to endlessly appoint the same "interim" U.S. Attorney would subvert Section 541 and thus extinguish the Senate's advice-and-consent role in the appointment of U.S. Attorneys. The government's preferred interpretation would inevitably result in Section 546 displacing Section 541 as the default mechanism for appointing U.S. Attorneys for a full Presidential term. Given that Congress "is unlikely to intend for an exception to swallow the rule," *EPA v. Calumet Shreveport Ref., L.L.C.*, 605 U.S. at 644, this Court should be wary of endorsing such an interpretation. The government points out that "[P]residential appointment and Senate confirmation [have] remain[ed] the norm," Gov't Br. 29-30, but that is only true because no court has adopted the government's theory that Section 546 allows the Attorney General to rubberstamp an endless succession of "interim" terms.

While government argues that the district court's interpretation of Subsection 546(c) "adds words. . . to the statute Congress enacted," Gov't Br. 21 (quoting *Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024)), it is the government's

preferred reading of Subsection 546(c) that requires the improper insertion of absent terms. Subsection 546(c) provides that "a person appointed" under the statute may serve until "the expiration of 120 days after appointment *by the Attorney General*" (emphasis added). The natural reading of this statute is that the time limitation is thus benchmarked to the Attorney General's actions, not an individual's appointment. Yet the Government reads the statute as stating that an interim U.S. Attorney may serve until "the expiration of 120 days after [*his or her*] appointment by the Attorney General." Those words do not appear in the statute, however, and courts "ordinarily resist reading words or elements into a statute that do not appear on its face." *Dean v. United States*, 556 U.S. 568, 572 (2009) (quoting *Bates v. United States*, 522 U.S. 23, 29 (1997)).

The government's preferred interpretation of Section 546 also flouts the surplusage canon. *See* Scalia & Garner, *supra*, at 174. As set forth above, the government reads Subsection (c) to provide that "[a] person appointed as United States attorney under this section may serve until . . . the expiration of 120 days after [*his or her*] appointment by the Attorney General under this section." 28 U.S.C. § 546(c). But under that interpretation, the provision should stop after the word "appointment." The phrase "by the Attorney General under this section" in Subsection (c)(2) would be entirely redundant. Under Attorney General James's reading of Subsection (c), however, there is no superfluity.

Before the district court, the government attempted to justify this glitch in its preferred reading of Section 546 by arguing that the phrase "by the Attorney General under this section" serves to "clarif[y] that the 120-day limit governs appointments only under Section 546," and not appointments under Section 541. J.A. 179. But no additional language is needed to clarify whether the clause "a person appointed under *this section*," 28 U.S.C. § 546(c) (emphasis added), refers to a person appointed under a *different section*—Section 541.

Nor does looking to Subsection (c)(1) help the government explain away the surplusage. In its briefing below, the government described the superfluous language in its interpretation of Subsection (c)(2) as "draw[ing] a contrast" with Subsection (c)(1) and "reorient[ing] the reader." J.A. 179. Yet absent an express textual indication—which the phrase "by the Attorney General under this section" is not—it would be strange to assume that Congress intended Subsections (c)(1) and (c)(2) to be read in "contrast." J.A. 179.

Subsection (c)(1), which provides that Senate confirmation of a full-time U.S. Attorney terminates an interim appointment, "is indisputably benchmarked to an event unrelated to any specific person's interim appointment." *United Sates v. Giraud*, 2025 WL 2416737, at *10 (D.N.J. Aug. 21, 2025). There is no indication that Subsection (c)(2) is any different. Below, the government conceded that under Subsection (c)(1), "[o]nce the Senate confirms a U.S. Attorney, the interim

24

officeholder is out, regardless of how long she served or who appointed her." J.A. 180. Subsection (c)(2) should be read the same way: Once the clock hits 120 days after the Attorney General's initial appointment, the interim officeholder is out, regardless of how long she served or who appointed her. Subsection (c)(2) is benchmarked to action "by the Attorney General under this section," just as Subsection (c)(1) is benchmarked to action by Congress. Neither provision is appointee-specific.

Moreover, the government overlooks the fact that the time limitations on acting appointments under the FVRA, the alternative source of the Executive Branch's temporary-appointment authority, Gov't Br. 26, are not benchmarked to the date of an individual's appointment. Under 5 U.S.C. § 3346(a)(1), acting officers may serve "for no longer than 210 days beginning *on the date the vacancy occurs*." *Id.* § 3346(a)(1) (emphasis added). This provision reinforces the conclusion that Congress intended for acting and interim appointments to be temporary, not indefinite, and that the date of an individual's appointment does not dictate when the Executive Branch's temporary appointment authority lapses.

