IN THE

# United States Court of Appeals
# for the Fourth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

v.

LETITIA JAMES

*Defendant-Appellee*

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

v.

JAMES COMEY, JR.

*Defendant-Appellee*

On Appeal from the United States District Court for the Eastern District of Virginia, Nos. 2:25-cr-122, 2:25-cr-272 (Currie, J. (D.S.C.))

**BRIEF FOR AMICUS CURIAE VIRGINIA ASSOCIATION OF CRIMINAL DEFENSE LAWYERS IN SUPPORT OF APPELLEES AND AFFIRMANCE**

MARVIN D. MILLER
AMICUS COMMITTEE, VIRGINIA
ASSOCIATION OF CRIMINAL DEFENSE
LAWYERS
THE LAW OFFICES OF
MARVIN D. MILLER
1203 DUKE STREET
ALEXANDRIA, VA 22314

JAMES I. PEARCE
SAMANTHA P. BATEMAN
MARY L. DOHRMANN
NATHANIEL A.G. ZELINSKY
WASHINGTON LITIGATION GROUP
1717 K ST NW, SUITE 1120
WASHINGTON, D.C. 20006
202-521-8750
jpearce@washingtonlitigationgroup.org

*March 9, 2026*

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

*Amicus curiae*, the Virginia Association of Criminal Defense Lawyers, is not a corporate entity and is not owned in whole or in part by any corporate entity.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ...................................................... ii

TABLE OF AUTHORITIES ..................................................................... iv

INTEREST OF THE *AMICUS CURIAE* .................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................... 2

STATEMENT OF THE CASE ................................................................. 4

    I.     Legal background ............................................................. 4

    II.    Factual Background ........................................................... 5

ARGUMENT ...................................................................................... 7

    I.     United States Attorneys Exercise Extraordinary
         Authority and Discretion .................................................... 8

    II.    The Power To Appoint U.S. Attorneys Has Never
         Been Solely Concentrated In The Executive Branch ............... 12

    III.   In Attempting to Exercise Unilateral U.S. Attorney
         Appointment Power, the Executive Branch Has
         Exceeded Congressional Limits ........................................... 19

         A.    In This and Other Cases, the Executive Branch
              Has Pursued Unilateral U.S. Attorney
              Appointment Power. .................................................. 20

         B.    Unilateral Power to Prosecute Does Not Imply
               Unilateral Power to Appoint. ....................................... 30

CONCLUSION ................................................................................... 32

# TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Berger v. United States,*
295 U.S. 78 (1935) ................................................................. 10

*Edmond v. United States,*
520 U.S. 651 (1997) .......................................................... 15, 30

*Ewing v. Mytinger & Casselberry,*
339 U.S. 594 (1950) .............................................................. 9, 10

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
561 U.S. 477 (2010) ............................................................... 24

*Freytag v. Comm'r,*
501 U.S. 868 (1991) ............................................................ 7, 15

*In re Grand Jury Subpoenas to Office of New York State Att'y Gen.,*
No. 25-mc-19, 2026 WL 60793 (N.D.N.Y. Jan. 8, 2026) ..................... 29

*In re Persico,*
522 F.2d 41 (2d Cir. 1975) ...................................................... 24

*INS v. Chadha,*
462 U.S. 919 (1983) ............................................................... 15

*Knight v. Comm'r,*
552 U.S. 181 (2008) .......................................................... 22, 23

*Morrison v. Olson,*
487 U.S. 654 (1988) ........................................................ 8, 30, 31

*NLRB. v. New Vista Nursing and Rehab.,*
719 F.3d 203 (3d Cir. 2013) ................................................... 26

*NLRB v. SW Gen., Inc.,*
580 U.S. 288 (2017) ....................................................... passim

iv

# TABLE OF AUTHORITIES—Continued

Page(s)

*Seila L. LLC v. Consumer Fin. Prot. Bureau,*
   591 U.S. 197 (2020)........................................................ 24

*Trump v. United States,*
   603 U.S. 593 (2024) ...................................................... 30

*United States v. (Under Seal),*
   714 F.2d 347 (4th Cir. 1983) ......................................... 9

*United States v. Armstrong,*
   517 U.S. 456 (1996) ....................................................... 8

*United States v. Arthrex, Inc.,*
   594 U.S. 1 (2021).......................................................... 15

*United States v. Batchelder,*
   442 U.S. 114 (1979) ....................................................... 9

*United States v. Fisher,*
   455 F.2d 1101 (2d Cir. 1972) ......................................... 9

*United States v. Garcia,*
   No. 25-cr-230, 2025 WL 2784640 (D. Nev. Sept. 30, 2025)............... 28

*United States v. Giraud,*
   795 F.Supp.3d 560 (D.N.J. 2025 ),
   *aff'd* 160 F.4th 390 (3d Cir. 2025) ................................Passim

*United States v. Hilario,*
   218 F.3d 19 (1st Cir. 2000) .......................................... 17

*United States v. Nixon,*
   418 U.S. 683 (1974)...................................................... 30

*United States v. Ramirez,*
   807 F.Supp.3d 1086 (C.D. Cal. 2025) ............................... 28

Page(s)

*United States v. Ramirez-Martinez,*
No.22-cr-1721, 2026 WL 113431 (D.N.M. Jan. 14, 2026) ...............28, 29

*United States v. Samango,*
607 F.2d 877 (9th Cir. 1979)..................................................... 9

*United States v. Serubo,*
604 F.2d 807 (3d Cir. 1979)...................................................... 9

*United States v. Trump,*
740 F.Supp.3d 1245 (S.D. Fla. 2024) ..................................... 22


**CONSTITUTION, RULES, STATUTES:**

United States Constitution
Article II  ................................................................................ 4

Act of Feb. 20, 1863, ch. 45, 12 Stat. 656 ....................................16

Act of July 23, 1868, ch. 227, 15 Stat. 168...................................16

Act of June 22, 1870, ch. 150, § 17, 16 Stat. 162, 164-65........................... 23

Act of March 3, 1863, ch. 93, § 2, 12 Stat. 768 ..........................16

Act of Sept. 6, 1966, Pub. L. No. 89-554, § 541(c), 80 Stat. 617 ..........14, 15

Judiciary Act, ch. 20, 1 Stat. 73, 92-93 (1789) .......................................12, 13

Preserving United States Attorney Independence Act
of 2007, Pub. L. No. 110-34, § 2, 121 Stat. 224 .......................................19

USA PATRIOT Improvement and Reauthorization Act of 2005,
Pub. L. No. 109-177, Title V, § 502, 120 Stat. 192, 246 (2006)..............19

# TABLE OF AUTHORITIES—Continued

Page(s)

