Cooley

Ephraim A. McDowell
T: +1 202 776 2310
emcdowell@cooley.com

Via CM/ECF

August 24, 2026

Nwamaka Anowi, Clerk of Court
U.S. Court of Appeals for the Fourth Circuit
1100 East Main Street, Ste. 501
Richmond, VA 23219

**Re: *United States v. Comey*, No. 25-4674; *United States v. James*, No. 25-4673 (L)**

Dear Ms. Anowi:

Pursuant to Federal Rule of Appellate Procedure 28(j), Mr. Comey submits the Second Circuit's decision in *In re Grand Jury Subpoenas to the Office of the New York State Attorney General*, No. 25-156 (Aug. 21, 2026). There, the court of appeals held that the putative Acting U.S. Attorney for the Northern District of New York was not validly serving in that role when he obtained subpoenas directed at the New York Attorney General's Office. The court concluded that the Federal Vacancies Reform Act (FVRA) "permits only a First Assistant already in place when the vacancy arises to become the acting officer automatically." *Id.* at 4. And the court determined that the U.S. Attorney General's "general delegation" of "all the duties of the U.S. Attorney's office was an unlawful use of general delegation authority to circumvent" the FVRA. *Id.*

The Second Circuit's decision supports Mr. Comey's argument in two respects. First, the court interpreted the FVRA in a manner that "safeguards" Congress's "Appointments Clause power," while rejecting the government's reading because it "would impose essentially no limits on Executive discretion." *Id.* at 15, 17. That reasoning mirrors Mr. Comey's structural arguments in support of his interpretation of 28 U.S.C. § 546.

Second, the Second Circuit affirmed the district court's remedy of quashing the subpoenas. Op. 35. In so doing, the court relied on "the well-established principle"—upon which Mr. Comey relies here, Br. 34-36—"that the proper remedy for a 'Government actor's exercise of power that the actor did not lawfully possess' is invalidation of the *ultra vires* action." Op. 35 (citation omitted). Moreover, the Second Circuit rejected the government's argument that the putative Acting U.S. Attorney's "hypothetical ability to obtain the subpoenas under different circumstances" could "permit [the court] to uphold them on the facts before [it]." *Id.* at 37. That analysis reinforces Mr. Comey's argument that the Court must look only to the specific appointment that Ms. Halligan purported to have at the time she secured the indictment—not to some hypothetical appointment she could have had. Br. 43-47.

Sincerely,

/s/ Ephraim A. McDowell
Ephraim A. McDowell

# In the
# United States Court of Appeals
## For the Second Circuit

---

August Term, 2025
No. 26-156

IN RE GRAND JURY SUBPOENAS TO THE OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL.

OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL,
*Petitioner-Appellee*,

*v.*

UNITED STATES OF AMERICA,
*Respondent-Appellant*.

---

On Appeal from a Judgment of the United States District Court
for the Northern District of New York.

---

ARGUED: MAY 4, 2026
DECIDED: AUGUST 21, 2026

Before: CALABRESI, PARK, and KAHN, *Circuit Judges*.

---

This case concerns whether John A. Sarcone III validly served as, and lawfully exercised the duties of, the Acting U.S. Attorney for the Northern District of New York. We hold that he did not.

The Appointments Clause of the Constitution requires that "Officers of the United States" be nominated by the President and confirmed by the Senate. When

a Senate-confirmed U.S. Attorney leaves office, the Federal Vacancies Reform Act of 1998 ("FVRA") specifies who may perform the office's duties in an acting capacity, and for how long. The Government maintains that Sarcone lawfully served as the Acting U.S. Attorney because he was designated First Assistant to the U.S. Attorney after the Senate-confirmed U.S. Attorney left office and thereby automatically became the acting officer under the FVRA. Pursuant to that authority, Sarcone obtained two grand jury subpoenas directed at the New York Office of the Attorney General ("NYOAG") in connection with its investigations into the National Rifle Association and Donald J. Trump for financial misconduct. The Government contends that, even if Sarcone was not the acting officer, the Attorney General's delegation of all the office's duties to him provided an independent source of authority. NYOAG moved to quash the subpoenas.

The United States District Court for the Northern District of New York (Schofield, *J.*, sitting by designation) granted that motion, holding that Sarcone lacked authority to obtain the subpoenas either as Acting U.S. Attorney or through authority delegated by the Attorney General. The court further disqualified Sarcone from future involvement in the underlying investigations.

We hold that Sarcone was not serving as Acting U.S. Attorney when he obtained the subpoenas because the FVRA permits only a First Assistant already in place when the vacancy arises to become the acting officer automatically. We further hold that the general delegation to Sarcone of all the duties of the U.S. Attorney's office was an unlawful use of general delegation authority to circumvent the FVRA's exclusivity provision. Because Sarcone lacked authority to obtain the subpoenas on either theory, we **AFFIRM** the district court's order quashing them. And because the government on appeal did not provide any argument as to why the district court erred in disqualifying Sarcone from future involvement in the underlying investigations, we treat the issue as forfeited and **AFFIRM** the order below.

Judge Park dissents in a separate opinion.

---

DONALD B. VERRILLI, JR., Munger, Tolles & Olson LLP, Washington, DC; *with* Hailyn J. Chen & Victoria A. Degtyareva, Munger, Tolles & Olson LLP, Los Angeles, CA; Barbara D. Underwood, Solicitor General (Kumiki

Gibson & Michael Jaffe, *on the brief*), Office of the New York State Attorney General, New York, NY, *for Petitioner-Appellee*.

HENRY C. WHITAKER, Counselor to the Attorney General (Rajit S. Dosanjh, Assistant United States Attorney, *on the brief*), *for* Todd Blanche, Acting Attorney General, *for Respondent-Appellant*.

---

CALABRESI, Circuit Judge:

This case concerns whether John A. Sarcone III validly served as, and lawfully exercised the powers of, the Acting U.S. Attorney for the Northern District of New York. We hold that he did not.

The Appointments Clause of the Constitution requires that "Officers of the United States" be nominated by the President and confirmed by the Senate. When a Senate-confirmed U.S. Attorney leaves office, the Federal Vacancies Reform Act of 1998 ("FVRA") specifies who may perform the office's duties in an acting capacity, and for how long. The Government maintains that Sarcone lawfully served as the Acting U.S. Attorney because he was designated First Assistant to the U.S. Attorney ("FAUSA") after the Senate-confirmed U.S. Attorney left office and thereby automatically became the acting officer under the FVRA. Pursuant to that authority, Sarcone obtained two grand jury subpoenas directed at the New York Office of the Attorney General ("NYOAG") in connection with its investigations into the National Rifle Association and Donald J. Trump for financial misconduct. The Government contends that, even if Sarcone was not the acting officer, the Attorney General's delegation of all the office's duties to him

provided an independent source of authority. NYOAG moved to quash the subpoenas.

The United States District Court for the Northern District of New York (Schofield, *J.*, sitting by designation) granted that motion, holding that Sarcone lacked authority to obtain the subpoenas either as Acting U.S. Attorney or through authority delegated by the Attorney General. The court further disqualified Sarcone from future involvement in the underlying investigations.

We hold that Sarcone was not serving as Acting U.S. Attorney when he obtained the subpoenas because the FVRA permits only a First Assistant already in place when the vacancy arises to become the acting officer automatically. We further hold that the general delegation to Sarcone of all the duties of the U.S. Attorney's office was an unlawful use of general delegation authority to circumvent the FVRA's exclusivity provision. Because Sarcone lacked authority to obtain the subpoenas on either theory, we **AFFIRM** the district court's order quashing them. And because the government on appeal did not provide any argument as to why the district court erred in disqualifying Sarcone from future involvement in the underlying investigations, we treat the issue as forfeited and **AFFIRM** the order below.

## I. Background

### A. Legal Framework

The Constitution prescribes distinct and important roles for the Executive and Legislative branches of government in the appointment of "Officers of the

United States." Generally, such officers must be nominated by the President and confirmed by the Senate under the Appointments Clause:

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. art. II, § 2, cl. 2. Known as "PAS" offices, approximately 1,000 Executive Branch positions require presidential nomination and Senate confirmation. Congress includes U.S. Attorneys among those offices subject to the PAS process. 28 U.S.C. § 541(a).

The Appointments Clause is more than a mere formality. "[I]t is among the significant structural safeguards of the constitutional scheme." *Edmond v. United States*, 520 U.S. 651, 659 (1997). At the Founding, "'the power of appointment to offices' was deemed 'the most insidious and powerful weapon of eighteenth century despotism.'" *Freytag v. Commissioner*, 501 U.S. 868, 883 (1991) (quoting Gordon S. Wood, *The Creation of the American Republic 1776-1787*, at 79 (1969)). By subjecting the President's nominees to Senate confirmation, the Framers envisioned a critical role for the legislature in ensuring that those who fill PAS roles possess the qualifications and character befitting of the office. As Alexander Hamilton wrote in the Federalist Papers, the Appointments Clause serves as an "excellent check upon a spirit of favoritism in the President." The Federalist No. 76 (Alexander Hamilton). Otherwise, an Executive with a unilateral appointment

power "would be governed much more by his private inclinations" than he would if his nominees required Senate approval. *Id.*

While the PAS process is the "default manner of appointment," the Constitution affords Congress the flexibility to establish alternative means of appointment for inferior officers. *United States v. Arthrex, Inc.*, 594 U.S. 1, 12 (2021) (quoting *Edmond*, 520 U.S. at 660). Recognizing that the PAS process can take time and that vacancies occasionally arise, Congress set out certain fixed means by which PAS offices may be filled for a "limited time, and under special and temporary conditions," until the Senate confirms a presidentially appointed nominee. *United States v. Eaton*, 169 U.S. 331, 343 (1898).

With respect to U.S. Attorneys, two different statutes enable an official temporarily to perform the role. The first is the FVRA, 5 U.S.C. § 3345 *et seq.*, which applies to all PAS offices across the Executive branch. When a PAS officer "dies, resigns, or is otherwise unable to perform the functions and duties of the office," the FVRA identifies three categories of individuals who may fill the office on an acting basis. 5 U.S.C. § 3345(a). First, "the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity." 5 U.S.C. § 3345(a)(1). Under this provision, First Assistants "automatically assume acting duties" without any action required by the Executive. *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 305 (2017). In this regard, (a)(1) is the FVRA's "default rule." *Id.* at 293.

Second, the President may temporarily fill the position with a Senate-confirmed official who is already serving in a different PAS office. 5 U.S.C.

§ 3345(a)(2). And third, the President may temporarily assign someone within the agency to the acting role if that individual satisfies certain seniority and experience criteria. *Id.* § 3345(a)(3). Eligible individuals within all three of these categories are limited to serving for "no longer than 210 days beginning on the date the vacancy occurs," or, subject to certain requirements, while a nomination is pending. *Id.* § 3346(a).

The FVRA is "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of" a PAS office. *Id.* § 3347(a). In making the FVRA exclusive, Congress sought to prevent overreliance on acting officials, which it viewed as a "threat to the Senate's advice and consent power." *SW Gen.*, 580 U.S. at 293-95. The statute's exceptions are narrow. A separate "statutory provision" governs only if it "*expressly* . . . authorizes the President, a court, or the head of an Executive department, to designate an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity." *Id.* § 3347(a)(1)(A) (emphasis added). And a statute vesting an agency head with "general authority . . . to delegate duties" does not qualify. *Id.* § 3347(b).

For U.S. Attorneys, an additional statute offers a mechanism for temporary appointments consistent with the FVRA's exclusivity provision. 28 U.S.C. § 546 provides that when an "office of United States attorney is vacant," the Attorney General may appoint an Interim U.S. Attorney for no more than 120 days, provided that the Senate had not previously refused to confirm that individual. 28 U.S.C. § 546(a)-(c). If the 120-day period lapses, "the district court for such district" is authorized to "appoint a United States attorney to serve until the

vacancy is filled." *Id.* § 546(d). These two statutory provisions, the FVRA and § 546, are the only means by which U.S. Attorney's offices may be filled on a temporary basis. Otherwise, the President must obtain for his nominee the advice and consent of the Senate.