Though the government argues that Fourth Circuit precedent supports its preferred reading of Section 546, it relies on a recent case that instead cuts against its expansive theory of the Attorney General's power to appoint U.S. Attorneys. In *Salomon-Guillen v. Garland*, 123 F.4th 709 (4th Cir. 2024), this Court considered

25

the scope of the Attorney General's authority to appoint temporary members to the Board of Immigration Appeals (BIA). Under the relevant regulations, the unilateral authority to appoint *permanent* members of the BIA belonged to the Attorney General. *See* 8 C.F.R. § 1003.1(a)(1). Neither Senate confirmation nor any other mechanism provided a check on the Attorney General's power. *Id.* The appellant argued, however, that there was an implicit constraint on the Attorney General's authority to appoint *temporary* Board members. *Salomon-Guillen*, 123 F.4th at 717. The regulation at issue authorized the appointment of "temporary Board members for *terms not to exceed six months.*" 8 C.F.R. § 1003.1(a)(4) (2022) (emphasis added). In the appellant's view, the absence of the word "renewable" before "terms" indicated that the Attorney General could not appoint a temporary Board member to successive terms. The Fourth Circuit rejected this argument, concluding that the regulation's text did not "restrict the [Attorney General's] power to appoint the same person to multiple consecutive terms." *Salomon-Guillen*, 123 F.4th at 717.

*Salomon-Guillen* illuminates two critical differences between temporary BIA appointments and interim U.S. Attorney appointments. First, whereas any potential constraint on the Attorney General's power to appoint temporary BIA members needed to be reconciled with the Attorney General's absolute authority to appoint permanent BIA members, the Attorney General has no authority to appoint a full-fledged U.S. Attorney. Only the President can do that, with the advice and consent

of the Senate. *See* 28 U.S.C. § 541. And second, the regulation at issue in *Salomon-Guillen* imposed a six-month time limitation on "terms," not persons. 8 C.F.R. § 1003.1(a)(4) (2022). Subsection (c), in contrast, imposes a limit on when "a person . . . may serve." Further, by using the plural form of the word "term" and referring to "terms" of six months, the regulation at issue in *Salomon-Guillen* implied that one could serve for multiple terms. 8 C.F.R. § 1003.1(a)(4) (2022). Section 546 does not use similar language. Subsection (c) provides that a person may not serve as interim U.S. Attorney after a 120-day window expires; it does not state that a person may serve "terms" of 120 days. That is a meaningful distinction.

## B.    Statutory history confirms that the Attorney General's interim appointment authority expires after 120 days

The statutory history of Section 546 further supports the plain-text reading. Under the reenactment canon of statutory interpretation, "[i]f the legislature amends or reenacts a provision other than by way of a consolidating statute or restyling project, a significant change in language is presumed to entail a change in meaning." Scalia & Garner, *supra*, at 256. Such a change happened here. Through the passage of the PATRIOT Act in 2006, Congress "entirely removed the 120-day limit and the district court's backstopping role," and simply provided that "'a person appointed as United States attorney under this section may serve until the qualification of a United States Attorney for such district appointed by the President under section 541 of this title.'" *United States v. Giraud*, 2025 WL 2416737, at *11 (quoting Pub. L. No.

109–77, Title V, § 502, 120 Stat. 192, 246 (2006)).  But this switch was "short lived." *Giraud*, 2025 WL 2416737, at *11.  Recognizing that the amendment "created a possible loophole that could permit United States Attorneys appointed on an interim basis to serve indefinitely without Senate confirmation," Congress in June 2007 enacted a law restoring the pre-2006 regime.  H.R. Rep. No. 110–58, at 4 (2007), *see* Pub. L. No. 110–34, § 2, 121 Stat. 224 (2007).