5 U.S.C. § 3345 ................................................................Passim

5 U.S.C. § 3345(a)(1)......................................................5, 17

5 U.S.C. § 3345(a)(2) .....................................................5, 18

5 U.S.C. § 3345(a)(3) .....................................................5, 18

5 U.S.C. § 3346(a)(1) ..........................................................18

5 U.S.C. § 3346(a)(2) ..........................................................18

5 U.S.C. § 3346(b)................................................................18

5 U.S.C. § 3347.....................................................................27

5 U.S.C. § 3348(b) ...............................................................18

28 U.S.C. § 509 ............................................................. 21, 22

28 U.S.C. § 510............................................................. 21, 22

28 U.S.C. § 515 ......................................................................21

28 U.S.C. § 515(a) ............................................................... 22

28 U.S.C. § 515(b) ............................................................... 22

28 U.S.C. § 541......................................................................15

28 U.S.C. § 541(a) ..........................................................4, 30

28 U.S.C. § 543 .................................................................... 23

28 U.S.C. § 546 ...............................................................Passim

Page(s)

28 U.S.C. § 546(a)........................................................ 4, 5

28 U.S.C. § 546(b) ........................................................... 4

28 U.S.C. § 546(c).....................................................4, 5, 17

28 U.S.C. § 546(d) .....................................................4, 6, 17

28 U.S.C. § 547 ................................................................ 8

MISCELLANEOUS GOVERNMENT DOCUMENTS:

44 Cong. Rec. 4544 (1909) ......................................... 24

H.R. Rep. No. 110-58 (2007)....................................... 19

H.R. Rep. No. 59-2901 (1906)..................................... 24

*In re: Publishing a Vacancy Announcement for an
Interim United States Attorney Pursuant to
28 U.S.C. § 546(d)* (E.D. Va., Jan. 20, 2026) ....................................24, 25

Letter from George Washington, U.S. President,
to the U.S. Senate (Sept. 24, 1789) ........................................13

Letter from John Adams, U.S. President,
to the U.S. Senate (July 7, 1797) ...........................................14

Letter from Thomas Jefferson, U.S. President,
to the U.S. Senate (Jan. 28, 1805) .........................................14

The Federalist No. 76 (Alexander Hamilton)
(Jacob E. Cooke ed., 1961) ...................................................15

*Removing Politics from the Administration of
Justice: Hearings on S. 2803 and S. 2978 Before*

*the S. Comm. on the Judiciary*, 93rd Cong. 16 (1974) ...................... 10, 11

Robert H. Jackson, U.S. Att'y Gen., Address Delivered
   at the Second Annual Conference of United States
   Attorneys: The Federal Prosecutor 1 (April 1, 1940) ...............3, 10, 11, 12

S. Exec. Journal, 1st Cong., 1st Sess. (1789) .............................................14

S. Rep. No. 105-250 (1998) ........................................................................18

Temporary Filling of Vacancies in the Office of
   United States Attorney, 27 Op. O.L.C. 149, (2003) ................................ 17

*Appointment of Interim United States Attorney by
   the United States District Court for the Eastern
   District of Virginia, Pursuant to Title 28, United States
   Code, Section 546(d)*, United States District Court for
   the Eastern District of Virginia (Feb. 20, 2026) ................................... 25

*Re: United States Attorney for the Northern District
   of New York*, United States District Court for the
   Northern District of New York (Feb. 12, 2026)..................................... 30

**OTHER PUBLICATIONS:**

Andrew Kent, *Congress and the Independence of Federal Law
   Enforcement*, 52 U.C. Davis L. Rev. 1927, 1934 (2019) ......................... 11

Charles Warren, *New Light on the History of the Federal
   Judiciary Act of 1789*, 37 Harv. L. Rev. 49 (1923) ...........................12, 13

James A. Heilpern, *Interim United States Attorneys*,
   28 Geo. Mason L. Rev. 187, 190 (2020) .................................................14

Jennifer L. Selin & Lauren Mattioli, *Independent Justice?*

*U.S. Attorneys As A Case Study of Political Appointments*,
58 U. Mich. J.L. Reform 675 (2025)......................................................13

Jeremy Herb et al., *Inside the Seven Tumultuous Days
That Led to the James Comey Indictment*,
CNN (updated Sept. 28, 2025) ............................................... 6

Joseph Story, *Commentaries on the Constitution of the
United States* 376-77 (1833) ....................................................31

Kyla Guilfoil et al., *DOJ Fires New U.S. Attorney Hours
After Judges Appointed Him to Replace Trump Loyalist*,
NBC News (updated Feb. 21, 2026) ...................................... 25

Melissa Quinn, *Trump's Attacks on Comey and Leadership
Shifts in Prosecutors' Office Could Undermine Case,
Legal Experts Say*, CBS NEWS (updated Oct. 8, 2025) ...........................7

Sara Sun Beale, *Rethinking the Identity and Role of
United States Attorneys*, 6 Ohio St. J. Crim. L. 369 (2009)..................14

Scott Ingram, *Representing the United States Government:
Reconceiving the Federal Prosecutor's Role Through A
Historical Lens*, 31 Notre Dame J.L. Ethics
& Pub. Pol'y 293 (2017) ........................................................13

Scott MacFarlane, *Trump Admin. Fires 2 Prosecutors Who
Opposed Charges Against N.Y. Attorney General Letitia
James, Source Says*, CBS NEWS (Oct. 20, 2025)......................................7

## INTEREST OF THE *AMICUS CURIAE*[1]

*Amicus curiae*, the Virginia Association of Criminal Defense Lawyers (VACDL), is a statewide organization of lawyers who practice criminal defense which seeks to improve the fairness and quality of justice in Virginia's criminal law system. This goal is achieved by providing continuing legal education courses to its members on criminal defense; providing a network system to enhance collaboration in addressing issues that arise in cases; and by filing briefs as *amicus curiae* in cases presenting important issues relating to principles of justice and fairness. As an organization of lawyers who represent those accused of crimes, the VACDL advocates for a fair system which includes appointment of U.S. Attorneys in conformance with applicable legislation and constitutional principles.

---

[1] No counsel for any party has authored this brief in whole or in part, and no entity or person, aside from *amicus curiae* and its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. All parties consent to the filing of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

On September 20, 2025, the President publicly announced that former FBI Director James Comey and New York Attorney General Letitia James—neither of them yet criminal defendants—were "guilty as hell" of unspecified offenses. The interim U.S. Attorney in the Eastern District of Virginia, where Mr. Comey and Ms. James would later be indicted, appears to have disagreed and resigned. The Attorney General hastened to find someone who would do the President's bidding.

On September 22, the Attorney General issued an order that purported to make Lindsey Halligan the interim U.S. Attorney for the Eastern District of Virginia. Three days later, Ms. Halligan personally appeared before a grand jury and secured an indictment against Mr. Comey. Two weeks after that, she personally secured one against Ms. James as well.