**B. Sarcone's Appointment**

On February 17, 2025, the Senate-confirmed U.S. Attorney for the Northern District of New York, Carla B. Freedman, left office. Under the FVRA, the then-FAUSA for the district, Daniel Hanlon, automatically became Acting U.S. Attorney. On February 28, the Attorney General appointed John A. Sarcone III as Interim U.S. Attorney under 28 U.S.C. § 546, effective March 17, replacing Hanlon as the temporary head of the office.

Sarcone's interim term expired 120 days later on July 14. That day, the Northern District's Board of Judges declined to exercise its authority under 28 U.S.C. § 546(d) to appoint a U.S. Attorney for the district, leaving the office vacant. The Department of Justice then took a series of personnel actions within the district. First, it reassigned Daniel Hanlon from FAUSA to Deputy U.S. Attorney, creating a vacancy in the FAUSA role. Second, it appointed Sarcone to the now-vacant FAUSA position, stating that the "[r]eason" for the "[t]emporary [a]ppointment" was to "[s]erv[e] as Acting U.S. Attorney for a 210-day period." App'x 2090-92. Third, it designated Sarcone a Special Attorney under 28 U.S.C. § 515, a position traditionally used for cross-district prosecutions or specific high-profile investigations rather than district-wide responsibilities. The designation letter purported to vest Sarcone with authority "to conduct in the Northern District

of New York, any kind of legal proceedings, civil or criminal, including Grand Jury proceedings, . . . which United States Attorneys are authorized to conduct" for an "indefinite" period. App'x 2087. Based on these appointments as FAUSA and Special Attorney, Sarcone represented to the Chief Judge of the Northern District that, "by operation of law under the [FVRA]," he was "now serving as Acting United States Attorney for the Northern District of New York indefinitely." App'x 2086.

**C. The Grand Jury Subpoenas**

The subpoenas in this case sought information relating to two enforcement actions brought by NYOAG, which New York Attorney General Letitia James has led since 2018. First, in August 2020, NYOAG sued the National Rifle Association ("NRA"), a nonprofit incorporated in New York, along with its senior executives. *See People v. National Rifle Ass'n*, Index No. 451625/2020 (N.Y. Sup. Ct.). NYOAG alleged that the NRA mishandled its assets and misappropriated charitable funds for personal use. A jury returned a verdict against the NRA and its executives, and New York courts have upheld the verdict. *See People v. National Rifle Ass'n*, 171 N.Y.S.3d 782, 786-87 (N.Y. Sup. Ct. 2022); *People v. National Rifle Ass'n*, 203 N.Y.S.3d 255, 261-62 (N.Y. App. Div. 2023).

Second, in September 2022, NYOAG sued Donald J. Trump and his associates for financial fraud, based on conduct in his personal capacity as a New York business owner. *See People v. Trump*, Index No. 452564/2022 (N.Y. Sup. Ct.). NYOAG alleged that they inflated the value of Trump's assets by as much as $2.2 billion a year. The trial court found the defendants liable, and both state and

federal courts have upheld that determination. *See, e.g.*, *Trump v. James*, 2022 WL 1718951 (N.D.N.Y. 2022); *People v. Trump Org., Inc.*, 38 N.Y.3d 1053, 1054 (N.Y. 2022).

On August 5, 2025, NYOAG was served with two grand jury subpoenas. App'x 68-74. They demanded production of "[a]ny and all documents relating to" or "reflecting communications about" NYOAG's NRA and Trump cases. *Id.* at 70, 74. The subpoenas were obtained by Sarcone, who identified himself as the "Acting United States Attorney." *Id.* at 68, 72. They referenced neither his "Special Attorney" nor his "First Assistant" title and named no prosecutor other than Sarcone. Yet by the time the subpoenas were served on NYOAG, Sarcone's 120-day term as Interim U.S. Attorney under § 546 had already expired.

**D. Procedural History**

On August 19, 2025, NYOAG moved to quash the subpoenas. It argued that the subpoenas were issued in retaliation and with an intent to harass Letitia James and NYOAG; were unreasonable intrusions on New York's sovereignty; infringed on NYOAG's First Amendment rights; were overbroad and unduly burdensome; sought privileged information; and were invalid because Sarcone was not lawfully serving as Acting U.S. Attorney when he obtained them.

The Government opposed the motion on every ground. As relevant here, it asserted that Sarcone was validly serving as Acting U.S. Attorney because he had been appointed FAUSA while the U.S. Attorney position was vacant and was thereby automatically elevated to the office under the FVRA. And regardless of his title under the FVRA, the Government maintained, the Attorney General's

delegation to Sarcone of all the duties of U.S. Attorney as Special Attorney and FAUSA independently authorized him to obtain the subpoenas.

The Northern District judges recused themselves from deciding the motion, having declined to appoint a U.S. Attorney when Sarcone's 120-day term as Interim U.S. Attorney expired. The Chief Judge of this Court designated Judge Schofield of the Southern District of New York to decide the motion. On January 8, 2026, the district court quashed the subpoenas, finding that Sarcone "was not lawfully serving as Acting U.S. Attorney when the subpoenas were issued." *In re Grand Jury Subpoenas to Off. of N.Y. State Att'y Gen.*, 814 F. Supp. 3d 284, 288 (N.D.N.Y. 2026). The district court held that only a FAUSA serving when the vacancy arises is eligible to assume the role of Acting U.S. Attorney under the FVRA's automatic-succession provision. *See id.* Because Sarcone was named FAUSA after the U.S. Attorney's office was already vacant, the FVRA's automatic-succession provision did not apply. *Id.*

The district court also rejected the Government's alternative argument that Sarcone could obtain the subpoenas through his delegated authority as Special Attorney and FAUSA under §§ 510 and 515. The delegation to Sarcone, the district court concluded, was an improper "attempt to use general delegation to create an Acting U.S. Attorney outside the FVRA's statutory framework," in violation of the FVRA's exclusivity provision, 5 U.S.C. § 3347(a). *Id.* at 297-98. The district court accordingly invalidated the subpoenas under Federal Rule of Criminal Procedure 17. It also disqualified Sarcone from "any further involvement in prosecuting or supervising the criminal investigations that prompted the subpoenas." *Id.* at 298.

The district court did not address any of NYOAG's other claims in support of its motion to quash.

The Government timely appealed. It concedes that Sarcone can no longer serve as Acting U.S. Attorney under the FVRA's 210-day time limit because his purported tenure had long since expired. *See* Respondent-Appellant's Br. 3 n.1. As of this decision, the President has not submitted a nominee to the Senate and, according to the Government, Sarcone continues to serve as the operative head of the U.S. Attorney's office. *See id.*

## II. Standard of Review

We review a district court's decision to quash grand jury subpoenas for abuse of discretion. *United States v. Skelos*, 988 F.3d 645, 660 (2d Cir. 2021). Questions of statutory interpretation are reviewed *de novo* and factual determinations are reviewed for clear error. *United States v. Freeman*, 99 F.4th 125, 127 (2d Cir. 2024); *In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 68-69 (2d Cir. 2003). Decisions to disqualify an attorney, including a prosecutor, are reviewed for abuse of discretion. *See United States v. Jones*, 381 F.3d 114, 119 (2d Cir. 2004); *United States v. Badalamenti*, 794 F.2d 821, 828 (2d Cir. 1986).

## III. Discussion

The Government asserts that the district court erred in quashing the subpoenas and disqualifying Sarcone. Specifically, it says that Sarcone was validly serving as Acting U.S. Attorney under the FVRA when he obtained the grand jury subpoenas, and, in any event, he had sufficient authority as FAUSA and Special Attorney. For the reasons discussed below, we disagree.

**A. Mootness**

Before reaching the merits, we must first consider whether this appeal is moot. On March 9, 2026, the grand jury that issued the subpoenas was discharged. Respondent-Appellant's Rule 28(j) Letter, *In re Grand Jury Subpoenas to the Off. of the N.Y. State Att'y Gen. v. United States*, No. 26-156 (2d. Cir.), ECF No. 87. In this Circuit, grand jury subpoenas become unenforceable upon the discharge of the issuing grand jury. *In re Grand Jury Proceedings*, 971 F.3d 40, 50 (2d Cir. 2020). NYOAG is thus no longer subject to the subpoenas, as both parties agree. But the subpoenas' unenforceability "does not render [the] motion to quash moot." *Id.* at 53. We retain "jurisdiction to review the issues raised" because, given the limited duration for which a grand jury sits, "this dispute is 'capable of repetition, yet evading review.'" *Id.* (citing *United States v. Juvenile Male*, 564 U.S. 932, 938 (2011)).

The appeal remains live for a second reason as well: the district court also disqualified Sarcone "from any further involvement in prosecuting or supervising the instant investigations, regardless of his title." *In re Grand Jury Subpoenas*, 814 F. Supp. 3d at 300. That prospective disqualification was based on Sarcone's alleged improper appointment and is a "live dispute" on which the Government can obtain "effectual relief" by prevailing on appeal. *Council for Responsible Nutrition v. James*, 159 F.4th 155, 162 (2d Cir. 2025). This case is therefore not moot.

**B. Sarcone's Appointment as Acting U.S. Attorney Under the FVRA**

The Government's front-line argument is that the grand jury subpoenas were valid because Sarcone lawfully obtained them in his capacity as the Acting U.S. Attorney. Both parties agree that the U.S. Attorney for the Northern District

is a PAS office subject to the FVRA, and that the office is vacant. The last Senate-confirmed U.S. Attorney departed on February 17, 2025, shortly after President Trump took office. Pursuant to 28 U.S.C. § 546, the Attorney General appointed Sarcone as Interim U.S. Attorney, effective March 17, 2025. Once Sarcone's 120-day term as Interim U.S. Attorney expired, he was then designated as the new FAUSA and as a Special Attorney, effective July 15, 2025. Because the U.S. Attorney's office was vacant at the time that Sarcone became FAUSA, the Government contends that he automatically became Acting U.S. Attorney by operation of the FVRA's automatic-succession provision, 5 U.S.C. § 3345(a)(1). We disagree. The FVRA makes clear that the automatic-succession provision applies only to the person serving as First Assistant at the time the vacancy arises. Because Sarcone was not the FAUSA when the previous U.S. Attorney left office and created the vacancy, § 3345(a)(1) did not apply.

*1. Statutory Language and Structure*

Through paragraphs (a)(1), (a)(2), and (a)(3) of § 3345, Congress delimited the three means by which a PAS vacancy may temporarily be filled under the FVRA. Paragraph (a)(1)'s designation of the First Assistant as the acting official is the FVRA's default provision, operating automatically upon the vacancy of the PAS office. That automaticity is critical: it ensures continuity in the PAS office without requiring the President or agency head to take any action at all. But Congress also knew that (a)(1) would sometimes fail to supply a qualified successor, such as when no First Assistant is in place, or when the President might prefer to select someone other than the default designee. Accordingly, Congress

defined in paragraphs (a)(2) and (a)(3) a limited pool of officials from which the President could choose. These officials must either be Senate-confirmed officers serving in a different PAS office, 5 U.S.C. § 3345(a)(2), or possess sufficient agency expertise and experience for the role, *id.* § 3345(a)(3).

In short, if the President wishes to deviate from the default, the new person must be sufficiently qualified. A statutory scheme providing for automatic succession to ensure continuity, paired with presidential flexibility within certain limits, makes good sense. *See Biden v. Nebraska*, 600 U.S. 477, 512 (2023) (Barrett, *J.*, concurring) ("Context also includes common sense."). This approach reflects a prudent way for Congress to safeguard its Appointments Clause power while affording some degree of Executive discretion during temporary vacancies.

Reading (a)(1) to encompass First Assistants who are designated after the vacancy arises would turn the FVRA's common-sense framework on its head. Under that reading, the President could install virtually anyone as the acting officer simply by naming that person First Assistant, regardless of whether they possessed any of the qualifications Congress required for the Executive to depart from the default.