The Government's interpretation of Section 546 would give no effect to the 2007 amendment. Instead, the Government's reading would mean that the amendment failed to close the very loophole that motivated its passage.  That cannot be the correct reading of the statute. "When Congress amends legislation, courts must presume it intends [the change] to have real and substantial effect." *Ross v. Blake*, 578 U.S. at 641-42.  And "Courts should remember that '[l]egislation has an aim; it seeks to obviate some mischief.'"  Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 538–39 (1947); *see also*, Samuel L. Bray, *The Mischief Rule*, 109 Geo. L.J. 967, 968 (2021) ("The mischief rule instructs an interpreter to consider the problem to which the statute was addressed, and also the way in which the statute is a remedy for that problem. . . . [T]he generating problem is taken as part of the context for reading the statute.").  Yet as the district court recognized, "if the Government's reading were correct, the 2007 Act would have had virtually no effect, as it would still allow the Executive to evade the Senate

28

confirmation process indefinitely by stacking successive 120-day appointments."
J.A. 295.

The government's resort to legislative history—rather than statutory history—
is entirely unavailing.  After deriding legislative history as "not the law," Gov't Br.
34 (citation omitted), the government employs the worst version of the practice it
criticizes: "looking over a crowd and picking out your friends."  Gov't Br. 34
(quoting *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005)).
To support its theory that an Attorney General may make an unlimited number of
successive interim appointments, the government quotes floor statements from
Senator Kyl—the author of an amendment to Section 546 that *failed* to pass.  Gov't
Br. 34; *see* 153 Cong. Rec. S3250 (March 19, 2007).  But "floor statements by
individual legislators rank among the least illuminating forms of legislative history."
*N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 307 (2017).  And though Senator Kyl feared
that Section 546 allowed the Attorney General to make more than one interim
appointment, the majority that rejected his amendment and voted to pass the 2007
bill did not share his interpretation.

Senator Feinstein, the architect of the legislation that *did* pass, stated that the
bill would "give the Attorney General the authority to appoint interim U.S. attorneys,
but it would limit that authority to 120 days.  If after that time the President had not
nominated a new U.S. [A]ttorney or the Senate had not confirmed a nominee, then

the district courts would appoint an interim U.S. attorney." 153 Cong. Rec. S3298 (March 20, 2007). And the House Report on the 2007 amendment—a far more reliable source of legislative history than the statement of any individual legislator— stated that the amendment was motivated by concerns about the Executive Branch "Bypassing the Requirement of Senatorial Advice and Consent," emphasizing "several instances where the Attorney General made successive interim appointments pursuant to section 546 of either the same or different individuals." H.R. Rep. No. 110–58, at 6 (2007). Resort to legislative history is unnecessary given that the plain text of Section 546 squarely forecloses the government's radical reading of Section 546, but the legislative history weighs heavily in favor of Ms. James's position.

### C.    The government's reliance on "historical practice" is unavailing

Nor does historical practice within the Executive Branch support the government's preferred reading of the statute. The government argues that because the Executive Branch has previously attempted to make multiple interim appointments under Section 546, the practice must be permissible. In support of this argument, the government points to one example of a successive interim appointment in 1987, Gov't Br. 32, and cites a 2008 report from the Congressional Research Service stating that "between January 1993 and March 9, 2006, at least eight U.S. Attorney vacancies—three under the Clinton Administration and five

under the Bush Administration—were filled through successive 120-day appointments by the Attorney General under the provisions of 28 U.S.C. § 546." Henry B. Hogue, Cong. Rsch. Serv., RS21412, *Temporarily Filling Presidentially Appointed, Senate-Confirmed Positions* 6 n.23 (Jan. 25, 2008).

Citing nine examples over two decades is not strong evidence of historical practice. Though a "systematic, unbroken, executive practice, long pursued to the knowledge of Congress and never before questioned" may be evidence of a statute's meaning, *Medellín v. Texas*, 552 U.S. 491, 531 (2008) (quoting *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981)), that is not what the government provides. Instead, it offers only a handful of anecdotes among hundreds of interim U.S. Attorney appointments. This is precisely the type of evidence that the Supreme Court rejected in *Southwest General*. *See* 580 U.S. at 308 ("'[H]istorical practice' is too grand a title for the Board's evidence . . . the 112 nominations that the Board cites make up less than two percent of the thousands of nominations . . . ."). The only difference between the government's argument in this case and in *Southwest General* is that here, the government cites nine examples rather than 112. And critically, the government does not point to *any* instance of successive interim appointments following the statute's 2007 amendment. In the 19 years since Congress amended Section 546 to install guardrails on the Attorney General's appointment authority,

31

the government cannot find a single example of the practice it asks this Court to endorse.