But those indictments suffered an identical and fatal defect: the order appointing Ms. Halligan was unlawful. Under 28 U.S.C. § 546, the Attorney General has the power to appoint an interim U.S. Attorney for no more than 120 days, after which there must be either a presidentially nominated and Senate confirmed or a judicially appointed U.S. Attorney. As Mr. Comey and Ms. James explain in their briefs, the Executive Branch cannot use Section 546 to make a successive interim U.S. Attorney appointment when, as here,

an Attorney-General-appointed interim U.S. Attorney has already served the full term and been replaced by a judicially appointed interim.

The legal issue presented by Ms. Halligan's unlawful appointment is no technical matter, and the stakes extend far beyond this case. The U.S. Attorney for each federal district wields vast powers—either as "one of the most beneficent forces in our society" or, when acting "from malice or other base motives," "one of the worst." Robert H. Jackson, U.S. Att'y Gen., Address Delivered at the Second Annual Conference of United States Attorneys: The Federal Prosecutor 1 (April 1, 1940). Since Congress first created U.S. Attorneys in 1789, Presidents have understood that anyone nominated to fill such a position must obtain the Senate's advice and consent. And from the 1860s until the 1980s, Congress provided that the Judiciary—not the Executive—may select a temporary U.S. Attorney when the post is vacant. The Executive's authority to unilaterally appoint a U.S. Attorney is recent, narrow, and limited.

In attempting to appoint Ms. Halligan (and others throughout the country), the Executive Branch abused that power. This Court should enforce the statutes Congress passed with respect to the awesome position of U.S. Attorney, an office that wields great responsibilities for securing justice and protecting civil liberties. The Court should sustain the district court's

dismissal of the indictments against Mr. Comey and Ms. James because Ms. Halligan was not lawfully the interim U.S. Attorney for the Eastern District of Virginia when she obtained those indictments.

STATEMENT OF THE CASE

## I.      LEGAL BACKGROUND

The Appointments Clause provides that "Officers of the United States" shall be appointed by the President with the advice and consent of the Senate. U.S. Const. art. II, § 2, cl. 2. But "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.* U.S. Attorneys are inferior officers whom Congress has directed must be appointed by the President, with the advice and consent of the Senate. 28 U.S.C. § 541(a).

To address vacancies in a U.S. Attorney position, Congress enacted 28 U.S.C. § 546. Under Section 546, the Attorney General may appoint an interim U.S. Attorney, *id.* § 546(a), so long as the Attorney General's appointee is not a person that the President nominated to the same office and to whom "the Senate refused to give advice and consent." *Id.* § 546(b). An interim U.S. Attorney under Section 546(a) serves until either the "qualification" of a presidentially appointed and Senate-confirmed nominee or for 120 days. *Id.* § 546(c). If the 120 days expires, the district court in the

relevant judicial district "may appoint" a U.S. Attorney "to serve until the vacancy is filled." *Id.* § 546(d).

Congress has also long supplied the President with "limited authority to appoint acting officials" "temporarily" "without first obtaining Senate approval" to an office that otherwise requires presidential appointment and Senate confirmation ("PAS"). *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 294 (2017). The current law, enacted in 1998, is the Federal Vacancies Reform Act, 5 U.S.C. §§ 3345 *et seq.* ("FVRA"), which identifies three types of government officials who may perform acting service in a PAS office. *Id.* § 3345(a)(1)-(3). The FVRA provides, as a default, that the "first assistant" serves as the acting officer, but allows the President (but only the President) to instead select another Senate-confirmed officer or a sufficiently senior officer or employee in the agency. *Id.* § 3345(a)(1)-(3).

## II.   FACTUAL BACKGROUND[2]

A day after the Senate-confirmed U.S. Attorney for the Eastern District of Virginia resigned on January 20, 2025, the Attorney General appointed Erik Siebert to serve as the interim U.S. Attorney under 28 U.S.C. § 546(a). Less than two weeks before the 120-day limit in Section 546(c) expired, the

---

[2] Unless otherwise noted, the facts in this section are drawn from the district court's recitation. *See* J.A. 92-94; 285-88.

judges on the Eastern District of Virginia appointed him to continue in that role under Section 546(d). But on September 19, 2025, Mr. Siebert resigned, reportedly following pressure from senior Department of Justice officials after he declined to pursue criminal charges against Mr. Comey and Ms. James.

The next day, the President personally directed a social media post to the Attorney General declaring that Mr. Comey and Ms. James were "guilty as hell" and stating: "We can't delay any longer, it's killing our reputation and credibility . . . . JUSTICE MUST BE SERVED, NOW!!!" Two days later, on September 22, 2025, the Attorney General issued an order purporting to appoint Lindsey Halligan—who had previously served as the President's personal attorney—as the interim United States Attorney for the Eastern District of Virginia under 28 U.S.C. § 546.

Indictments swiftly followed. On September 25, Ms. Halligan appeared before the grand jury, where she personally presented and secured a two-count indictment against Mr. Comey, mere days before the statute of limitations was due to expire.[3] Soon after the indictment, the President

---

[3] Jeremy Herb et al., *Inside the Seven Tumultuous Days That Led to the James Comey Indictment*, CNN (updated Sept. 28, 2025), https://www.cnn.com/2025/09/26/politics/james-comey-indictment-trump-prosecution.

posted on social media that Mr. Comey was a "Dirty Cop" and "one of the worst human beings this Country has ever been exposed to."[4]  On October 9, Ms. Halligan personally presented and secured a two-count indictment against Ms. James.  Approximately one week later, two career prosecutors who had reportedly recommended against charging James were terminated.[5]

On November 24, 2025, the district court granted motions to dismiss the indictment in each case on the grounds that Ms. Halligan's appointment under Section 546 was invalid.

## ARGUMENT

"[T]he power of appointment to offices was deemed the most insidious and powerful weapon of eighteenth century despotism."  *Freytag v. Comm'r*, 501 U.S. 868, 883 (1991) (citation omitted).  The Framers thus crafted the Appointments Clause to empower Congress to define the duties of officers;

---

[4] Melissa Quinn, *Trump's Attacks on Comey and Leadership Shifts in Prosecutors' Office Could Undermine Case, Legal Experts Say*, CBS NEWS (updated Oct. 8, 2025), https://www.cbsnews.com/amp/news/trump-attacks-on-comey-and-leadership-shifts-in-virginia-prosecutors-office-could-undermine-case/.