Sidestepping (a)(2) and (a)(3) in this way also would invert the statute's internal logic. Congress made (a)(1) automatic precisely because it requires no fresh exercise of judgment: the First Assistant had already been vetted and installed before any vacancy arose, for reasons having nothing to do with filling the vacant office. Designating a First Assistant after the vacancy is not automatic succession at all; it is a deliberate and discretionary choice made without any of

the criteria Congress enacted to govern such deliberate choices under (a)(2) and (a)(3). The Government would thus convert the FVRA's one non-discretionary path into its most discretionary one, untethered by any qualification requirements.

The incentives such a scheme would create run exactly backward. An Executive who wanted an unqualified loyalist in an acting role would have no reason to use (a)(2) and (a)(3), which demand Senate confirmation or substantial agency tenure. He would instead route every acting appointment through (a)(1), which demands nothing. The Government's reading thus rewards evasion and penalizes compliance—a strange design for a statute Congress enacted to stop the Executive from skirting the Vacancies Act, and one that would undermine the statute's purpose as "a reclamation of the Congress's Appointments Clause power." *SW Gen., Inc. v. NLRB*, 796 F.3d 67, 70 (D.C. Cir. 2015), *aff'd*, 580 U.S. 288 (2017).

The Government asserts that, even under its reading, (a)(2) and (a)(3) still serve a function in three narrow situations where (a)(1) is unavailable. First, where the First Assistant position is itself a PAS office, (a)(1) is unavailable because the First Assistant cannot be appointed without Senate confirmation. Second, (a)(1) is unavailable when the office of an agency head is vacant and the First Assistant must be appointed by the agency head. And third, (a)(2) and (a)(3) play a role where the President wishes to keep the current First Assistant in his place and appoint someone else for the acting role.

Even accepting all three hypotheticals as valid—and we are dubious that they are[1]—they do little to advance the Government's position. First, it would be anomalous for Congress to have conditioned the extent of the President's discretion on the unrelated happenstance of whether the officer's First Assistant role happened to be vacant. The most coherent reading of the statutory framework is that Congress focused on the PAS office itself in determining the President's options. Second, the Government does not, and cannot, dispute that its reading would impose essentially no limits on Executive discretion and hence is the exact opposite of what § 3345, in both its design and its specific requirements, was written to accomplish.

Beyond the clear structure of the statutory scheme, § 3345's plain text also confirms the incumbency requirement in (a)(1). That provision provides that if a PAS officer "dies, resigns, or is otherwise unable to perform the functions and duties of the office," then "the first assistant to the office of such officer shall perform the functions and duties of the office in an acting capacity subject to the time limitations of section 3346." 5 U.S.C. § 3345(a). The mechanism operates on a self-executing if-then basis: if the triggering event occurs, then the First Assistant

[1] For example, the Government's third scenario is not really a scenario at all. It posits that (a)(2) and (a)(3) play a distinct role when the President wishes to leave the incumbent First Assistant in that position while installing someone else as acting officer. But under the Government's own reading of (a)(1), the President would not need (a)(2) or (a)(3) to accomplish just that. He could momentarily reassign the incumbent First Assistant, designate his preferred candidate to the now-vacant First Assistant slot, and that candidate would automatically become Acting U.S. Attorney under (a)(1). The President could then put the original First Assistant back in place.

"shall" automatically become the acting officer. The first two triggers—death and resignation—are instantaneous events: one is either dead or alive, and in a job or out of it. Accordingly, the relevant question under the statute is who occupies the First Assistant role at the instant that the triggering event occurs. A conditional event anchored to an instantaneous trigger cannot reach forward in time to encompass a First Assistant appointed *after* the triggering event has already passed.

Ordinary usage demonstrates the instantaneous nature of the triggering language. Take a single, but dramatic, example: if the President dies, the Vice President "shall become President" automatically. U.S. Const. amend. XXV, § 1. This provision plainly refers to whoever is Vice President at the moment of death. Were the Vice Presidency itself vacant, succession would pass to the Speaker of the House; it would not go to whoever later is made Vice President. 3 U.S.C. § 19(a)(1). The Twenty-Fifth Amendment's automatic-succession mechanism thus operates precisely as the FVRA does.

The Government advances several textual arguments for a broader reading, but none persuade. First, the Government points to the statute's reference to the "first assistant *to the office* of such officer" rather than the "first assistant to the officer," arguing that this phrasing permits later-appointed First Assistants to qualify under § 3345(a)(1). That reading asks the phrase "to the office" to bear more weight than it can; we do not see why that difference of words makes the slightest difference semantically. The statutory text is consistent with a straightforward reading of the statute. The First Assistant becomes the acting

officer not because of any personal association with the departed officeholder, but because of his relationship to the newly vacated *office*.

Second, the Government observes that other provisions of § 3345 contain "backward-looking language" while (a)(1) does not and asserts that this absence means (a)(1) does not impose an incumbency requirement. Respondent-Appellant's Br. 22. Specifically, the Government notes that (a)(3) conditions the President's authority to name acting officials on how long the candidate served in the agency before the vacancy, while (a)(1) lacks a similar requirement. This argument misapprehends how the statute operates. Paragraph (a)(1) has no backward-looking constraint because its focus is on a specific point in time: the moment the vacancy arises. A First Assistant's eligibility for automatic succession under (a)(1) turns solely on whether they occupied that position when the vacancy arose, not on how long they had served before that moment, or any other retrospective criteria.

Third, the Government asserts that the catchall phrase following "dies" and "resigns" — "is otherwise unable to perform the functions and duties of the office" — necessitates an ongoing state, rather than an instantaneous trigger. But to discern the phrase's meaning, "[t]wo general principles are relevant." *Fischer v. United States*, 603 U.S. 480, 487 (2024). First, a term is "given more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294 (2008). Second, and more specifically, "a general or collective term at the end of a list of specific items is typically controlled and defined by reference to those specific items that precede it." *Fischer*, 603 U.S. at 481.

While the isolated phrase "is otherwise unable to perform" could hypothetically describe an ongoing state rather than a discrete instant, settled principles of statutory construction tell us to read a "general or collective term at the end of a list of specific items in light of any common attributes shared by the specific items." *Bissonnette v. LePage Bakeries Park St., LLC*, 601 U.S. 246, 252 (2024) (internal quotation marks omitted). The shared attribute of the two terms, "dies" and "resigns," is that they describe instantaneous events that create a vacancy. Read consistently with that shared attribute, the phrase "is otherwise unable to perform" constitutes a singular moment in time—the onset of the incapacity that triggered the vacancy. Even though the resulting incapacity, which follows the instantaneous event, may continue into the future, the statute's triggering mechanism looks to the initial onset of the vacancy rather than to the ongoing state that follows.

Any contrary reading of the catchall phrase "is otherwise unable to perform" would destroy the statute's careful enumeration. If that phrase authorized continuous, open-ended substitution untethered to a fixed triggering instant, Congress would have had no reason separately to list "dies" and "resigns" as distinct triggers in the first place. Construing the catchall phrase to reach beyond the moment of onset would therefore "render[] meaningless the specific text that accompanies" it. *Fischer*, 603 U.S. at 487.

Finally, the Government further contends that (a)(1) necessarily refers to an ongoing state of vacancy, rather than to its onset, because the same conditional clause—"dies, resigns, or is otherwise unable to perform the functions and duties

of the office"—also governs (a)(2) and (a)(3), the discretionary categories available to the President after a vacancy has occurred. This, too, misapprehends the statute. Across all three provisions, the triggering event—the "if"—is the same: the onset of the vacancy. What differs is the consequence—the "then." Under (a)(1), the First Assistant in place at the onset of the vacancy "shall" become the acting officer. "Shall" signals an automatic result occurring instantaneously with the trigger. Under (a)(2) and (a)(3), by contrast, the onset of the vacancy simply triggers the President's discretion to act, which the President "may" exercise thereafter at a time of his choosing. A single triggering event thus produces one automatic consequence and two discretionary consequences. There is nothing illogical or contradictory about that deliberate statutory scheme.

2. *Statutory History*

As discussed below, the Government relies on legislative history to ask us to read a momentous change into the alteration of a few words in 1998. But the statutory history of the FVRA, as well as the legislative history that the government marshals, "reinforce[] [our] textual analysis" and foreclose that reading. *Snyder v. United States*, 603 U.S. 1, 12 (2024). We turn first to the statutory history.

The statutory phrase designating the First Assistant who was in place automatically to become the acting officer traces its roots to the original Vacancies Act of 1868. *See* Act of July 23, 1868, ch. 227, 15 Stat. 168. Since then, materially similar language has appeared in every iteration of the law through minor rewordings. Prior to the FVRA, the Vacancies Act provided that if a PAS officer

"dies, resigns, or is sick or absent," "*his* first assistant . . . shall perform the duties of the office until a successor is appointed." 5 U.S.C. § 3345 (1997) (emphasis added). With the FVRA's enactment in 1998, "*his* first assistant" was changed to "the first assistant *to the office* of such officer." 5 U.S.C. 3345(a) (emphasis added). According to the Government, by uncoupling the First Assistant from the singular individual filling the PAS office, Congress intended to remove the incumbency requirement so that the First Assistant "to the office" may become the acting official at any point during the vacancy.

Rather than freighting the modest change in a few words with the enormous significance the Government claims, Congress was doing something far more mundane: continuing its longstanding practice of modernizing and clarifying statutes through slight rephrasing. Indeed, there are at least two simple explanations for the change.

First, the change removed the male-default pronoun to reflect a plain reality: by 1998, women routinely held senior-level, Senate-confirmed offices throughout the Executive branch. During the first year of the presidential administration under which the FVRA was passed, for example, women filled roughly a third of these positions. *See Who Are the Women of the U.S.: Equality*, President's Interagency Council on Women, https://perma.cc/8U5K-NB8M. Read against that backdrop, Congress's replacement of the male-centric language with a gender-neutral formulation was unremarkable.

Second, the change reflected a standardization throughout the statutory provision to focus on the *office* rather than the individual *officeholder*. In the modern

statute, § 3345 speaks in office-centric terms throughout. The triggering provision applies to an officer who can no longer "perform the functions and duties *of the office*." 5 U.S.C. § 3345(a) (emphasis added). Paragraph (a)(2) reaches "a person who serves *in an office* for which appointment is required." *Id.* § 3345(a)(2) (emphasis added). And (c)(2) provides that the "expiration of a term *of office* is an inability to perform the functions and duties *of such office*." *Id.* § 3345(c)(2) (emphasis added). In rewriting the Vacancies Act, Congress merely conformed (a)(1) to the office-centric language running through the entirety of the section.

Congress "does not alter the fundamental details of a [statutory] scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Had Congress meant to abolish the longstanding incumbency requirement in (a)(1), it would have done so far more clearly in the written text.

*3. Legislative History*

Because the FVRA's "text and context suffice to identify Congress's intent," we need not "consider its legislative history." *Schneiderman v. Am. Chem. Soc'y*, 172 F.4th 158, 182 (2d Cir. 2026). Nevertheless, we turn to it here because the Government relies on it. We find, instead, that the legislative history validates what the text and structure of the FVRA already provide and runs exactly contrary to the Government's reading.

As originally introduced in the Senate, the FVRA bill contained two relevant differences from what ultimately became law. First, rather than saying "first assistant to the office of such officer," the original bill instead said "first assistant

*of such officer*." S. Rep. No. 105-250, at 25 (1998) (emphasis added). Second, that earlier version drew from a much narrower pool of individuals who could become the acting officer: only the First Assistant under (a)(1), or someone already serving in another Senate-confirmed position under (a)(2), could serve. *Id.* It contained no counterpart to (a)(3)'s qualified-agency-staff provision.

Senator Lieberman objected to the earlier version of the bill. He warned that "the universe of individuals who may serve as acting" was too "severe" in its limitations and "could be harmful to the functioning of the executive branch." 144 Cong. Rec. S11037 (daily ed. Sept. 28, 1998). "Because individuals holding Senate-confirmed positions already have a lot to do," Lieberman predicted, "it almost always will be the first assistant who takes over as the acting." *Id.* And as he understood the meaning of (a)(1), "a first assistant apparently can take over only if he or she was the first assistant *at the time of the vacancy*." *Id.* (emphasis added).