The more relevant evidence of the Executive Branch's historical understanding of Section 546 squarely refutes the government's preferred interpretation. Just three days after Congress enacted the 1986 law, the Office of Legal Counsel (OLC) issued an opinion, authored by then-Deputy Assistant Attorney General Samuel Alito, that contradicts the interpretation that the government now maintains.[8] OLC concluded that while a "vacancy exists when the 120-day period expires under the amended section 546 and the President has either not made an appointment or the appointment has not been confirmed," "it *does not follow* that the Attorney General may make another appointment pursuant to 28 U.S.C. § 546(a) after the expiration of the 120-day period." *Id*. at 2 (emphasis added). Then-Deputy Assistant Attorney General Alito reasoned that "[t]he statutory plan discloses a Congressional purpose that after the expiration of the 120-day period further interim appointments are to be made by the court rather than by the Attorney General." *Id.* at 3. This "contemporaneous[]" Executive Branch interpretation provides persuasive evidence of statutory meaning. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 386 (2024). And though the government

---

[8] *See Definition of Vacancy for the Purpose of Interim Appointment of United States Attorneys pursuant to 28 U.S.C. 546, as amended*, Office of Legal Counsel (Nov. 13, 1986), https://perma.cc/SD5Q-7CPH.

derides then-Attorney General Alito's opinion as the faulty product of "the era in which it was written," Gov't Br. 35, the government it has provided no evidence that OLC ever changed its position in the subsequent forty years until this Administration.

Moreover, the government's characterization of Subsection (d) as a "fallback option," Gov't Br. 5, is entirely inconsistent with the way that this Administration has operated. Neither this Administration nor any other has treated Subsection (d) as a "fallback" that comes into play only when the Attorney General fails to act after an interim appointment expires. Consider Mr. Siebert's appointment. Approximately two weeks *before* Mr. Siebert's 546(a) appointment expired, the district court—pursuant to Subsection (d)—unanimously appointed Mr. Siebert to continue in his role as interim U.S. attorney.[9] The district court did not wait to see whether the Attorney General would act, nor did the Attorney General try to preempt the district court by announcing in advance that she would appoint Mr. Siebert to a second 120-day term.

The same is true of other interim U.S. Attorney appointments throughout the country, including in the Southern District of New York: Before Jay Clayton's 120-

---

[9] United States District Court for the Eastern District of Virginia, *Appointment of Erik S. Siebert as Interim U.S. Attorney Effective May 21, 2025* (May 9, 2025), https://www.vaed.uscourts.gov/news/appointment-erik-s-siebert-interim-us-attorney-effective-may-21-2025.

day term expired, the district court issued an order providing for his reappointment.[10] And in the District of New Jersey, the Attorney General attempted to extend Alina Habba's term as U.S. Attorney only *after* it failed to convince the district court to reappoint her upon the expiration of her interim term.[11] This administration's own conduct belies the assertion that it views Subsection (d) as a "fallback option." Gov't Br. 5. Rather than serving as a "fallback," Subsection (d) is the "incentive for the President to exercise his statutory power under 28 U.S.C. § 541" to appoint U.S. Attorneys with the advice and consent of the Senate. *Sotomayor Vazquez*, 69 F. Supp. 2d at 295.

Nor does the history of Subsection (d) support the notion that Congress intended it to serve only as a "fallback." Gov't Br. 5. Until 1986, the district court had *exclusive* authority to appoint an interim U.S. Attorney. The pre-1986-amendment version of the statute read: "The district court for a district in which the office of United States attorney is vacant, may appoint a United States attorney to serve until the vacancy is filled. The order of appointment by the court shall be filed

_____

[10] *See* Benjamin Weiser, *Manhattan Judges Approve Trump's Choice for U.S. Attorney*, N.Y. Times (Aug. 18, 2025), https://www.nytimes.com/2025/08/18/nyregion/jay-clayton-us-attorney-manhattan-trump.html.

[11] *See* Joey Fox, *Deputy AG accuses judges of 'act[ing] like activists' in bypassing Habba*, N.J. Globe (July 22, 2025, 2:53 PM), https://newjerseyglobe.com/judiciary/deputy-ag-accuses-judges-of-acting-like-activists-in-bypassing-habba/.

with the clerk of the court." Pub. L. No. 89–554, § 4(c), 80 Stat. 618 (1966). When Congress amended the statute in 1986 and added Subsection (a) to provide certain authority to the Attorney General, it did not eliminate the district court's role in the interim U.S. Attorney appointment process. It merely gave the Attorney General the limited authority to choose an interim U.S. Attorney for 120 days, after which control remained in the hands of the district court. Except for the ill-fated 2006 amendment that lasted less than a year, that scheme has not changed. The interpretation of Subsection (d) that the government now advances is squarely at odds with the statute's history. This Court cannot accept a theory of Section 546 that is contrary to the text, structure, context, and historical understanding of every relevant provision.