[5] Scott MacFarlane, *Trump Admin. Fires 2 Prosecutors Who Opposed Charges Against N.Y. Attorney General Letitia James, Source Says*, CBS NEWS (Oct. 20, 2025), https://www.cbsnews.com/amp/news/trump-admin-fires-2-prosecutors-opposed-letitia-james-charges/.

provide the Senate the critical role in confirming the appointment of all principal officers; and allow Congress to vest the appointment of inferior officers in the President, the heads of departments, or the Courts.

Cognizant of the far-reaching prosecutorial powers that U.S. Attorneys wield, Congress has long both required Senate approval for U.S. Attorney appointments and restricted who may serve during a vacancy. But in this case and elsewhere throughout the country, the Executive Branch has run roughshod over those rules, seeking unilateral control over U.S. Attorney appointments. If permitted, that approach would fatally undermine the system Congress carefully calibrated to ensure that only qualified and worthy candidates wield the formidable powers of a U.S. Attorney.

## I. UNITED STATES ATTORNEYS EXERCISE EXTRAORDINARY AUTHORITY AND DISCRETION

United States Attorneys exercise the "vast power" and "immense discretion" of a prosecutor at the highest level. *Morrison v. Olson*, 487 U.S. 654, 727 (1988) (Scalia, J., dissenting). They decide how "to enforce the Nation's criminal laws," and courts afford "the presumption of regularity" to their "prosecutorial decisions." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quotation marks omitted); *see also* 28 U.S.C. § 547 (setting out the duties of U.S. Attorneys).

To be sure, the defense bar and the courts play a critical role in protecting against prosecutorial abuse once a case has been filed. But "[w]hether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion" alone. *United States v. Batchelder*, 442 U.S. 114, 124 (1979). Indeed, "grand jury proceedings are secret, Ex parte[,] and largely under the control of the federal prosecutor." *United States v. Serubo*, 604 F.2d 807, 816 (3d Cir. 1979) (footnote omitted). In that setting, "the prosecutor operates without the check of a judge or a trained legal adversary, and [is] virtually immune from public scrutiny." *Id.* at 817. As this Court has explained, however, the grand jury can perform its "independent investigatory function" only when it does not become "the private tool of the prosecutor." *United States v. (Under Seal)*, 714 F.2d 347, 349 (4th Cir. 1983) (citing *United States v. Fisher*, 455 F.2d 1101, 1105 (2d Cir. 1972)); *see United States v. Samango*, 607 F.2d 877, 882 (9th Cir. 1979) (the grand jury's dual role—"independent determination of probable cause that a crime has been committed and protection of citizens against unfounded prosecutions"—requires freedom from "manipulation . . . by over-zealous prosecutors"). For offenses that are not subject to the Fifth Amendment's Grand Jury Clause, a prosecutor may charge a person by information alone. *See Ewing v. Mytinger & Casselberry*,

339 U.S. 594, 599 (1950) (noting the "impact" of an "indictment" or "information" "on the reputation or liberty of a man" and the "incalculable" "harm" caused "by the mere institution of [a] proceeding[]").

In an address to U.S. Attorneys more than 80 years ago, then-Attorney General Robert H. Jackson observed that prosecutors have "more control over life, liberty, and reputation than any other person in America."  Robert H. Jackson, U.S. Att'y Gen., Address Delivered at the Second Annual Conference of United States Attorneys: The Federal Prosecutor 1 (April 1, 1940).  That control comes with attendant responsibilities to exercise power in a scrupulously fair and ethical manner.  Indeed, federal prosecutors operate not as "an ordinary party to a controversy," but instead as a "representative" of "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all." *Berger v. United States*, 295 U.S. 78, 88 (1935).  In that role, prosecutors seek not merely to "win a case"; their efforts, including prosecuting "with earnestness and vigor," and "strik[ing] hard blows" but not "foul ones," aim foremost to ensure that "justice shall be done."  *Id.*; *accord* Jackson, *supra*, at 3 ("Although the government technically loses its case, it has really won if justice has been done.").

Seeking justice requires that prosecutions be based on "law and merit, and not on considerations of party affiliation, political image-making, or White House approval or influence." *Removing Politics from the Administration of Justice: Hearings on S. 2803 and S. 2978 Before the S. Comm. on the Judiciary*, 93rd Cong. 16 (1974) (statement of Hon. Theodore C. Sorenson, Former Special Counsel to President Kennedy); *see* Andrew Kent, *Congress and the Independence of Federal Law Enforcement*, 52 U.C. Davis L. Rev. 1927, 1934 (2019) ("Partisan political considerations, personal vendettas or favoritism, financial gain, or self-protection or self-dealing should play no role in investigating or prosecuting cases, hiring or firing career officials, prosecutors, and law enforcement agents, and U.S. Attorneys and FBI Directors."). Thus, prosecutors, when assessing whether to open an investigation or pursue criminal charges, must maintain "a detached and impartial view of all groups in [their] community." Jackson, *supra*, at 4.

Jackson recognized, however, that the "tremendous" power and discretion that prosecutors wield could, in the wrong hands, lead to abuses. *Id.* at 1. "He can have citizens investigated and, if he is that kind of person, he can have this done to the tune of public statements and veiled or unveiled intimation." *Id.* Those abuses might culminate in "the most dangerous power of the prosecutor: that he will pick people that he thinks he should get,

rather than pick cases that need to be prosecuted." *Id.* at 4. That concern was greatest, Jackson worried, "[i]n times of fear or hysteria," where a person may be targeted for "being unpopular with the predominant or governing group, being attached to the wrong political views, or being personally obnoxious to or in the way of the prosecutor himself." *Id.* at 5.

## II. THE POWER TO APPOINT U.S. ATTORNEYS HAS NEVER BEEN SOLELY CONCENTRATED IN THE EXECUTIVE BRANCH

Jackson also recognized that because U.S. Attorneys possess "immense power to strike at citizens . . . with all the force of government itself," the U.S. Attorney position "*from the very beginning* has been safeguarded by presidential appointment, requiring confirmation of the Senate." *Id.* at 2 (emphasis added). Meanwhile, Congress relied on the Judiciary to fill temporary U.S. Attorney vacancies for more than 150 years, giving little or no role to the Executive Branch. That long history demonstrates that all three branches have shared the power and responsibility for appointing U.S. Attorneys.