The version of the bill that ultimately won Senator Lieberman's approval and became law contained two relevant changes. First, in (a)(1), "first assistant of such officer" became "first assistant to the office of such officer." Second, (a)(3) was added, which expanded the pool of eligible acting officers to include senior agency staff.

The Government asserts that the change in (a)(1)'s language deliberately removed an incumbency requirement in response to Lieberman's concerns that the FVRA's criteria were too severe. But Lieberman's own statements refute that account: it was the addition of (a)(3), not the tweak in (a)(1), that changed his mind. He explained, "the final version of the bill resolves one of my biggest concerns—

that we not define who may serve as an acting official in a manner that, in some cases, effectively precludes anyone from serving in an acting capacity." 144 Cong. Rec. S12861 (daily ed. Oct. 21, 1998). Significantly, Lieberman explained that the final bill resolved this problem "by offering the President the option to choose any senior agency staff who has worked at the agency for at least 90 days to serve as the acting official." *Id.*

Lieberman thus attributed his change of heart entirely to (a)(3), saying nothing to suggest that (a)(1)'s incumbency requirement had been removed. Indeed, that Lieberman originally understood (a)(1) to require incumbency and said nothing about the issue when announcing his support for the bill *reinforces* our reading of the statutory text that nothing substantively changed in (a)(1) through its amended language.

The Government's account is further belied by the remainder of the legislative history. The FVRA's overriding purpose was to *limit* the Executive's overuse of temporary appointments and to protect the Senate's role in the appointment of Executive officers. As the Senate Report for the first version of the FVRA bill explained, "[i]f the Constitution's separation of powers is to be maintained, . . . legislation to address the deficiencies in the operation of the current Vacancies Act is necessary," because "the Senate's confirmation power is being undermined as never before." S. Rep. No. 105-250, at 5 (1998). Congress would not have drained the FVRA of force through a minor rewording of (a)(1) while declaring its purpose to be the opposite. And when it comes to legislative history, "the authoritative source for finding the Legislature's intent lies in the

Committee Reports on the bill" rather than "the passing comments of one Member," on which the Government relies. *Garcia v. United States*, 469 U.S. 70, 76 (1984) (citations omitted).

In any event, to the extent that individual Senators' comments do cast light on a statutory scheme, they expressed the same sentiment as the Senate Report. When introducing the bill, Senator Thompson explained that "legislation is needed to preserve one of the Senate's most important powers: the duty to advise and consent on presidential nominees." 144 Cong. Rec. S6413 (daily ed. June 16, 1998). Senator Lieberman agreed, saying that the bill "addresse[d] an enormously important issue: the need to protect the Senate's constitutional role in the appointment of Federal officers." 144 Cong. Rec. S12861 (daily ed. Oct. 21, 1998). Legislation was necessary, Lieberman explained, because "[u]nfortunately, in too many cases, over the course of the past several Administrations, the Senate's constitutional prerogatives have been ignored, through the Executive's far too common practice of appointing acting officials to serve lengthy periods in positions that are supposed to be filled with individuals confirmed by the Senate." *Id.*

The Government's view—that the FVRA *expanded* the President's discretion to install acting officials under (a)(1) compared with its predecessor—thus runs directly counter to the problem Congress understood itself to be solving.

*4. Executive Practice*

Finally, the Government cites "a quarter-century of Executive Branch practice of having agency heads appoint first assistants after a vacancy arises."

Respondent-Appellant's Reply Br. 14. It is true that, since the FVRA's enactment, there have been numerous examples of this practice. *See id.* at 14-16 & n.3 (listing examples). But an executive practice that has gone unchallenged for some time "'does not, by itself, create power.'" *Medellín v. Texas*, 552 U.S. 491, 532 (2008) (quoting *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981)). That is especially so where, as here, the Executive has a documented history of overstepping the bounds Congress proscribed. *See* S. Rep. No. 105-250, at 5 (1998) ("[T]he Senate's confirmation power is being undermined as never before."). Indeed, the FVRA's very purpose was to restore the Senate's Advice-and-Consent power against the Executive's contravention of the Vacancies Act and the Appointments Clause. *See SW Gen.*, 580 U.S. at 295. That the Executive branch has pushed the limits of the FVRA since its enactment proves only that the original mischief the statute was enacted to curtail persisted, not that Congress blessed it.[2]

The Government warns on policy grounds that our reading would unduly burden the Executive branch during transitions between presidential administrations, when agency heads often appoint First Assistants after a vacancy

---

[2] Significantly, the Executive practice of designating post-vacancy First Assistants to become acting officers did not immediately follow the change of words in (a)(1) that the Government principally relies on. For several years following the FVRA's enactment, the official position of the Department of Justice's Office of Legal Counsel was that "you must be the first assistant when the vacancy occurs" in order to become the acting officer. *Guidance on Application of Fed. Vacancies Reform Act of 1998*, 23 Op. O.L.C. 60, 64 (1999). None of the Government's examples date to this post-enactment period. Rather, it was not until 2001 when the Office of Legal Counsel curiously *reversed* its position on the incumbency requirement that the Executive began a practice of post-vacancy appointments. *See Designation of Acting Assoc. Att'y Gen.*, 25 Op. O.L.C. 177 (2001).

arises. But we do not "avoid the plain meaning of a statute by construction" simply "because we think as written it begets hard . . . consequences." *Helvering v. New York Tr. Co.*, 292 U.S. 455, 470 (1934) (internal quotation marks omitted). Balancing Executive flexibility against Senate input is Congress's prerogative under the Appointments Clause—not ours. And by making (a)(2) and (a)(3) available during transitions, Congress gave the Executive precisely the degree of flexibility it deemed appropriate.

* * *

Text, structure, and history all point the same way. We hold that only the First Assistant in place when a vacancy arises may become the acting officer under § 3345(a)(1). Sarcone was not; he was designated FAUSA after the vacancy arose. He therefore was not lawfully serving as Acting U.S. Attorney when he obtained the subpoenas directed at NYOAG.

**C. Sarcone's Authority as FAUSA and Special Attorney**

The Government asserts in the alternative that, even if Sarcone was not properly serving as Acting U.S. Attorney, he nevertheless had authority to obtain the subpoenas through the Attorney General's delegation of authority to him as Special Attorney and FAUSA.

The Attorney General is the "head of the Department of Justice" and is vested with nearly "[a]ll functions" of the agency." 28 U.S.C. §§ 503, 509. She may "conduct any kind of legal proceeding, civil or criminal, . . . which United States attorneys are authorized by law to conduct." *Id.* § 515(a). She also has authority to "supervise all litigation" on behalf of the United States, and to "direct all United

States attorneys, assistant United States attorneys, and special attorneys" in carrying out their duties. *Id.* § 519. Beyond these direct powers, the Attorney General also may delegate broadly. She may appoint special attorneys and may delegate "any function of the Attorney General" to "any other officer, employee, or agency of the Department of Justice." *Id.* §§ 515, 510. And she may "specifically direct[]" any "attorney specially appointed by" her to "conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings . . . , which United States attorneys are authorized by law to conduct." *Id.* § 515(a).

Like the Attorney General, many agency heads possess general delegatory authority. But the FVRA's exclusivity provision forecloses using that authority to circumvent its requirements. It specifies that "Sections 3345 and 3346 are the exclusive means for temporarily authorizing an acting official to perform the functions and duties of" a PAS office, unless a different statute "expressly" authorizes another designation method or the President makes a recess appointment. 5 U.S.C. § 3347(a). A statute "providing general authority . . . to delegate duties" does not qualify as such an exception and thus cannot bypass the FVRA's terms. *Id.* § 3347(b).

The exclusivity provision's controlling principle is that, without an independent provision expressly providing otherwise, §§ 3345 and 3346 are the sole means by which someone can serve as an acting officer. The statute dictates that whether someone is impermissibly serving as an acting officer turns on function, not form. Section 3345 defines an acting officer not by whether an individual claims that label but by whether he performs "the functions and duties

of the" vacant "office." *Id.* § 3345(a)(1)-(3). Under that functional conception of acting officers, the dispositive inquiry is whether a delegation is so comprehensive that an individual functionally occupies the vacant PAS office by performing its duties, thereby serving as the *de facto* acting officer.

A straightforward application of the FVRA's exclusivity provision bars Sarcone's wholesale delegation. He was granted complete authority to "conduct in the Northern District of New York, any kind of legal proceedings, civil or criminal, including Grand Jury proceedings and proceedings before United States Magistrates, which United States Attorneys are authorized to conduct." App'x 2072. The delegation was made under the Attorney General's general delegation authority, §§ 510, 515, and it was exhaustive of the PAS office's functions and duties.

To be clear, we have no occasion today to delineate when a partial delegation becomes an impermissible one. The delegation in the instant case presents no such difficulty: the sweeping delegation given to Sarcone of all the duties of the U.S. Attorney for the Northern District left him indistinguishable from an *acting officer*. To install someone in a vacant office through a general delegation authority that § 3347(b) expressly forbids, is to install an acting officer by another name. The FVRA forbids it.

The Government asserts that the exclusivity provision applies only to "designating an 'acting official' to perform all the functions and duties of an office, not the means of delegating some or all the office's delegable duties to a non-acting official." Respondent-Appellant's Br. 45. On that view, the delegation to Sarcone

assertedly complied with the FVRA on two counts. First, Sarcone received no non-delegable functions, the Government having identified no such functions of U.S. Attorneys. And second, the delegation designated Sarcone as Special Attorney and FAUSA, not as Acting U.S. Attorney—a purely nominal designation, which § 3345(a) rejects.

The Government's reading of the exclusivity provision would, however, render the FVRA a dead letter. Under that reading, whenever the Executive wished to fill a vacancy free of the FVRA's limits, all the Executive would need to do would be to delegate all the powers of the vacant office to that handpicked individual without calling him the "acting" officer. For U.S. Attorneys, that means the Attorney General could install any attorney to serve as the Acting U.S. Attorney, regardless of whether that person has been confirmed by the Senate for another office or possessed any agency experience.

Additionally, that functional Acting U.S. Attorney could serve *indefinitely*. He could serve for the entirety of a presidential term—or longer—without the Senate ever having the opportunity to confirm him, and this could occur despite the FVRA's specific 210-day limit on such unconfirmed U.S. Attorneys.

Beyond evading the FVRA's eligibility requirements and time limits, the Government's reading would allow the Executive to bypass the Appointments Clause's requirement of Senate confirmation altogether whenever a PAS office's duties are wholly delegable. Such a reading that permits the Executive to evade both Congress's requirements in the FVRA and the Constitution's mandate that PAS officers be Senate-confirmed cannot be correct. Limitless and indefinite

discretion was precisely what the Appointments Clause was designed to check and what the FVRA sought to curtail. *See SW Gen.*, 580 U.S. at 313 & n.1 (Thomas, *J.*, concurring).

The Government's reading fares no better as a matter of text. Section 3347 draws no line between delegable and non-delegable duties. It bars, in general terms, using general delegation power to authorize an official to "perform the functions and duties of" a PAS office, regardless of whether any particular duty is delegable. 5 U.S.C. § 3347(a). And we may not read into the statute a distinction that its plain text does not contain. *See United States v. Helm*, 58 F.4th 75, 90 (2d Cir. 2023) ("When the statutory text is plain and unambiguous, our sole function is to enforce it according to its terms." (quoting *United States v. Bedi*, 15 F.4th 222, 226 (2d Cir. 2021)).

The Government contends, however, that this Court and others have "concluded that the FVRA does not invalidate the exercise of delegable functions and duties of a vacant office," and thus that the delegation to Sarcone was permissible. Respondent-Appellant's Br. 49. None of the cases it cites supports the Government's position here.

The Government principally relies on the Federal Circuit's decision in *Arthrex, Inc. v. Smith & Nephew, Inc.*, 35 F.4th 1328 (Fed. Cir. 2022). In that case, Arthrex challenged an action the Commissioner for Patents took when he exercised all the "non-exclusive functions and duties of" the Director of the Patent and Trademark Office—a then-vacant PAS position. *Id.* at 1332. Arthrex argued that § 3347 barred the Commissioner from doing so, but the Federal Circuit

disagreed, holding that "[t]he plain language of the statute limits the scope of the FVRA to non-delegable functions and duties." *Id.* at 1338.