Recognizing the many shortcomings of its preferred reading of Section 546, the government attempts to invoke "constitutional avoidance" as a final fallback to save its position. But that canon is entirely unavailing. Constitutional avoidance "has no application in the absence of statutory ambiguity." *United States v. Oakland Cannabis Buyers' Cooperative*, 532 U.S. 483, 494 (2001). In the words of the district court, the text Section 546 "is unambiguous." And even if the text had failed to resolve uncertainty about whether 546 affords the Attorney General unlimited authority to install successive interim U.S. Attorneys, the statute's structure and history decisively confirm that the answer is no. *See Boumediene v. Bush*, 553 U.S.

723, 787 (2008) ("The canon of constitutional avoidance does not supplant traditional modes of statutory interpretation.") (citation omitted).

Further, the supposed constitutional quagmire that the government cautions this Court to avoid is entirely illusory. The Appointments Clause expressly authorizes Congress to "by Law" vest the appointment of interior Officers such as interim U.S. Attorneys in "Courts of Law." And Since 1863, Congress has "by Law" provided that courts may appoint interim U.S. Attorneys. So the arrangement that the government calls into question (1) is explicitly authorized by the Constitution, and (2) has been accepted by Congress and the courts for more than 160 years.

## II.    MS. HALLIGAN'S IMPROPER APPOINTMENT ALSO VIOLATED THE APPOINTMENTS CLAUSE

In criticizing the district court's conclusion that the government's Section 546 violation also ran afoul of the Appointments Clause, the government betrays a fundamental misunderstanding of how the two provisions relate. The government attacks a strawman in emphasizing that "not every action in excess of statutory authority is *ipso facto* in violation of the Constitution." Gov't Br. 23 (citation omitted). That is not what Ms. James argues, or what the district court held. The district court's constitutional holding is grounded in the plain text of the Appointments Clause and does not, as the government mistakenly believes, provide that "it would be a constitutional violation most of the time a government official exceeded her statutory authority." Gov't Br. 44 (emphasis omitted). The

36

Appointments Clause dictates that inferior officers like U.S. Attorneys can be appointed only (1) by the President "with the Advice and Consent of the Senate," or (2) through a process that Congress has properly authorized "by Law." An appointment that comports with neither of these pathways violates the Appointments Clause.

Congress "by Law" vested the appointment of interim U.S. Attorneys in a "Head of Department[]"—the Attorney General—as well as in "the Courts of Law"—district courts. But the Attorney General's authority to appoint an interim U.S. Attorney had expired by the time she purported to appoint Ms. Halligan, and Ms. Halligan was not appointed by the district court. Accordingly, her appointment was not authorized "by Law."

Because the Attorney General's purported appointment of Ms. Halligan occurred in violation of Section 546 and without the advice and consent of the Senate, it also violates the Appointments Clause. *See Trump v. United States*, 603 U.S. 593, 644-45 (2024) (Thomas, J., concurring); *United States v. Trump*, 740 F. Supp. 3d at 1263. In *United States v. Trump*, the district court recognized that if an inferior office is appointed in a manner that does not comply with any statute, her appointment violates the Appointments Clause. 740 F. Supp. 3d at 1304. The government contends that Attorney General James's theory of Appointments Clause violations is too broad, but tellingly, it does not argue that *Trump* was

incorrectly decided.

## III. DISMISAL OF THE INDICTMENT WAS THE APPROPRIATE REMEDY

Because Ms. Halligan's appointment violated both the Appointments Clause and Section 546, the district court correctly dismissed the indictment. When Ms. Halligan presented this case to the grand jury and signed the indictment, she was not a "government" prosecutor with the power to secure an indictment: Ms. Halligan was not a properly-appointed interim U.S. Attorney, Special Attorney, or Assistant U.S. Attorney. Nor was she a de facto government prosecutor. Despite Ms. Bondi's attempt to turn back the clock, the Attorney General lacked the power to (1) retroactively appoint Ms. Halligan to positions she never held, or (2) ratify a void indictment. Further, the government's failed attempts to indict Ms. James in the wake of Ms. Halligan's disqualification dispel any doubt about whether Ms. Halligan's invalid involvement in this prosecution was harmless error. The government attempts to argue counterfactuals, but the record plainly establishes that properly-appointed government attorneys are either unwilling or unable to indict Ms. James. The initial indictment would not have occurred but for Ms. Halligan's improper appointment.