**A.** Congress originally established the U.S. Attorney position as the "attorney for the United States in [ea]ch district" shortly after the Founding in the 1789 Judiciary Act. *See* Judiciary Act, ch. 20, § 35, 1 Stat. 73, 92-93 (1789). The Judiciary Act's original version envisioned that the pertinent

district court—also newly created under the Act, *id.* § 3—would appoint "a meet person learned in the law, to act as Attorney of the United States in each district." Charles Warren, *New Light on the History of the Federal Judiciary Act of 1789*, 37 Harv. L. Rev. 49, 108 (1923) (quotation marks omitted); *see* Jennifer L. Selin & Lauren Mattioli, *Independent Justice? U.S. Attorneys As A Case Study of Political Appointments*, 58 U. Mich. J.L. Reform 675, 684 (2025) (noting that the Act's name and legislative history "gave the impression that U.S. Attorneys were connected to the federal judiciary").[6] As enacted, the Act was silent on where the appointment power rested, *see* Judiciary Act, § 35 ("there shall be appointed"), but President George Washington appointed several U.S. Attorneys "[w]ithin days of the Judiciary Act becoming law." Scott Ingram, *Representing the United States Government: Reconceiving the Federal Prosecutor's Role Through A Historical Lens*, 31 Notre Dame J.L. Ethics & Pub. Pol'y 293, 301 (2017).

Although the Judiciary Act did not expressly require it, Presidents consistently understood the law to require the Senate's advice and consent for U.S. Attorney appointments. For example, in September 1789, President Washington sent to the Senate a slate of nominees that included 11 new U.S.

---

[6] This history undermines *amicus curiae* Unify.Us's claim (at 11) that "[t]here is no evidence that anyone at the Founding contemplated judicial appointment of federal prosecutors."

Attorney appointments, Letter from George Washington, U.S. President, to the U.S. Senate (Sept. 24, 1789), https://perma.cc/E9BP-KR86 (appointing original U.S. Attorneys), and the Senate promptly confirmed them, S. Exec. Journal, 1st Cong., 1st Sess. 29-32 (1789). His successors followed suit. *See, e.g.*, Letter from John Adams, U.S. President, to the U.S. Senate (July 7, 1797), https://perma.cc/837V-C3BV (nominating Jeremiah Smith to be U.S. Attorney for the District of New Hampshire); Letter from Thomas Jefferson, U.S. President, to the U.S. Senate (Jan. 28, 1805), https://perma.cc/RB2K-NRJS (nominating Edward Scott to be the U.S. Attorney for the district of "East Tenissee"). The Executive Branch thus did not interpret the Judiciary Act as granting it "unilateral authority to appoint" U.S. Attorneys. James A. Heilpern, *Interim United States Attorneys*, 28 Geo. Mason L. Rev. 187, 190 (2020); *see* Sara Sun Beale, *Rethinking the Identity and Role of United States Attorneys*, 6 Ohio St. J. Crim. L. 369, 392 (2009) ("Like the attorney general, the new federal attorneys and marshals in each district were appointed by the president with the advice and consent of the Senate.").

The Executive Branch's historical understanding that U.S. Attorney nominees must secure the Senate's confirmation—an understanding that Congress made explicit in 1966, *see* Act of Sept. 6, 1966, Pub. L. No. 89-554, § 541(c), 80 Stat. 617, 617—"serves both to curb Executive abuses of the

appointment power" and "to promote a judicious choice of persons" to fill the position. *Edmond v. United States*, 520 U.S. 651, 659-60 (1997) (citations omitted; cleaned up). Acutely conscious that the "manipulation of official appointments" was a "powerful weapon" in the Crown's hands, *Freytag v. Comm'r*, 501 U.S. 868, 883 (1991) (citation omitted), the Framers provided Congress, not the Executive Branch, the role of defining offices and appointment methods. Having "'lived under a form of government that permitted arbitrary governmental acts to go unchecked,'" the Framers "recognized the serious risk for abuse and corruption posed by permitting one person to fill every office in the Government." *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 317 (Thomas, J., concurring) (first quoting *INS v. Chadha*, 462 U.S. 919, 959 (1983); and then citing The Federalist No. 76, at 513 (Alexander Hamilton) (Jacob E. Cooke ed., 1961)).

Subjecting the President's nominations to Senate scrutiny provides "an excellent check upon the spirit of favoritism in the President" and "tend[s] to prevent the appointment of unfit characters." The Federalist No. 76, at 513. Congress has thus made "nomination by the President and confirmation by the Senate"—the "'default manner of appointment' for inferior officers," *United States v. Arthrex, Inc.*, 594 U.S. 1, 12 (2021) (citing *Edmond*, 520 U.S. at 660)—statutorily required for U.S. Attorneys, 28 U.S.C. § 541.

**B.** Prompt presidential nomination and Senate consideration is not always feasible, particularly where a U.S. Attorney leaves office unexpectedly. Congress has therefore provided for the temporary filling of the U.S. Attorney office, assigning the Judiciary a leading role, and limiting the Executive Branch's ability to make unilateral appointments even on a temporary basis.

Beginning in the 1860s, Congress provided the power to make temporary U.S. Attorney appointments. In the midst and aftermath of the Civil War, Congress passed or updated several statutes to ensure continuity in Executive Branch positions. *See, e.g.*, Act of Feb. 20, 1863, ch. 45, 12 Stat. 656; Act of July 23, 1868, ch. 227, 15 Stat. 168; *see also SW Gen., Inc.,* 580 U.S. at 294 (discussing this history). One such law addressed a vacancy in the U.S. Attorney position. That law empowered the *Judiciary*—not the Executive Branch—to make an interim U.S. Attorney appointment. *See* Act of March 3, 1863, ch. 93, § 2, 12 Stat. 768, 768. When Congress first enacted 28 U.S.C. § 546 in 1966, it confirmed that "[t]he district court for the district in which the office of United States attorney is vacant" held the authority to "appoint a United States attorney to serve until the vacancy is filled." 80 Stat. at 618.

It was not until Congress amended Section 546 in 1986 that Congress empowered the Executive Branch, through the Attorney General, to unilaterally appoint a temporary U.S. Attorney. *See* J.A. 103, 295-296. That unilateral appointment authority could (and can) last no longer than 120 days, after which the district court is authorized to appoint the interim U.S. Attorney. *See* 28 U.S.C. § 546(c), (d); *see also* Comey Br. 15-32 (discussing Section 546); James Br. 16-36 (same). Unlike an interim U.S. Attorney appointed by Attorney General, a judicially appointed U.S. Attorney is not subject to any statutory time limit. *See United States v. Hilario*, 218 F.3d 19, 23 (1st Cir. 2000) (holding that a judicially appointed interim U.S. Attorney had lawfully served for over six years).