We decline to adopt *Arthrex*'s reasoning insofar as it limits the scope of § 3347 to only non-delegable duties because it goes beyond what the statute provides. In concluding that the FVRA was so limited, *Arthrex* relied on the definition of "function or duty" in § 3348, which defines the term as one that must "be performed by the applicable officer (*and only that officer*)." 5 U.S.C. § 3348(a) (emphasis added). That definition may well distinguish between delegable and non-delegable functions, and on that basis the court reasoned that § 3347's reference to "functions and duties" was equally cabined. But transposing § 3348's definition to other sections of the statute is plainly improper. Section 3348 expressly states that its definition applies only "[*i*]*n this section*," *id.* (emphasis added), supplying no general definition governing the statute as a whole. That definition thus has no bearing on the meaning of § 3347's exclusivity terms—or any other part of the FVRA.

The Government's remaining cases are inapplicable because they expressly concern the scope of § 3348 rather than § 3347. *See Schaghticoke Tribal Nation v. Kempthorne*, 587 F.3d 132, 135 (2d Cir. 2009) (per curiam) (interpreting § 3348); *Stand Up for California! v. U.S. Dep't of the Interior*, 994 F.3d 616, 622 (D.C. Cir. 2021) (same); *Kajmowicz v. Whitaker*, 42 F.4th 138, 148 (3d Cir. 2022) (same); *Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. U.S. Dep't of Homeland Sec.*, 107 F.4th 1064,

1073-74 (9th Cir. 2024) (same). They also involve limited delegations totally different from the complete delegation of a PAS office's duties before us here.[3]

Thus, while these cases confirm that non-acting officials may take on *some* delegable functions of a vacant PAS office—a proposition no party disputes—none of them supports the complete delegation of *all* of a PAS office's duties to a single individual as has occurred in the case before us. That distinction is decisive because it goes to the exclusivity provision's determinative inquiry: whether a person's delegation is so comprehensive that he functionally occupies the vacant PAS office as the *de facto* acting officer.

The Government warns that our position would "end the common practice . . . of having principal deputies or other individuals perform the delegable powers of a vacant PAS office in a non-acting capacity," which "would significantly upend the ordinary functions of the government." Respondent-Appellant's Br. 43. That misstates our holding completely. We reaffirm that agency heads remain free to delegate a vast universe of delegable functions that reside in vacant PAS offices. We hold only that the FVRA is violated when, as happened here, a delegation is so comprehensive that its recipient functionally occupies the vacant office.

---

[3] In *Schaghticoke*, for example, we upheld a limited delegation of the power to recognize an Indian tribe. *See* 587 F.3d at 135 ("[T]he Secretary of Interior delegated . . . the Indian acknowledgment duties of the Assistant Secretary—Indian Affairs."). And in *Stand Up for California!*, the D.C. Circuit reviewed only the "redelegation of final decisionmaking authority" over the acquisition of land in trust for an Indian tribe. *See* 994 F.3d at 621; *see also Kajmowicz*, 42 F.4th at 146 n.2 (reviewing a delegation of rulemaking authority under a specific statute, not for an entire PAS office).

Because the general delegation to Sarcone of all the duties of the U.S. Attorney functionally made him the acting officer in all but name, we hold under the FVRA's exclusivity provision that Sarcone lacked authority to obtain the subpoenas based on that delegation.

**D. The District Court's Decision to Quash the Subpoenas and Disqualify Sarcone**

*1. Motion to Quash*[4]

The district court did not abuse its discretion in quashing the subpoenas. Federal Rule of Criminal Procedure 17 permits a district court to quash a subpoena "if compliance would be unreasonable or oppressive," including where a subpoena reflects an "abuse of the grand jury process." *In re Grand Jury Subpoena Duces Tecum Dated Jan. 2, 1985 (Simels)*, 767 F.2d 26, 30 (2d Cir. 1985). A subpoena obtained by a prosecutor lacking lawful authority is the product of an abuse of the grand jury process, and compliance with it would be unreasonable and oppressive.

This conclusion follows from the well-established principle that the proper remedy for a "Government actor's exercise of power that the actor did not lawfully possess" is invalidation of the *ultra vires* action. *Collins v. Yellen*, 594 U.S. 220, 258 (2021); *see also Lucia v. SEC*, 585 U.S. 237, 251 (2018) (invalidating executive action taken in violation of the Appointments Clause). And the Government

[4] As noted above in Section III.A, although the quashed subpoenas are no longer enforceable, the issue of whether they were properly quashed is not moot because it is capable of repetition, yet evading review. *See In re Grand Jury Proceedings*, 971 F.3d at 53-54.

acknowledges that a "grand jury subpoena may be invalidated where the person who requested the subpoena lacks *any* authority to request the subpoenas from the grand jury." Respondent-Appellant's Br. 58 n.20; *see also In re Grand Jury Investigation*, 916 F.3d 1047 (D.C. Cir. 2019) (reviewing a motion to quash grand jury subpoenas on the ground that the issuing attorney lacked lawful authority to obtain them).

Because, as held above, Sarcone was not properly serving as the Acting U.S. Attorney under the FVRA, he lacked any lawful authority to obtain the grand jury subpoenas. And as we have further held, Sarcone also lacked authority as a delegee of all the duties of the U.S. Attorney's office.[5]

Indeed, and significantly in the instant case, Sarcone never invoked his supposed authority as a delegee. When Sarcone obtained the subpoenas, he identified himself solely as the Acting U.S. Attorney. He requested the subpoenas, signed cover letters, and directed delivery of responsive documents all under that title. *See* App'x 68-73. He did the same throughout the investigations, not once invoking his other titles. App'x 2242. Even had the delegation been valid, the subpoenas were obtained on the erroneous premise that Sarcone was the Acting

---

[5] It is also uncertain whether such a broad delegation is permissible under § 515, let alone the FVRA. In a different case with related facts, the Government admitted that "it was not aware of any case dealing with such a delegation [under § 515] that was coextensive with the authority of a statutorily created PAS office." *United States v. Naviwala*, 825 F. Supp. 3d 451, 516 (D.N.J. 2026) (internal quotation marks omitted); *see also In re Persico*, 522 F.2d 41 (2d Cir. 1975) (upholding a limited delegation of authority over grand jury inquiries but nothing more).

U.S. Attorney, not in his Special Attorney or FAUSA capacities that the Government now invokes.

Sarcone's hypothetical ability to obtain the subpoenas under different circumstances does not permit us to uphold them on the facts before us. In a different world, the Attorney General might have granted or might still grant Sarcone or someone like him a narrow delegation to conduct the specific investigations involved in this case, rather than entrust him with all the duties of the U.S. Attorney's office. Such a delegee might then have obtained or might still obtain the subpoenas in his capacity as Special Attorney and FAUSA. Such a delegation might well be permissible under the FVRA. But we cannot uphold an improperly requested subpoena because it could have been properly issued some other way. *See In re Grand Jury Proceeding (Oberlander)*, 971 F.3d 40, 50 (2d Cir. 2020) (refusing to enforce a subpoena unlawfully sought from a grand jury whose term had expired, even though another grand jury could have obtained the same information). The district court therefore properly quashed the subpoenas.

2. *Disqualification*

In addition to quashing the grand jury subpoenas, the district court "disqualified [Sarcone] from any further involvement in prosecuting or supervising" the underlying investigations. *In re Grand Jury Subpoenas*, 814 F. Supp. 3d at 300. In doing so, it observed that "[r]recent U.S. Attorney appointment opinions have adopted similar remedies." *Id.* (citing *United States v. Giraud*, 160 F.4th 390 (3d Cir. 2025); *United States v. Garcia*, No. 2:25-CR-00227, 2025 WL 2784640 (D. Nev. Sept. 30, 2025)). Noting that "courts often set aside actions taken

under unlawful appointments and require new proceedings before properly appointed officials," the court reasoned that "[t]he same principles" required Sarcone's disqualification from the investigations at issue. *Id.* (citing *Lucia*, 585 U.S. at 251-52; *Ryder v. United States*, 515 U.S. 177, 187-88 (1995); *Flinton v. Comm'r of Soc. Sec.*, 143 F.4th 90, 99 (2d Cir. 2025)). Because the government did not sufficiently address this issue on appeal, we treat the issue as forfeited and affirm the disqualification.

We have held that when a party fails to argue sufficiently an issue in its briefs, the issue is considered forfeited "and normally will not be addressed on appeal." *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998); *Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001). "Merely mentioning the relevant issue" is not enough "properly [to] present [the] issue on appeal." *Gross v. Rell*, 585 F3d 72, 95 (2d Cir. 2009).[6] Accordingly, we affirm the district court's disqualification of Sarcone from further involvement in the investigations at issue.

**IV. Conclusion**

We hold that Sarcone was not lawfully serving as Acting U.S. Attorney for the Northern District of New York under the FVRA, and that the delegation to him of all the duties of that office as Special Attorney and FAUSA was an unlawful circumvention of the FVRA's exclusivity provision. Because Sarcone thus lacked

---

[6] The government addresses the issue of disqualification briefly in passing. But these "conclusory" sentences are insufficient to overcome forfeiture, *see Zhang v. Gonzales*, 426 F.3d 540, 545 n.7 (2d Cir. 2005), and fall far short of meeting the demanding abuse of discretion standard for reversing the district court's disqualification, *see Jones*, 381 F.3d at 119; *Badalamenti*, 794 F.2d at 828.

any lawful authority to obtain the subpoenas, the district court properly quashed them. And because the government failed to address the issue of disqualification, we treat the issue as forfeited and decline to hold that the district court abused its discretion in disqualifying Sarcone from future involvement in the underlying investigations.

We have considered the Government's remaining arguments and conclude that they are without merit. We therefore **AFFIRM** the judgment of the district court.

PARK, *Circuit Judge*, dissenting:

The office of the U.S. Attorney for the Northern District of New York (N.D.N.Y.) became vacant when Carla Freedman resigned in February 2025. Five months later, the Attorney General appointed John A. Sarcone III as First Assistant U.S. Attorney ("FAUSA") for N.D.N.Y. The Federal Vacancies Reform Act ("FVRA") states that if a U.S. Attorney resigns, "the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity." 5 U.S.C. § 3345(a)(1). This makes clear that Sarcone became Acting U.S. Attorney when he was appointed as FAUSA. Nonetheless, the Attorney General took a belt-and-suspenders approach and also appointed Sarcone as Special Attorney with all powers of U.S. Attorneys under 28 U.S.C. § 515. So Sarcone had the authority to issue subpoenas both as Acting U.S. Attorney and as Special Attorney.

The majority misreads § 3345(a)(1) to apply only to the person serving as FAUSA at the moment the vacancy first arose. But the FVRA contains no such limitation to a specific person or point in time. And the majority's arguments based on statutory structure are actually policy arguments that overlook Congress's understanding that the executive branch must function during periods of transition and political stalemate. Finally, the majority concludes that Sarcone's appointment as Special Attorney violated the FVRA's exclusivity provision. But 5 U.S.C. § 3347 does not prohibit agency heads from delegating certain powers of an office to a non-acting official.

I respectfully dissent.

# I

## A

Article II of the Constitution requires the President to obtain "the Advice and Consent of the Senate" before appointing "Officers of the United States." U.S. Const. art. II § 2, cl. 2. "Given this provision, the responsibilities of an office requiring Presidential appointment and Senate confirmation—known as a 'PAS' office—may go unperformed if a vacancy arises and the President and Senate cannot promptly agree on a replacement." *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 292 (2017). As a result, Congress has authorized the President to appoint acting officers of PAS offices since President Washington's first term.

Congress has expanded this authority over time as the executive branch has grown and confirmation timelines have lengthened. The first Vacancies Act of 1792 authorized the President to fill vacancies only in the Departments of War, Treasury, and State,[1] but in 1868, Congress broadened the authority to appoint acting officers of almost all executive offices.[2] And, by 1988, Congress lengthened the 1868 Act's term limit for acting officers from 10 to 120 days.[3]

In the 1970s, a dispute arose between the Department of Justice ("DOJ") and the Comptroller General about whether limitations on acting officers in the Vacancies Act of 1868 applied to the DOJ. The DOJ argued that the Attorney General had independent statutory

---

[1] Act of May 8, 1792, ch. 37, § 8, 1 Stat. 281.