### A. Ms. Bondi could not retroactively appoint Ms. Halligan to positions she never held

After Ms. James moved to dismiss the indictment on the basis of Ms.

Halligan's improper appointment, Ms. Bondi attempted to save the indictment by retroactively naming Ms. Halligan to new positions she never held. *See* J.A. 38-39. Ms. Bondi's order could not, however, change the fact that when Ms. Halligan brought this indictment before the grand jury—appearing alone—she was not a proper "attorney for the government" within the meaning of Federal Rule of Criminal Procedure 1(b)(1). "Attorney for the government" means:

> (A) the Attorney General or an authorized assistant;
> (B) a United States attorney or an authorized assistant;
> (C) when applicable to cases arising under Guam law, the Guam Attorney General or other person whom Guam law authorizes to act in the matter; and
> (D) any other attorney authorized by law to conduct proceedings under these rules as a prosecutor.

Fed. R. Crim. P. 1(b).

When Ms. Halligan presented to the grand jury and signed the indictment of Ms. James, she held none of these titles. Her only status was as that of an unauthorized interim U.S. Attorney. The government cites no authority to support its argument that when an individual's purported appointment to one government position is unauthorized and void, courts must presume that she was instead appointed to some unspecified, lawful position within the government (and presumably the same agency). According to the government's theory of appointments violations, if Ms. Bondi blatantly overstepped her authority by purporting to appoint Ms. Halligan as the director of the FBI, Ms. Halligan would

39

have the authority to arrest people under some other, imaginary title that she was never given. And under the government's theory that "government attorney" means anyone who was hired by the Attorney General and receives a federal paycheck, Gov't Br. 39, a person employed as a paralegal or human resources officer can walk into grand jury rooms to secure indictments so long as she has passed the bar exam.

On October 31, 2025, the date that Ms. Bondi attempted to retroactively appoint Ms. Halligan as "Special Attorney," the Attorney General lacked the power to appoint *anyone* to a new prosecutorial position "*as of September 22, 2025.*" J.A. 38. The government fails to cite any case indicating that so long as the appointing officer allegedly "intended" to vest the relevant official with the proper authority, an invalid appointment can be excused. It is what the Attorney General did, not what was in her mind, that determines whether the appointment was proper.

Regardless, it is clear that Ms. Bondi did not initially intend to make Ms. Halligan "Special Attorney" rather than interim U.S. Attorney, any more than she intended to make Ms. Halligan interim U.S. Attorney for Wyoming instead of the Eastern District of Virginia. Contrary to the government's assertions, this is not an instance where the Attorney General simply "cited the wrong statute," Gov't Br. 2, or committed a "paperwork mistake," Gov't Br. 3. On social media, the President of the United States directly addressed Ms. Bondi and implored her to hire Ms. Halligan to replace Erik Siebert as interim U.S. Attorney for the Eastern District of

40

Virginia.  There was no ambiguity about which statute Ms. Bondi was intended to cite: it was Section 546.  The problem for Ms. Bondi is that no statute allowed her to do what the President intended.

The government attempts to slay another strawman in arguing that "acquiring the office of U.S. Attorney is not a prerequisite to obtaining and signing indictments."  Gov't Br. 14.  No one contends that if Ms. Halligan had obtained this indictment as a properly-appointed Assistant U.S. Attorney, the absence of the U.S. Attorney's signature would be consequential.  Rather, the fatal flaw in this indictment is that Ms. Halligan—who was not a proper attorney for the government—was the only individual to present this case to the grand jury and sign the indictment.  That fact requires dismissal.

Because Ms. Halligan was the only individual to participate in securing this indictment, the district court was correct to order dismissal.  This case is distinguishable from *United States v. Kelley*, 404 F. Supp. 3d 447, 450 (D. Mass. 2019), *aff'd*, 989 F.3d 67 (1st Cir. 2021), which the government invoked below but hardly mentions in its opening brief.  In *Kelley*, multiple properly-appointed government attorneys approved the indictment *before* it was signed.  *See Kelley*, 404 F. Supp. 3d at 453.  And in *Kelley*, the U.S. Attorney overseeing the office in question stated that, in his office, "the decision to prosecute is . . . made by a number of people and AUSAs at all times act under the direction of a supervisory AUSA."