Similarly limiting the Executive Branch's role in appointing temporary U.S. Attorneys is the Federal Vacancies Reform Act, 5 U.S.C. §§ 3345 *et seq.* ("FVRA"), which applies across the Executive Branch, and on which the Executive Branch has relied to fill U.S. Attorney's offices. *See* Temporary Filling of Vacancies in the Office of United States Attorney, 27 Op. O.L.C. 149, 149-51 (2003) (opining that both Section 546 and the FVRA are available for U.S. Attorney vacancies). The FVRA's limitations take two forms. First, it restricts who may serve in a vacant Executive Branch office. Under the statute's default rule in 5 U.S.C. § 3345(a)(1), the office's "first

assistant shall perform acting duties," *SW Gen.*, 580 U.S. at 301, a provision that leaves "no role" for the President, *United States v. Giraud*, 795 F.Supp.3d 560, 589 (D.N.J. 2025), *aff'd* 160 F.4th 390 (3d Cir. 2025). The President (and only the President) can deviate from that default rule, but only in two narrow ways: by selecting someone (1) who has already received the Senate's advice and consent, 5 U.S.C. § 3345(a)(2), or (2) who has held a senior position in the agency for at least 90 days, *Id.* § 3345(a)(3), and thus can thus perform "the routine functions of the office." S. Rep. No. 105-250, at 12 (1998).

Second, the FVRA allows the acting officer to serve only for "a limited period of time." *Id.* As a general matter, an acting officer may serve no longer than 210 days from the vacancy's occurrence. 5 U.S.C. § 3346(a)(1). Although that time may be extended under certain circumstances, *see, e.g. id.* § 3345(a)(2), (b), the FVRA likewise provides that if the Executive Branch fails to comply with the statute's time limitations (or other provisions), the office "remain[s] vacant," with its functions and duties to be performed only by the agency head, *id.* § 3348(b). In short, the FVRA supplies the President with only "limited authority to appoint acting officials to temporarily" fill a vacant office—including the U.S. Attorney—"without first obtaining Senate approval." *SW Gen.*, 580 U.S. at 294.

Nearly 20 years ago, Congress reaffirmed the Executive Branch's limited role in filling U.S. Attorney positions on a temporary basis. In 2006, Congress abolished the 120-day limit under Section 546(c) for an Attorney-General-selected interim U.S. Attorney. USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, Title V, § 502, 120 Stat. 192, 246 (2006); *see* H.R. Rep. No. 110-58, at 5 (2007) (noting that the 2006 amendment permitted interim U.S. Attorneys appointed by the Attorney General to "serve indefinitely without Senate confirmation"). But when "controversy" ensued, Gov. Br. 33, Congress swiftly reinstated the 120-day limit, *see* Preserving United States Attorney Independence Act of 2007, Pub. L. No. 110-34, § 2, 121 Stat. 224, thereby reinvigorating the Judiciary's "backstopping role" in the appointment of interim U.S. Attorneys under Section 546(d), *Giraud*, 795 F.Supp.3d at 581. That statutory change illustrated what the broader history amply confirms: the power to fill the U.S. Attorney position is shared, and the Executive Branch may not unilaterally fill that office other than temporarily and for a brief interval, in accordance with carefully circumscribed statutory limits.

### III. IN ATTEMPTING TO EXERCISE UNILATERAL U.S. ATTORNEY APPOINTMENT POWER, THE EXECUTIVE BRANCH HAS EXCEEDED CONGRESSIONAL LIMITS

Despite the long history demonstrating that all three branches have shared authority to appoint who wields the tremendous power and discretion as the U.S. Attorney in each district, the Executive Branch in this case sought unilateral appointment power. This case is not an outlier: the Executive Branch has recently pursued similar tactics throughout the country. These actions, in this case and elsewhere, are precisely the type of Executive-Branch aggrandizement the Appointments Clause was designed to prevent. It is no response to suggest, as both the government and its *amicus* do, that the President's executive power to investigate and prosecute implies the unilateral power to appoint who does so. History and constitutional structure rebut this audacious claim, which threatens to upend the Nation's longstanding respect for federal law enforcement.

### A. In This and Other Cases, the Executive Branch Has Pursued Unilateral U.S. Attorney Appointment Power.

The government's approach here and across the country aims to thwart other branches from participating in U.S. Attorney appointments. That approach threatens to erode the Appointments Clause's structural safeguards by consolidating appointment and supervision authority within a single branch.

1.  a.  Start with this case.  The government's claim that Section 546 permits the Attorney General to make multiple interim U.S. Attorney appointments—that is, to appoint Ms. Halligan as the interim U.S. Attorney after already Mr. Siebert had already completed a full 120-day term as the interim—is inconsistent with that provision's text, structure, and history.  *See* Comey Br. 15-32 (describing text, structure, and history of Section 546); James Br. 16-36 (same).  If accepted, moreover, it would permit the Executive Branch "to evade the Senate confirmation process indefinitely by stacking successive 120-day appointments."  J.A. 102.

The government also retroactively sought to install Ms. Halligan as the top prosecutor in the Eastern District of Virginia through another means designed to evade Senate or Judiciary participation in the appointment process.  After Mr. Comey moved to dismiss the indictment and challenged the lawfulness of Ms. Halligan's appointment, the Attorney General issued an order in October 2025 for "the avoidance of doubt" and which purported to invoke the Attorney General's authority under 28 U.S.C. §§ 509, 510, and 515 to belatedly appoint Ms. Halligan as a "Special Attorney."  J.A. 38.  That modest title, however, is a misnomer, as Ms. Halligan continued both before and after the Attorney General's order to hold herself out as *the* U.S. Attorney.  *See, e.g.*, J.A.  31-33 (indictment filed on Sept. 25, 2025); J.A. 77-80 (notice

filed on Nov. 20, 2025). Ms. Halligan thus understood the order as seeking to make her the *de facto* U.S. Attorney.[7]

The district court appropriately "reject[ed] the Attorney General's attempt to retroactively confer Special Attorney status on Ms. Halligan" without reaching the merits, J.A. 109, but any claim that the Attorney General could have installed Ms. Halligan as the U.S. Attorney (as Ms. Halligan herself continued to claim) through Section 515 fails on the merits as well. Section 515 authorizes the Attorney General to appoint "special attorney[s]" or "special assistant[s]," 28 U.S.C. § 515(b), and to empower them to "conduct any kind of legal proceeding, civil or criminal . . . *which United States attorneys are authorized by law to conduct.*" *Id.* § 515(a) (emphasis added).[8] By granting the Attorney General the authority to appoint a "special attorney" or a "special assistant" with powers analogous to a duly authorized U.S. Attorney, Congress necessarily distinguished those

---

[7] The order also articulated a narrower alternative argument, namely, that if a court limited Ms. Halligan's authority to "particular matters," she was empowered to "conduct and supervise the prosecutions of" Mr. Comey and Ms. James. J.A. 38. That fallback claim betrays the unconstitutionally retributive animus and personally targeted nature of these prosecutions. *See* Mot. to Dismiss Indictment Based on Vindictive and Selective Prosecution, *United States v. Comey*, No. 25-CR-272, ECF No. 59 (E.D. Va. Oct. 10, 2025).