[2] Act of July 23, 1868, ch. 227, 15 Stat. 168.

[3] *Id.*; Act of Feb. 6, 1891, ch. 113, 26 Stat. 733; Presidential Transitions Effectiveness Act, Pub. L. No. 100-398, § 7, 102 Stat. 985, 988 (1988).

authority to fill vacant offices, and it pointed to 28 U.S.C. §§ 509-510, which permit the Attorney General to exercise the duties of vacant offices and to delegate those duties to others. *See SW Gen.*, 580 U.S. at 294. Then in 1998, the Attorney General relied on her delegation authority—rather than the Vacancies Act—to "designate Bill Lann Lee to perform the functions and duties of and to act as Assistant Attorney General in charge of the Civil Rights Division" after the Senate had rejected Lee's appointment to that role. *Oversight of the Implementation of the Vacancies Act: Hearing Before the S. Comm. on Governmental Affairs*, 105th Cong. 102 (1998). In response, and after "intense negotiations," Congress passed the Federal Vacancies Reform Act. *See* Morton Rosenberg, Cong. Rsch. Serv., 98-892 A, *The New Vacancies Act: Congress Acts To Protect the Senate's Confirmation Prerogative* 9 (1998).

The FVRA expanded the President's authority to appoint acting officers and clarified the limits of that authority. First, like the Vacancies Act, § 3345 began with the default rule that "the first assistant to the office" of a departed officer would serve as acting officer, and it permitted the President to override that default rule by selecting any PAS officer to fill the vacancy. 5 U.S.C. § 3345(a)(1), (a)(2). Congress also added a new third channel to fill vacancies: the President could select a senior official from the office of the vacancy. *Id.* § 3345(a)(3). Second, § 3346 increased acting officers' terms from 120 to 210 days, with the option for an acting officer to serve indefinitely while a first or second nomination is pending. Third, § 3347 clarified that §§ 3345 and 3346 are "the exclusive means for temporarily authorizing an acting official to perform the functions and duties of any [PAS] office," with exceptions for recess appointments and statutes that "expressly" authorize an officer to serve "in an acting capacity." Finally, § 3348 provided that if there

was no acting officer, "the office shall remain vacant," and only the agency head could perform the office's non-delegable duties.

**B**

Intensifying partisan battles over nominations have led "[a]ll recent Presidents [to] rel[y] significantly on acting officials in Senate-confirmed roles." Nina A. Mendelson, *The Permissibility of Acting Officials: May the President Work Around Senate Confirmation?*, 72 ADMIN. L. REV. 533, 538 (2020). That is particularly true at the beginning of Presidential administrations, when the prior President's appointees often resign *en masse* and the Senate can be slow to confirm new nominees.

During the first year of President Trump's second term, the Senate was especially slow to confirm U.S. Attorneys, who oversee federal prosecutions in 94 districts across the country. Senate Minority Leader Chuck Schumer put a hold on all DOJ nominees as an act of protest.[4] As a result, the Senate did not confirm any of President Trump's U.S. Attorney nominees for nine months after his inauguration; by the end of 2025, the Senate had confirmed only 31 U.S. Attorneys, leaving many positions vacant across the country.[5]

The position of U.S. Attorney for N.D.N.Y. became vacant when Carla Freedman, the U.S. Attorney appointed by President Biden, resigned on February 17, 2025, shortly after President Trump

---

[4] *See* James Fanelli, Dave Michaels, Corinne Ramey, *A New Front in Trump's Clash with the Judiciary: Appointing Prosecutors*, WALL ST. J. (July 27, 2025).

[5] *See* Press Release, U.S. S. Comm. on the Judiciary, Senate Republicans Confirm 14 Law and Order Nominees to Deliver Safer Streets for Americans (Dec. 19, 2025), https://perma.cc/Z935-N7V2.

took office. To date, there is no Senate-confirmed U.S. Attorney for N.D.N.Y.

Since February 2025, the functions of the vacant office have been performed by different people under different statutory authorizations. First, when Freedman resigned, Daniel Hanlon, the FAUSA at the time, became Acting U.S. Attorney under the FVRA's default provision, 5 U.S.C. § 3345(a)(1). Then, on February 28, 2025, Attorney General Pamela Bondi announced that she would appoint Sarcone interim U.S. Attorney for N.D.N.Y. under 28 U.S.C. § 546, which authorizes the Attorney General to appoint interim U.S. Attorneys for 120-day terms. Sarcone's appointment as interim U.S. Attorney was effective on March 17 and ended on July 14, 2025. On that day, the district court in N.D.N.Y. could "appoint a United States attorney to serve until the vacancy is filled" under § 546(d). But the district court declined to exercise its authority under § 546(d) either to allow Sarcone to continue as acting officer or to appoint a replacement.[6] The office of U.S. Attorney thus became vacant again.

On July 14, 2025, the Attorney General appointed Sarcone "Special Attorney to the United States Attorney General" and authorized him "to conduct in the Northern District of New York, any kind of legal proceedings, civil or criminal, including Grand Jury proceedings and proceedings before United States Magistrates, which United States Attorneys are authorized to conduct." App'x at 2087, 2095. The DOJ also reassigned Hanlon from FAUSA to Deputy U.S. Attorney and designated Sarcone as FAUSA. The United States

[6] Press Release, U.S. Dist. Ct. for N.D.N.Y, United States Attorney for N.D.N.Y. (July 14, 2025), https://perma.cc/XP4Z-WB8F.

asserted that Sarcone—as FAUSA to the vacant U.S. Attorney office—became Acting U.S. Attorney under 5 U.S.C. § 3345(a)(1).

On August 5, 2025, Sarcone requested that the district court issue two grand jury subpoenas to the Office of the New York State Attorney General ("OAG"), which it duly issued. OAG moved to quash the subpoenas, which the district court granted. It concluded that Sarcone lacked authority to issue the subpoenas as Acting U.S. Attorney or as Special Attorney and disqualified him from the proceedings.

**II**

Sarcone was Acting U.S. Attorney under 5 U.S.C. § 3345(a)(1) when he issued the subpoenas, so the district court should not have quashed them or barred Sarcone from the OAG investigations.

**A**

5 U.S.C. § 3345(a)(1) states that if a PAS officer "dies, resigns, or is otherwise unable to perform the functions and duties of the office," "the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity subject to the time limitations of section 3346." This language creates a "general," "default rule" that "the first assistant to a vacant office shall become the acting officer." *SW Gen.*, 580 U.S. at 293. So anytime (1) there is a vacancy, (2) there is a first assistant, and (3) the time limit in § 3346 has not elapsed, the first assistant becomes acting officer. The application here is straightforward: (1) the office of U.S. Attorney for N.D.N.Y. was vacant, (2) Sarcone was first assistant, and

(3) the time limit in § 3346 had not elapsed,[7] so Sarcone became Acting U.S. Attorney.

This should be the end of the analysis. But the majority asserts that "only the First Assistant in place when a vacancy arises may become the acting officer under § 3345(a)(1)." *Ante* at 28. This is wrong. The FVRA is clear that any first assistant to a vacant office can become acting officer under § 3345(a)(1).

Start with the text. Subsection (a)(1) states that if a PAS officer departs, then "the first assistant *to the office* of such officer" becomes acting officer. 5 U.S.C. § 3345(a)(1) (emphasis added). The words "to the office" have meaning, "as each word in a statute should." *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 70 (2011). Without them, the statute would refer to "the first assistant . . . of such officer"—*i.e.*, the first assistant of the departed PAS officer. With them, the statute refers to a position—"first assistant *to the office* of such officer"—not a person. To this, the majority asserts that the difference in words between the two formulations does not make "the slightest difference semantically." *Ante* at 18. But a newly selected first assistant has the same relationship "to the office" that the incumbent did, even though he was not the first assistant to the departing officer. So the words "to the office" make clear that § 3345(a)(1) applies to any first assistant, not just the incumbent first assistant of the departing officer.

[7] 5 U.S.C. § 3346 states that acting officers under § 3345 can serve "for no longer than 210 days beginning on the date the vacancy occurs," subject to tolling provisions. For purposes of this appeal, it does not matter whether the 210-day clock began when Freedman resigned or when Sarcone's § 546 appointment elapsed because the subpoenas were timely issued either way.

The statutory history confirms this interpretation. The FVRA's predecessor, the Vacancies Act of 1868, stated that "[w]hen the head of an Executive agency . . . dies, resigns, or is sick or absent, *his first assistant* . . . shall perform the duties of the office." 5 U.S.C. § 3345 (1988). An early draft of the FVRA also referred to "the first assistant of such officer." S. Rep. No. 105-250, at 25 (1998). If Congress merely sought to "remove[] the male-default pronoun" as the majority implausibly suggests, *ante* at 22, this formulation would have sufficed. But Congress amended the FVRA to reference "the first assistant to the office of such officer"—not the first assistant to a specific officer. 5 U.S.C. § 3345(a)(1). "When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 189 (2020) (cleaned up). Reading "the first assistant to the office" to cover all first assistants to the office gives effect to Congress's amendment.[8]

[8] The Supreme Court has warned against "allowing ambiguous legislative history to muddy clear statutory language" in the FVRA. *SW Gen.*, 580 U.S. at 307 (quoting *Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011)). But to the extent the history is relevant, it tends to support this interpretation. As one of the FVRA's sponsors, Senator Thompson, explained: "The term 'first assistant to the office' is incorporated into 5 U.S.C. § 3345(a)(1), rather than 'first assistant to the officer.' This change is made to 'depersonalize' the first assistant." 144 Cong. Rec. S12822 (daily ed. Oct. 21, 1998). The majority agrees that this "change reflected a standardization throughout the statutory provision to focus on the *office* rather than the individual *officeholder*," but disregards this "office-centric language" by limiting § 3345(a)(1) to the first assistant of the departing officer. *Ante* at 22-23. Moreover, the phrase "to the office" was added after Senator Lieberman objected to the earlier draft as too restrictive because under its initial formulation "a first assistant apparently can take over only if he or she was the first assistant at the time of the vacancy." 144

The statutory structure supports this interpretation. Unlike subsection (a)(1), which imposes no limit on which "first assistant to the office" may become acting officer, subsection (a)(3) limits the pool of eligible senior agency officials to incumbents. Under subsection (a)(3), only officials who served "for not less than 90 days" "during the 365-day period preceding the date of death, resignation, or beginning of inability to serve" can be appointed. 5 U.S.C. § 3345(a)(3)(A). Section 3345(b)(1) imposes the same requirement on acting officers whom the President has nominated for Senate approval. The express incumbency requirements in § 3345(a)(3) and § 3345(b) thus suggest that Congress meant not to impose an incumbency requirement in § 3345(a)(1).[9]

Finally, the political branches have endorsed this understanding in opinion and practice. "[W]hile courts must exercise independent judgment in determining the meaning of statutory provisions, the contemporary and consistent views of a coordinate branch of government can provide evidence of the law's

Cong. Rec. S11037 (daily ed. Sept. 28, 1998). Lieberman did not "attribute[] his change of heart *entirely* to (a)(3)." *Ante* at 25 (emphasis added). When he endorsed the FVRA, he remarked that the original draft "contained a *number* of troubling provisions," and that the bill was revised to "address the concerns that remained." 144 Cong. Rec. S12861 (daily ed. Oct. 21, 1998) (emphasis added). That he highlighted the addition of (a)(3) as one of the changes he was "particularly pleased" about, *id.* does not support the majority's inference "that nothing substantively changed in (a)(1) through its amended language," *ante* at 25.