41

*Id.* at 450. The court's inquiry in *Kelley* concerned whether other government attorneys supervised and *approved* the indictment before it issued, not whether, weeks later, government attorneys indicated that they *approved of* the indictment. The problem here is not just Ms. Halligan's signature on the indictment—it is that she presented the indictment to the grand jury alone, without being a "proper representative of the Government." *Garcia-Andrade*, 2013 WL 4027859, at *9.

## B. The de facto officer doctrine is inapplicable

Because Ms. Halligan's appointment is unconstitutional, her work "cannot be salvaged by the *de facto* officer doctrine." *Trump*, 740 F. Supp. 3d at 1303. "'[O]ne who makes a timely challenge to the constitutional validity of the appointment of an officer . . . ' is entitled to relief." *Lucia*, 585 U.S. at 251 (quoting *Ryder*, 515 U.S. at 182-83). As the Supreme Court has recognized, in cases that involve a "[g]overnment actor's exercise of power that the actor did not lawfully possess," the proper remedy is invalidation of the *ultra vires* action. *Collins v. Yellen*, 594 U.S. 220, 258 (2021). Invalidation of the action "follows directly from the government actor's lack of authority to take the challenged action in the first place. That is, winning the merits of the constitutional challenge is enough." *CFPB v. All Am. Check Cashing, Inc.*, 33 F.4th 218, 241 (5th Cir. 2022) (Jones, J., concurring).

The government argues that because Ms. Halligan's unlawful appointment was at most a statutory violation, not a constitutional one, the de facto officer

doctrine applies.  As discussed, the government misunderstands the relationship between Section 546 and the Appointments Clause.  But regardless of whether a constitutional violation occurred, the Supreme Court in *Nguyen v. United States*, 539 U.S. at 77, explained that in the context of a statutory violation, the de facto officer doctrine typically applies only when "there is a merely technical defect of statutory authority," and not to "violations of a statutory provision that embodies a strong policy" concern.  *Id.* at 77-78 (citation and quotation marks omitted). The *Nguyen* Court thus declined to apply the de facto officer doctrine where one member of a panel deciding petitioners' appeals—the Chief Judge of the Northern Mariana Islands—was unauthorized to sit by designation under 28 U.S.C. § 292(a).  The strong policy concerns underpinning Section 546's limits on the Attorney General's interim appointment power—namely, that shifting authority to the district court after 120 days "provid[es] an incentive for the President to exercise his statutory power under 28 U.S.C. § 541," *Sotomayor Vazquez*, 69 F. Supp. 2d at 295, likewise compels the rejection of the de facto officer doctrine in this case.  The de facto officer doctrine is inapplicable regardless of whether Ms. Halligan's appointment violated the Appointments Clause.

### C.    Ms. Bondi's attempt to "ratify" the void indictment had no effect

The government does not cite a single case in which a court has accepted a prosecutor's attempt to "ratify" an unlawful indictment.  "Ratification is a doctrine

derived from agency law," *Wille v. Lutnick*, 158 F.4th 539, 546 (4th Cir. 2025), and the government fails to explain why this court should be the first to extend that doctrine to the criminal context. The "safeguards which surround an accused in a criminal prosecution . . . create wide differences between the bundle of legal principles which govern a criminal trial and those which apply to a civil suit." *Neaderland v. Comm'r*, 424 F.2d at 643 (citation omitted); *see Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890, 902 (6th Cir. 2021) (Opinion of White, J.) ("No one contests that criminal law and procedure afford special protections to a criminal defendant that are not accorded to a civil defendant.").

As the district court in *Wille* noted, administrative law structures should not be analogized to those of criminal law, where "a criminal defendant's liberty interest . . . motivate[s] courts to find that structural errors in the criminal context" are often uncurable. *Wille v. Raimondo*, No. CV 22-0689-BAH, 2024 WL 2832599, at *9 (D. Md. June 3, 2024), *aff'd sub nom. Wille v. Lutnick*, 158 F.4th 539. *See also CFPB v. Seila L. LLC*, 997 F.3d 837, 843 (9th Cir. 2021) (Bumatay, J., joined by Callahan, Ikuta, and Vandyke, dissenting from denial of en banc) (arguing that ratification is inappropriate for separation-of-powers violations and noting that "[i]n the criminal context, for example, the Court usually regards structural violations as so intrinsically harmful as to require automatic reversal of the defective decision.") (citation and quotation marks omitted).