[8] The order also cites 28 U.S.C. §§ 509 and 510, but neither Section 509 nor Section 510 supplies "an officer-appointing power." *See United States v. Trump*, 740 F.Supp.3d 1245, 1266 (S.D. Fla. 2024).

"special" positions from the office of the U.S. Attorney itself. Congress "easily could have" provided in Section 515 that an Attorney-General-appointed "special attorney" could serve "as" a U.S. Attorney, and it "presumably would have" if it intended the result the government seeks here. *Knight v. Comm'r*, 552 U.S. 181, 188 (2008).

Context leads to a similar conclusion. Congress has legislated a default rule of presidential nomination and Senate confirmation (in Section 541), a U.S. Attorney-specific vacancy provision (in Section 546), and a broader interstitial mechanism for addressing executive-branch vacancies that can be applied to U.S. Attorneys (in the FVRA). Congress has also authorized the Attorney General to appoint special attorneys to assist U.S. Attorneys. *See* 28 U.S.C. § 543. But what Congress has not done is empower the Attorney General to appoint a special attorney under Section 515 to transform that special attorney—who is not eligible to fill the role under Section 546 or the FVRA (*see infra* at 26-27 & n.11)—into an interim or acting U.S. Attorney.

Section 515's history confirms its narrow purpose. Unlike the longstanding U.S. Attorney position, Congress did not empower the Attorney General to appoint assistants for herself and for district attorneys until it created the Department of Justice in 1870. *See* Act of June 22, 1870, ch. 150, § 17, 16 Stat. 162, 164-65. Congress intended the Attorney General to use the

Section 515 authority where necessary to "employ special counsel in special cases." *See* H.R. Rep. No. 59-2901, at 2 (1906). It was never intended to displace the longstanding separate regime for the appointment and operation of U.S. Attorneys. Indeed, although "Attorneys General [have] made extensive use of special attorneys," *In re Persico*, 522 F.2d 41, 54 (2d Cir. 1975), including to prosecute U.S. Attorneys, *see* 44 Cong. Rec. 4544 (1909), the October order in this and other similar cases appears to be the first time an Attorney General has attempted to use the special-attorney appointment provision in Section 515 or its predecessors to install a temporary U.S. Attorney. *Cf. Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 220 (2020) ("Perhaps the most telling indication of [a] severe constitutional problem' with an executive entity 'is [a] lack of historical precedent' to support it.") (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 505 (2010).

b. Although Ms. Halligan no longer serves as the interim U.S. Attorney in the Eastern District of Virginia, the Executive Branch continues to assert that it alone may decide who serves as the U.S. Attorney there. On January 20, 2026, the Chief Judge of that District issued an order noting that Ms. Halligan's term as interim U.S. Attorney expired and soliciting applications for the position under Section 546(d). Order, *In re: Publishing a Vacancy*

*Announcement for an Interim United States Attorney Pursuant to 28 U.S.C. § 546(d)*, at 1 (E.D. Va., Jan. 20, 2026).  On February 20, 2026, the district court appointed James W. Hundley to serve in that role, but, as the district court observed, the Executive Branch removed Mr. Hundley "[h]ours later."[9] In a social media post shortly thereafter, the Deputy Attorney General wrote "Here we go again.  EDVA judges do not pick our US Attorney.  POTUS does. James Hundley, you're fired!"[10]

2.  The government's efforts to seize unilateral control over the U.S. Attorney appointment process in the Eastern District of Virginia form part of a larger and troubling pattern throughout the country.

- District of New Jersey

In the District of New Jersey, the Attorney General appointed Alina Habba as the interim U.S. Attorney under Section 546(a) and the President nominated her for the permanent position.  *Giraud*, 160 F.4th at 395.  As the

---

[9] *Appointment of Interim United States Attorney by the United States District Court for the Eastern District of Virginia, Pursuant to Title 28, United States Code, Section 546(d)*, United States District Court for the Eastern District of Virginia (Feb. 20, 2026), https://www.vaed.uscourts.gov/news/appointment-interim-united-states-attorney-united-states-district-court-eastern-district.

[10] Kyla Guilfoil et al., *DOJ Fires New U.S. Attorney Hours After Judges Appointed Him to Replace Trump Loyalist*, NBC News (updated Feb. 21, 2026), https://www.nbcnews.com/politics/trump-administration/deputy-ag-fires-interim-us-attorney-rcna260012.

120-day deadline under Section 546(c) neared, the district court announced that it would appoint under Section 546(d) the then-First Assistant U.S. Attorney to replace Habba. In response, the Executive Branch took several convoluted steps: it purported to (1) make Ms. Habba a "Special Attorney" under Section 515; (2) remove the First Assistant as interim U.S. Attorney and terminate her employment with the Department of Justice; (3) designate Ms. Habba as the First Assistant; (4) withdraw Ms. Habba's nomination to the permanent U.S. Attorney position; and then (5) assert that Ms. Habba was the acting U.S. Attorney under the FVRA. *Id.* at 395-96. The government later also argued that even if Ms. Habba was not lawfully serving as the acting U.S. Attorney under the FVRA, she could operate with authority delegated from the Attorney General. *Id.* at 402-03.

The Executive Branch's attempt to shoehorn Ms. Habba into the U.S. Attorney role thus bypassed not only the Senate's role envisioned in Section 541, but also the additional safeguard through the Judiciary that Congress provided in Section 546(d). On the government's delegation theory, Ms. Habba could have remained the *de facto* U.S. Attorney permanently. Permitting such conduct would have "eviscerate[d] the divided-powers framework" that the Appointments Clause "establish[es]." *NLRB. v. New Vista Nursing and Rehab.*, 719 F.3d 203, 230 (3d Cir. 2013).

The Third Circuit rightly rejected the Executive Branch's efforts at circumvention. It held that Ms. Habba was ineligible to serve as the acting U.S. Attorney under the FVRA because she was not serving as the First Assistant at the time the vacancy arose. *Giraud*, 160 F.4th at 397-401.[11] It also concluded that the government's delegation argument ran headlong into an exclusivity provision in the FVRA, 5 U.S.C. § 3347, which prohibits using the type of general vesting-and-delegation statutes on which the Attorney General claimed to rely. *Id*. at 402-06. The Third Circuit observed that the government's delegation theory—the same theory belatedly advanced below by Ms. Halligan—"would create a means for the Department of Justice to circumvent the FVRA's exclusivity provision, effectively permitting anyone to fill the U.S. Attorney role indefinitely," a result that "should raise a red flag, given the careful time limitations included in both the FVRA and the U.S. Attorney-specific statute." *Id*. at 406.