[9] Subsections 3345(a)(3) and (b)(1) also suggest that when Congress cared about incumbency, it considered 90 days of service in the year before the vacancy to be the relevant bar. The majority offers no explanation for its view that Congress conditioned § 3345(a)(1) on the more arbitrary question of who served as first assistant at the moment the PAS officer departed without regard to the duration of that service.

meaning." *Bondi v. VanDerStok*, 604 U.S. 458, 480-81 (2025) (cleaned up). Since 2001, the legislative and executive branches have agreed that "a person need not have been in the first assistant position before the vacancy occurs in order to serve as acting officer." Letter from Victor S. Rezendes, Managing Director, Strategic Issues, GAO, to U.S. Senator Joseph Lieberman and U.S. Representative Dan Burton (Dec. 7, 2001) ("2001 GAO Letter"); *see also Designation of Acting Associate Attorney General*, 25 Op. O.L.C. 177, 179-80 (2001) (concluding that "subsection (a)(1) applies to someone who . . . was designated as first assistant after the vacancy occurred," in part because the opposite conclusion would render the words "to the office" in § 3345(a)(1) "meaningless").[10] Based on these interpretations, the executive branch has "routinely relied on post-vacancy first assistants to serve as acting officials under the FVRA." Reply Br. at 14-15 & n.3 (listing 31 examples from the Department of Justice in the Bush, Obama, Trump, and Biden administrations).[11]

---

[10] To be sure, OLC initially "believe[d] that the better understanding is that you must be the first assistant when the vacancy occurs in order to be the acting officer by virtue of being the first assistant." *Guidance on Application of Federal Vacancies Reform Act of 1998*, 23 Op. O.L.C. 60, 63-64 (1999). But OLC offered no analysis to support that preliminary view, it reversed course two years later, and it has maintained for the past 25 years that post-vacancy first assistants may become acting officer under § 3345(a)(1).

[11] The majority discounts this historical practice as executive branch self-aggrandizement, saying it demonstrates only that "the Executive branch has pushed the limits of the FVRA since its enactment." *Ante* at 27. But the Government Accountability Office—the agency in the *legislative* branch tasked with reporting violations of the FVRA, *see* 5 U.S.C. § 3349—has reached the same conclusion, *see* 2001 GAO Letter. This cannot be dismissed as the self-interested interpretation of a single branch.

In short, the text of § 3345(a)(1), the FVRA's structure, and long-standing, bipartisan interpretations and practices all point in the same direction: any first assistant to a vacant office becomes acting officer under § 3345(a)(1). Sarcone was first assistant to the vacant office, and the § 3346 time limit had not elapsed, so he was Acting U.S. Attorney when he issued the subpoenas.

**B**

The majority reaches the opposite conclusion by making up an "incumbency requirement." *See ante* at 17-18. But § 3345(a)(1) never mentions incumbency, and courts should not "read into statutes words that aren't there." *Romag Fasteners, Inc. v. Fossil, Inc.*, 590 U.S. 212, 215 (2020). The majority's interpretation also renders § 3345(a)(1) a nullity anytime a PAS officer and first assistant resign simultaneously during presidential transitions—an odd result given that the FVRA grants more latitude to the executive during times of transition. *See* 5 U.S.C. § 3349a (extending the § 3346 time limits for vacancies arising within 60 days of a new President's inauguration).

The majority's defense of its incumbency requirement is weak. First, it misreads the text. The majority contends that the phrase "dies, resigns, or is otherwise unable to perform" refers only to the moment the PAS office becomes vacant because "[t]he first two triggers—death and resignation—are instantaneous events." *Ante* at 18. The problem with this argument is that the third trigger—"is otherwise unable to perform"—describes a continuing state, not a discrete event. So the majority's interpretation of "is otherwise unable" to refer only to "the onset of the incapacity that triggered the vacancy," *id.* at 20, reads the phrase "is otherwise unable" as "becomes otherwise unable." But Congress knows how to identify the instant a vacancy arises, rather than its continuing state.

Elsewhere in § 3345, it referred to the "beginning of inability to serve of the applicable officer." 5 U.S.C. § 3345(a)(3)(A), (b)(1)(A).[12] Moreover, the text of subsection (a)(1) confirms that it operates for the duration of the vacancy, not just its opening, because "perform[ing] the functions and duties of the office" is also a continuing state.

The majority's interpretation relies on the *ejusdem generis* canon, which reads a general term at the end of a list in light of common characteristics shared by the preceding terms. It thus treats the third cause of a vacancy (is otherwise unable to perform) as an instantaneous event matching the first two (dies or resigns). *See ante* at 19-20. But the majority gives no reason why the relevant characteristic is how the incapacity is triggered rather than how long the officer is unavailable. In any event, the third cause is different because, unlike death or resignation, it describes a state that may be continuing and may or may not be permanent. "[O]ne is either dead or alive, and in a job or out of it," *id.* at 18, but an officer who is ill one week may be better the next. The majority's attempt to read timing

---

[12] The phrase "is otherwise unable to perform" also cannot be limited to the onset of the vacancy because it sets the endpoint for acting officers who take over "temporarily" because of sickness. The time limitations in § 3346 do not apply "in the case of a vacancy caused by sickness," 5 U.S.C. § 3346(a), and nothing in § 3346 says that an acting officer's service ends once the PAS officer recovers. Instead, the triggering language supplies this limit by tying the acting officer's term to continued incapacity. Once recovered, the PAS officer "is" no longer "unable to perform," so subsection (a)(1) ceases to apply. But under the majority's interpretation, the "statute's triggering mechanism looks to the initial onset of the vacancy rather than to the ongoing state that follows," *ante* at 20, so it cannot then displace the acting officer when an inability to perform ends. Similarly, the majority agrees that when Sarcone became interim U.S. Attorney, he "replac[ed] Hanlon as the temporary head of the office," even though the time limitations in § 3346 had not expired. *Id.* at 8.

into "is otherwise unable" fails because *ejusdem generis* cannot override the plain meaning of the text. *See Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 588 (1980) ("[*E*]*jusdem generis* . . . is only an instrumentality for ascertaining the correct meaning of words when there is uncertainty." (cleaned up)); *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 227 (2008) ("[W]e do not woodenly apply limiting principles every time Congress includes a specific example along with a general phrase.").

Second, the majority's interpretation gives the same words in the same Act different meanings. The phrase "dies, resigns, or is otherwise unable to perform the functions and duties of the office," governs not only § 3345(a)(1), but also § 3345(a)(2) and (a)(3). If that phrase limited when first assistants could become acting officer under (a)(1), it would also limit when a President could select an acting officer under (a)(2) and (a)(3). But a President can select acting officers under (a)(2) and (a)(3) anytime during a vacancy. *See SW Gen.*, 580 U.S. at 309.

To be sure, (a)(1) uses the mandatory "shall" to describe the consequence of a vacancy while (a)(2) and (a)(3) use the permissive "may." *Ante* at 21. But "shall" does not have the temporal significance the majority assigns it. The same language ("dies, resigns, or is otherwise unable to perform") also appears in § 3348(b) followed by the word "shall," without imposing any time limit. *See* 5 U.S.C. § 3348(b)(1) (stating that if no acting officer is serving, and a PAS officer "dies, resigns, or is otherwise unable to perform," "the office shall remain vacant"). If the majority were correct that the word "shall" "signals an automatic result occurring instantaneously with the trigger," then § 3348(b) would be unintelligible. *Ante* at 21. An office does not "remain" vacant in an instant. The majority's conclusion—that "dies, resigns, or is otherwise unable to perform"

temporally limits subsection (a)(1) to the moment of the PAS officer's departure—does not make sense because those words do not similarly limit any of the other three provisions in which they appear.

Third, the majority relies on a non-sequitur. It jumps from the premise that the phrase "dies, resigns, or is otherwise unable to perform" limits *when* a first assistant can become acting officer to a conclusion about *which* first assistant can become acting officer—*i.e.*, only an incumbent first assistant. But a time limit is different from an incumbency requirement, so the former cannot create the latter. To illustrate this point, consider the implication of the majority's argument if Hanlon—the incumbent FAUSA when Freedman resigned—had remained FAUSA on July 14, 2025, when Sarcone's interim appointment under § 546 elapsed. If the majority were correct that § 3345(a)(1) operates only at the moment of the PAS officer's departure, then it would have operated only on February 17, when Freedman resigned, so Hanlon would not have become Acting U.S. Attorney on July 14, even though he was the incumbent FAUSA. But this would make little sense and OAG conceded at oral argument that Hanlon would become Acting U.S. Attorney in this hypothetical. Oral Arg. Tr. at 29-31. The majority's reading of the statute is thus internally inconsistent—in some places, it says the automatic-succession provision is limited to a person (the incumbent FAUSA), but elsewhere, to a point in time (when the vacancy arises).

Turning to structure, the majority argues that if the President can select someone to become first assistant, and thus acting officer under subsection (a)(1), then he can sidestep (a)(2) and (a)(3) altogether. But "[l]anguage in a statute is not rendered superfluous merely because in some contexts that language may not be pertinent." *United States v. Turkette*, 452 U.S. 576, 583 n.5 (1981). Although in this context a President could effectively select an Acting U.S. Attorney

under subsection (a)(1) by appointing the FAUSA, the FVRA applies to a wide range of PAS offices, and for others, the President must rely on (a)(2) or (a)(3) to select the acting officer. First, the first assistant to an agency head is often itself a PAS position.[13] Congress knew this was common when it passed the FVRA. *See* 5 U.S.C. § 3345(b)(2)(B) (referencing when "the office of such first assistant is an office for which appointment is required to be made by the President, by and with the advice and consent of the Senate"). For these positions, the President cannot choose the first assistant who becomes acting officer under (a)(1). Second, the President must rely on (a)(2) and (a)(3) to select an acting officer when the PAS office lacks

---

[13] *See, e.g.*, 28 U.S.C. §§ 504, 508(a) (Department of Justice); 22 U.S.C. § 2651a(a)(2) (Department of State); 31 U.S.C. § 301(c) (Department of the Treasury); 10 U.S.C. § 132 (Department of Defense); 6 U.S.C. § 113(a)(1)(A) (Department of Homeland Security); 7 U.S.C. §§ 2210, 2211 (Department of Agriculture); 49 U.S.C. § 102 (Department of Transportation); 43 U.S.C. § 1452 (Department of the Interior); 29 U.S.C. § 552 (Department of Labor); 20 U.S.C. § 3412 (Department of Education); 42 U.S.C. § 7132 (Department of Energy); 31 U.S.C. § 502(b) (Office of Management and Budget); 10 U.S.C. § 7015 (Department of the Army); 10 U.S.C. § 8015 (Department of the Navy); 10 U.S.C. § 9015 (Department of the Air Force); 42 U.S.C. § 3533 (Department of Housing and Urban Development); 22 U.S.C. § 287(b) (United Nations Representative); 51 U.S.C. § 20111(b) (National Aeronautics and Space Administration); 5 U.S.C. § 1102(b) (Office of Personnel Management); 50 U.S.C. § 3026 (Office of the Director for National Intelligence); 15 U.S.C. § 633(b)(1) (Small Business Administration); 42 U.S.C. § 902(b) (Social Security Administration).

a designated first assistant[14] and when the first assistant must be chosen by the PAS officer.[15]

So the plain-text reading of (a)(1)—that any first assistant performs the functions and duties of the vacant office—does not create superfluity. Instead, it allows the President to use (a)(1) to fill vacancies where he may freely select the first assistant but requires him to use (a)(2) or (a)(3) to fill vacancies otherwise. There is nothing "anomalous" about Congress limiting who the President can choose to be Acting Attorney General or Acting Secretary of State, but letting him select an Acting U.S. Attorney under (a)(1). *Ante* at 17.[16] So

---

[14] *See* S. Rep. No. 105-250, at 12 (explaining that "[c]ertain officers have first assistants designated by statute" and "[o]ther departments and agencies have established first assistants by regulation," but cases remain where "there is no first assistant"). After the FVRA passed, several agencies designated first assistants to their PAS offices. *E.g.*, Organization of the Department of Justice, 64 Fed. Reg. 6526 (Feb. 10, 1999); Agency Organization: Vacancy, Disability, and Absence, 64 Fed. Reg. 62122 (Nov. 16, 1999) (Department of the Treasury); Organization and Delegation of Duties, 78 Fed. Reg. 23158, 23160 (Apr. 18, 2013) (Department of Transportation).

[15] *E.g.*, 12 U.S.C. § 5491(b)(5) (Bureau of Consumer Financial Protection); 44 U.S.C. § 2103(c) (National Archives and Records Administration).