Consistent with this recognition that a criminal defendant's liberty interests are unique, "caselaw supports the view that an invalid indictment is a nullity." *United States v. Bolton*, 893 F.2d 894, 899 (7th Cir. 1990). And bedrock principles of agency law provide that "[r]atification cannot . . . give legal significance to an act which was a nullity from the start." *Newman v. Schiff*, 778 F.2d 460, 467 (8th Cir. 1985). Ms. Bondi's attempt to "ratify" the indictment was thus entirely devoid of force or effect.

### D. The unlawful appointment of Ms. Halligan was not harmless error

Because Ms. Halligan's unlawful appointment fundamentally tainted the structural integrity of the grand jury process, this is a case where the harmless-error inquiry does not apply. *See Bank of Nova Scotia*, 487 U.S. at 257 (collecting cases and concluding that the presumption of prejudice applies where "the structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair"). But if the Court did evaluate the prejudicial impact of Ms. Halligan's improper involvement in this prosecution, it would readily conclude that the government cannot sustain its "burden of showing harmlessness" under Federal Rule of Criminal Procedure 52(a). *United States v. Davila*, 569 U.S. at 607.

"The Supreme Court has articulated different harmless-error standards, depending on whether the error is of constitutional dimension." *United States v. Thompson*, 287 F.3d at 1253 (citation omitted). "If the error is of constitutional

magnitude, then the government is required to prove the error was harmless beyond a reasonable doubt." *United States v. Haidley*, 400 F.3d at 645. "As to errors not of constitutional magnitude, . . . the government is required to establish that" there is not "'grave doubt' as to whether the error substantially influenced the outcome of the proceedings." *Id.* (citation omitted). In the specific context of a nonconstitutional violation related to an indictment, the government must show that the violation did not "substantially influence[] the grand jury's decision to indict." *Bank of Nova Scotia*, 487 U.S. at 256 (citation omitted).

Regardless of whether Ms. Halligan's unlawful appointment amounted to a constitutional violation or solely a statutory violation, the government cannot meet its burden of showing harmlessness. The government fails to demonstrate that Ms. Halligan's unlawful appointment did not "substantially influence[] the grand jury's decision to indict," *id.*, and the government certainly cannot establish that the appointments violation "was harmless beyond a reasonable doubt." *Haidley*, 400 F.3d at 645. Instead, the circumstances surrounding the indictment make clear that *but for* Ms. Halligan's improper appointment as interim U.S. Attorney, Ms. James's indictment never would have been presented to a grand jury. President Trump publicly asked Ms. Bondi to appoint Ms. Halligan (which Ms. Bondi ultimately did unlawfully) because he seemingly believed that under Mr. Siebert, "nothing is going to be done" about "Letitia"—*i.e.*, Ms. James—and others who had targeted him and

were, in the President's view, "guilty as hell."[12]   The President's own public statements indicate that the grand jury proceeding would not have occurred absent Ms. Halligan's unlawful appointment.  And the two failed indictments following Ms. Halligan's disqualification indicate that properly-appointed prosecutors are unable to secure an indictment.  Against this record, there is no plausible argument that Ms. Halligan's unlawful appointment was harmless error.

## CONCLUSION

For the foregoing reasons, the district court's order should be affirmed.

## REQUEST FOR ORAL ARGUMENT

Ms. James respectfully requests oral argument. Given the importance of the statutory and constitutional questions in the case, oral argument would assist the Court's consideration.

---

[12] Betsey Klein, *Trump calls on Attorney General Bondi to use power of the Justice Department more aggressively*, CNN (Sept. 20, 2025), https://www.cnn.com/2025/09/20/politics/trump-justice-department-pam-bondi.

Dated:  March 3, 2026

Respectfully submitted,

*/s/ Abbe David Lowell*
Abbe David Lowell
LOWELL & ASSOCIATES, PLLC
1250 H Street NW, Suite 250
Washington, DC 20005
Tel: 202-964-6110
Fax: 202-964-6116
ALowellpublicoutreach@lowellandassoc
iates.com

*Counsel for Defendant-Appellee*
*Letitia James*

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 3, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Abbe David Lowell*
Abbe David Lowell

## **CERTIFICATE OF COMPLIANCE**

I certify that:

1.      This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it consists of 11,093 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced, serif typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Abbe David Lowell*
Abbe David Lowell