- Other Federal Districts

In at least four other federal districts, courts have applied similar reasoning to conclude that the Executive Branch has unlawfully circumvented the laws governing U.S. Attorney appointments. For example,

---

[11] This reasoning would apply equally to Ms. Halligan had the government sought to install her under the FVRA.

in the District of Nevada, Sigal Chattah served for 119 days as the Attorney General's appointment under Section 546(a), at which point the Attorney General purported to designate Ms. Chattah as the First Assistant and declare her the acting U.S. Attorney under the FVRA. *United States v. Garcia*, No. 25-cr-230, 2025 WL 2784640, at *1 (D. Nev. Sept. 30, 2025). The district court disagreed, observing that the FVRA "is a carefully crafted assertion of Congress's power under" the Appointments Clause and "would be defeated if the Executive Branch—the very branch Congress was trying to constrain—could choose whomever it wanted, whenever it wanted, and fill the vacancy simply by declaring that person to be first assistant." *Id.* at *9. It also concluded that the Executive Branch could not "rely on §§ 509, 510, and 515 to temporarily fill the vacant U.S. Attorney position in Nevada." *Id.* at *12.

Courts adjudicating challenges to similar tactics in Los Angeles and New Mexico have reached similar conclusions. *See United States v. Ramirez*, 807 F.Supp.3d 1086, 1105 (C.D. Cal. 2025) (concluding that Bilal Essayli's service as acting U.S. Attorney for the Central District of California "is unlawful and has been unlawful since it began," and that his service "cannot be premised on his appointment as a Special Attorney"); *United States v. Ramirez-Martinez*, No.22-cr-1721, 2026 WL 113431, at *20 (D.N.M. Jan. 14,

2026) (concluding that Ryan Ellison "is not, and was never, a valid Acting United States Attorney for the District of New Mexico under" the FVRA, and "has not been, and cannot be, delegated all of the functions and duties of a United States Attorney").

The Executive Branch's efforts at unilateral control over the U.S. Attorney position in the Northern District of New York resemble its conduct in the Eastern District of Virginia. The Attorney General "recently installed" John Sarcone as the acting U.S. Attorney in the Northern District of New York, and, while purporting to hold that role, Mr. Sarcone "personally directed" two subpoenas to the New York Attorney General's Office, which is headed by one of the defendants in these cases, Ms. James. *In re Grand Jury Subpoenas to Office of New York State Att'y Gen.*, No. 25-mc-19, 2026 WL 60793, at *1 (N.D.N.Y. Jan. 8, 2026). Relying on a "growing body of persuasive authority," the district court concluded that Mr. Sarcone's service "was and is unlawful because it bypassed the statutory requirements that govern who may exercise the powers of a U.S. Attorney." *Id.* When the District Court for Northern District of New York subsequently exercised its authority under Section 546(d) to appoint an interim U.S. Attorney on

February 11, 2026, the Executive Branch removed that judicially appointed interim U.S. Attorney "[b]y the end of the day."[12]

### B. Unilateral Power to Prosecute Does Not Imply Unilateral Power to Appoint.

The government and its *amicus curiae* defend the Executive Branch's unilateral assertion of U.S. Attorney appointment power on the ground that the President's control over the Executive Branch encompasses the prerogative to select the top prosecutor in each federal district, unimpeded by the involvement of the other branches. *See* Gov. Br. 26-27; Brief for Unify.Us as *Amicus Curiae* Supporting Appellants, at 4-9. That argument is deeply flawed.

There is no dispute that the "Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case." *United States v. Nixon*, 418 U.S. 683, 693 (1974); *see Morrison*, 487 U.S. at 706 (Scalia, J., dissenting) ("Governmental investigation and prosecution of crimes is a quintessentially executive function."). The Supreme Court has identified the authority to investigate and prosecute as one of the President's "conclusive and preclusive" powers. *Trump v. United States*, 603 U.S. 593, 620 (2024).

---

[12] *Re: United States Attorney for the Northern District of New York*, United States District Court for the Northern District of New York (Feb. 12, 2026), https://www.nynd.uscourts.gov/news/re-united-states-attorney-northern-district-new-york.

But it does not follow that the Executive Branch possesses the unilateral authority to appoint the U.S. Attorneys to wield those powers. Quite the opposite. Unlike the power to investigate and prosecute, "the power to appoint inferior officers such as [U.S. Attorneys] is not in itself an 'executive' function in the constitutional sense." *Morrison*, 487 U.S. at 695. Although Congress has conferred on the President the power to appoint U.S. Attorneys in the first instance, it has also required Senate advice and consent. 28 U.S.C. § 541(a). The Senate's role in the appointment process aims to "curb Executive abuses of the appointment power." *Edmond*, 520 U.S. at 659 (citing Joseph Story, *Commentaries on the Constitution of the United States* 376-77 (1833)). The cases now on appeal before this Court—and the other cases throughout the country noted above—exemplify Executive Branch abuses of the U.S. Attorney appointment power.

## CONCLUSION

This Court should affirm the district court's orders.

Respectfully submitted,

March 9, 2026

/s/ James I. Pearce
JAMES I. PEARCE
SAMANTHA BATEMAN
MARY L. DOHRMANN
NATHANIEL A.G. ZELINSKY
WASHINGTON LITIGATION GROUP
1717 K St NW
Suite 1120
Washington, DC 20006
202-521-8750
jpearce@washingtonlitigationgroup.org
sbateman@washingtonlitigationgroup.org
mdohrmann@washingtonlitigationgroup.org
nzelinsky@washingtonlitigationgroup.org

*Counsel for Virginia Association of Criminal Defense Lawyers*

MARVIN D. MILLER
AMICUS COMMITTEE, VIRGINIA ASSOCIATION OF CRIMINAL DEFENSE LAWYERS
The Law Offices of
Marvin D. Miller
1203 Duke Street
Alexandria, VA 22314

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify the following:

1. This brief complies with Fed. R. App. P. 29(a)(5) because it contains 6,490 words, excluding those parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because the brief has been prepared in Georgia 14-point font using Microsoft Word 2018.

3. This brief complies with the electronic filing requirements of Local R. 31.1(c) because the text of the electronic brief is identical to the text of the paper copies and because OpenText was run on the file containing the electronic version of this brief and no viruses were detected.

/s/ James I. Pearce
JAMES I. PEARCE
WASHINGTON LITIGATION GROUP
1717 K St NW
Suite 1120
Washington, DC 20006
202-521-8750
jpearce@washingtonlitigationgroup.org

March 9, 2026

**CERTIFICATE OF SERVICE**

I certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on March 9, 2026. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

/s/ James I. Pearce
JAMES I. PEARCE
WASHINGTON LITIGATION GROUP
1717 K St NW
Suite 1120
Washington, DC 20006
202-521-8750
jpearce@washingtonlitigationgroup.org

March 9, 2025