[16] The majority's charge that this interpretation would "impose essentially no limits on Executive discretion" is overblown. *Ante* at 17. The FVRA limits how long an acting official may serve under (a)(1), 5 U.S.C. §§ 3345(a)(1), 3346; it limits when a person who has been nominated for a vacant PAS office may perform the duties of that office in an acting capacity, *id.* § 3345(b)(1); and Congress has separately limited the President's ability to pick first assistants for certain offices, *see supra* at 15 & n.13. These are the limits Congress specified. During transitions, when joint resignations of PAS officers and their first assistants are commonplace, relying on subsections (a)(2) and (a)(3) might require the President to fill vacancies

even if (a)(1) sometimes renders (a)(2) and (a)(3) inapplicable, that does not justify adopting an atextual reading of (a)(1). *Cf. Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 457 (2007) ("The 'loophole,' in our judgment, is properly left for Congress to consider, and to close if it finds such action warranted.").

The majority's remaining structural arguments are grounded in policy and its conception of the statute's "internal logic" and "incentives." *Ante* at 15-16. It infers that "Congress made (a)(1) automatic precisely because it requires no fresh exercise of judgment." *Id.* at 15. That does not follow. Congress could have made subsection (a)(1) automatic simply to ensure that the duties of a PAS office do not "go unperformed if a vacancy arises and the President and Senate cannot promptly agree on a replacement." *SW Gen.*, 580 U.S. at 292. Automaticity does not support the majority's inference because (a)(1) operates automatically under either reading. The majority's view that Congress intended to remove the President's discretion to install acting officials under (a)(1) comes instead from its own view that Congress wanted "to stop the Executive from skirting the Vacancies Act." *Ante* at 16. "But no legislation pursues its purposes at all costs." *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987). And the majority's account that the FVRA was aimed to protect the Senate's constitutional role by restricting the President's ability to fill vacancies is oversimplified and self-serving. The FVRA was "a compromise measure," *SW Gen.*, 580 U.S. at 307, that

---

with holdovers from prior administrations or career officials. It makes sense that for some offices, Congress meant to give the President leeway to choose someone he trusts to serve in a temporary acting capacity. *See Trump v. Slaughter*, 609 U.S. ----, 146 S. Ct. 2283, 2310 (2026) ("To discharge the duties of his trust, the President must have the assistance of officers he can trust." (cleaned up)).

expanded the President's authority to select acting officers, including by allowing the President to select senior agency officials and by increasing acting officers' terms from 120 to 210 days. The FVRA is thus a good example of why the Supreme Court has "repeatedly" warned that "the text of a law controls over purported legislative intentions unmoored from any statutory text." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022) (collecting cases).

In sum, the FVRA's text, structure, and purpose rebut the majority's conclusion that only the incumbent first assistant when a vacancy first arises can become acting officer under 5 U.S.C. § 3345(a)(1). The better reading of the statute is that *any* first assistant to a vacant office becomes acting officer, subject only to the time limits in § 3346.

**III**

The subpoenas were also valid because Sarcone had authority to issue them as Special Attorney.

**A**

Congress has authorized the Attorney General to exercise all powers of U.S. Attorneys and to delegate those powers to others, through several reinforcing statutes. The Attorney General is the "head of the Department of Justice," 28 U.S.C. § 503, vested with virtually "[a]ll functions of other officers of the Department of Justice," *id.* § 509. She has authority to "make [appropriate] provisions . . . authorizing the performance by any other officer, employee, or agency of the Department of Justice of any function of the Attorney General." *Id.* § 510. She may "conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings . . . , which United States attorneys are authorized by law to conduct,"

and "specially appoint[]" other attorneys to conduct those proceedings. *Id.* § 515(a). She also may "direct[]" "the conduct of litigation in which the United States . . . is interested," *id.* § 516; "sen[d]" "any officer of the Department of Justice . . . to attend to the interests of the United States in a suit," *id.* § 517; and personally or by delegation "conduct and argue any case in a court of the United States in which the United States is interested," *id.* § 518(b).

These statutory authorizations are essential for the Attorney General to exercise her "broad power to enforce the criminal laws of the United States." *In re Persico*, 522 F.2d 41, 55 (2d Cir. 1975). The Attorney General has long relied on these provisions to delegate prosecutorial authority to others. *See, e.g.*, *id.* at 45 (describing the appointment of a Special Attorney to a "Strike Force" against organized crime); *see also United States v. Wrigley*, 520 F.2d 362, 370 (8th Cir. 1975) ("[U]ntil Congress imposes limitations on the power of the Attorney General, we must accept his right to authorize, absent a violation of the Constitution, special attorneys to conduct any criminal proceeding in a designated judicial district which United States Attorneys are authorized to conduct.").

Here, Attorney General Bondi relied on these statutes to appoint Sarcone as Special Attorney and to authorize him to conduct "any kind of legal proceedings, civil or criminal, including Grand Jury proceedings . . . which United States Attorneys are authorized to conduct." App'x at 2087, 2095. This delegation authorized Sarcone to issue the subpoenas.[17]

---

[17] Even if Sarcone did not become Acting U.S. Attorney, the fact that he signed the subpoenas with the title "Acting U.S. Attorney" would not undermine his authority to issue the subpoenas as Special Attorney because

**B**

The majority concludes that this delegation was invalid under the FVRA's exclusivity provision, which prohibits the Attorney General from relying on delegation statutes to appoint "an acting official." 5 U.S.C. § 3347. But this is incorrect because § 3347 does not prohibit agency heads from delegating the delegable powers of a PAS office to a non-acting official, as the Attorney General did here.

Section 3347 covers actions that "temporarily *authoriz[e] an acting official* to perform the functions and duties" of a PAS office. 5 U.S.C. § 3347(a) (emphasis added). It thus ensures that the executive must follow the FVRA when it names acting officers and conveys *all* authorities of a PAS office to them. But when the executive has delegated only the delegable authorities of the PAS office, it has not "authoriz[ed] *an acting official* to perform the functions and duties" of a PAS office under § 3347.

The structure of the FVRA supports this conclusion. Section 3348(b) states that when a PAS office is vacant, "only the head of such Executive agency may perform" the duties of the office that are "required by statute to be performed by the applicable officer," *i.e.*, non-delegable duties. *Id.* § 3348(a)(2)(A), (b). By requiring agency heads to perform a vacant office's *non-delegable* duties, § 3348(b) contemplates that non-acting officers can perform the *delegable* duties of the vacant office. The majority's assertion that this would "render the FVRA a dead letter," *ante* at 31, is wrong because the executive must still follow the FVRA to select an officer to perform the non-delegable duties of the vacant office.

---

it would not make an otherwise-valid subpoena "unreasonable or oppressive." Fed. R. Crim. P. 17(c)(2).

Interpreting § 3347 to permit delegations that do not create an acting officer is also consistent with the FVRA's history. One of the reasons Congress enacted the FVRA was to address the Attorney General's reliance on 28 U.S.C. §§ 509, 510 to appoint acting officials, as she did in "designat[ing] Bill Lann Lee to perform the functions and duties of and *to act as Assistant Attorney General in charge of the Civil Rights Division*." *Oversight of the Implementation of the Vacancies Act: Hearing Before the S. Comm. on Governmental Affairs*, 105th Cong. 102 (1998) (emphasis added).[18] Section 3347 prohibits that practice, but it does not go further to prohibit delegations of authority to non-acting officials.

Finally, other courts and the political branches have embraced this interpretation. In *Schaghticoke Tribal Nation v. Kempthorne*, 587 F.3d 132 (2d Cir. 2009), we held that the FVRA did not prohibit the Secretary of the Interior from delegating the duty of the vacant office of Assistant Secretary—Indian Affairs "to make Indian acknowledgment decisions" because that duty was not "required by statute or regulation to be performed by the Assistant Secretary." *Id.* at 135 (cleaned up). And the Federal Circuit agrees that "[t]he plain language of the statute limits the scope of the FVRA to non-delegable functions and duties." *Arthrex, Inc. v. Smith & Nephew, Inc.*, 35 F.4th 1328, 1338 (Fed. Cir. 2022).[19] The GAO and OLC also agree that the

---

[18] Although the appointment of Bill Lann Lee was controversial, DOJ had made appointments like this routinely before the FVRA. *See Oversight of the Implementation of the Vacancies Act: Hearing Before the S. Comm. on Governmental Affairs*, 105th Cong. 101-06 (1998) (Appendix I).

[19] The majority faults the Federal Circuit for using § 3348 to interpret § 3347. But when interpreting statutes, "our task is to fit, if possible, all parts into an harmonious whole." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 100 (2012) (quoting *FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 389 (1959)).

FVRA permits non-acting officers to exercise the delegable duties of a vacant PAS office. *See* Letter from Gary L. Kepplinger, General Counsel, GAO, to U.S. Senators Richard J. Durbin, Russell D. Feingold, and Edward M. Kennedy (June 13, 2008) (concluding that the FVRA did not prohibit the Principal Deputy Assistant Attorney General from performing the duties of the vacant office of Assistant Attorney General for OLC); 23 Op. O.L.C. at 72 ("[T]he Act permits non-exclusive responsibilities to be delegated to other appropriate officers and employees in the agency."). The majority's reading thus disregards the uniform interpretation of both the executive branch and the component of the legislative branch charged with monitoring FVRA compliance. *See supra* at 10 & n.11. And the Senate Report for the bill confirms that Congress understood that the "[d]elegable functions of the [vacant] office could still be performed by other officers or employees" under the FVRA. S. Rep. No. 105-250, at 18; *see ante* at 25-26 (noting that "the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill" (quoting *Garcia v. United States*, 469 U.S. 70, 76 (1984)).

The FVRA's text, structure, and history, and the practices and interpretations of the political branches all support the government's understanding that § 3347 permits non-acting officers to exercise the delegable duties of a vacant office. Section 3347 thus permitted the Attorney General to appoint Sarcone Special Attorney and to delegate to him the powers of U.S. Attorneys.

---

By interpreting § 3347 to prohibit delegations that § 3348 contemplates, the majority needlessly reads discord into a coherent scheme.

**C**

The majority misreads § 3347 to prohibit the Attorney General from installing a "de facto" Acting U.S. Attorney through delegations, which is how it describes Sarcone's appointment.

There are two problems with this interpretation. First, its premise—that comprehensive delegations are equivalent to acting officer appointments—is mistaken. An acting officer is different from a delegee. Unlike acting officers, delegees cannot exercise non-delegable duties and are limited by the scope of their delegation. That difference remains even when the executive purports to delegate all authorities of a PAS office because unlike an acting officer, a delegee's actions may be subject to factual or legal challenge.[20] And for PAS offices with non-delegable authorities, *see* 5 U.S.C. § 3348(a)(2) (referencing such offices), the recipient of a broad delegation necessarily has less authority than an acting officer, so a broad delegation is not the same as an acting officer appointment.

Second, the majority's interpretation is atextual. The FVRA does not use the words "de facto" acting officer. Although the majority says the inquiry is "whether a person's delegation is so comprehensive that he functionally occupies the vacant PAS office," it fails to explain what that means. *Ante* at 34. Would Sarcone be "de facto" Acting U.S. Attorney if he had all delegated powers of U.S. Attorneys, but did not lead the office as FAUSA? What if he were given the same delegation, but a handful of cases were carved out

[20] Sarcone has faced precisely these challenges. *See Matter of Ord. to Authorize Disclosure of Tax Returns*, No. 25-Misc.-22, 2026 WL 63331, at *3 (N.D.N.Y. Jan. 8, 2026) (concluding that Sarcone could not be delegated the power to authorize an application for the Internal Revenue Service to disclose tax return information under 26 U.S.C. § 6103(i)).

from it? The majority's substitution of the statutory language with its own "de facto" officer test is ungrounded and unhelpful.

**IV**

Mr. Sarcone had the authority to subpoena OAG both as Acting U.S. Attorney under 5 U.S.C. § 3345(a)(1) and also as Special Attorney. By concluding otherwise, the majority imposes new limits on executive authority, upsetting the balance that Congress struck in the FVRA. I respectfully dissent.